# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

STATE OF LOUISIANA; LOUISIANA DEPARTMENT OF EDUCATION; STATE OF MISSISSIPPI; STATE OF MONTANA; STATE OF IDAHO; RAPIDES PARISH SCHOOL BOARD,

*Plaintiffs-Appellees,*

v.

U.S. DEPARTMENT OF EDUCATION; MIGUEL CARDONA, in his official capacity as Secretary of Education; U.S. DEPARTMENT OF EDUCATION'S OFFICE FOR CIVIL RIGHTS; CATHERINE LHAMON, in her official capacity as Assistant Secretary for Civil Rights; U.S. DEPARTMENT OF JUSTICE; MERRICK B. GARLAND, in his official capacity as Attorney General of the United States, KRISTEN CLARKE, in her official capacity as Assistant Attorney General for the Civil Rights Division,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Louisiana
Case Nos. 3:24-cv-563 and 3:24-cv-567

## RESPONSE IN OPPOSITION TO MOTION FOR STAY

Julie Marie Blake
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jblake@ADFlegal.org

Jonathan A. Scruggs
ALLIANCE DEFENDING FREEDOM
15100 N. 90th St.
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@adflegal.org

John J. Bursch
Matthew S. Bowman
Natalie D. Thompson
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
mbowman@ADFlegal.org
nthompson@ADFlegal.org

*Counsel for Plaintiff-Appellee Rapides Parish School Board*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Plaintiffs-Appellees:

State of Louisiana

Louisiana Department of Education

State of Mississippi

State of Montana

State of Idaho

Rapides Parish School Board

Defendants-Appellants:

U.S. Department of Education

U.S. Department of Education, Office for Civil Rights

Miguel Cardona, in his official capacity as Secretary of Education

Catherine Lhamon, in her official capacity as Assistant Secretary of Education for Civil Rights

U.S. Department of Justice

Merrick B. Garland, in his official capacity as Attorney General of the United States

Kristen Clarke, in her official capacity as Assistant Attorney General for the Civil Rights Division, U.S. Department of Justice.

Counsel for Plaintiffs-Appellees States:

Elizabeth B. Murrill, Attorney General of Louisiana

J. Benjamin Aguinaga, Louisiana Solicitor General

Tracy Short, Assistant Chief Deputy Attorney General of Louisiana

Autumn Hamit Patterson, Special Assistant Solicitor General of Louisiana

Donal A. Daugherty, Jr., Defense of Freedom Institute for Policy Studies

Paul Zimmerman, Defense of Freedom Institute for Policy Studies

Martha A. Astor, Defense of Freedom Institute for Policy Studies

Lynn Fitch, Attorney General of Mississippi

Scott G. Stewart, Solicitor General of Mississippi

Justin L. Matheny, Deputy Solicitor General of Mississippi

Austin Knudsen, Attorney General of Montana

Christian B. Corrigan, Solicitor General of Montana

Peter Torstensen, Deputy Solicitor General of Montana

Raúl Labrador, Attorney General of Idaho

Alan Hurst, Solicitor General of Idaho

Josh Turner, Chief of Constitutional Litigation and Policy for Idaho

Counsel for Plaintiff-Appellee Rapides Parish School Board:

John J. Bursch, Alliance Defending Freedom

Natalie D. Thompson, Alliance Defending Freedom

Matthew S. Bowman, Alliance Defending Freedom

Julie Marie Blake, Alliance Defending Freedom

Michael T. Johnson, Johnson, Siebeneicher & Ingram

<u>Counsel for Defendants-Appellants</u>:

Brian M. Boynton, Principal Deputy Assistant Attorney General

Emily B. Nestler, Assistant Branch Director

Elizabeth Tulis, Trial Attorney, U.S. Department of Justice

Rebecca Kopplin, Trial Attorney, U.S. Department of Justice

Benjamin Takemoto, Trial Attorney, U.S. Department of Justice

Hannah Solomon-Strauss, Trial Attorney, U.S. Department of Justice

Pardis Gheibi, Trial Attorney, U.S. Department of Justice

Melissa N. Patterson, Attorney, U.S. Department of Justice

Stephanie R. Marcus, Attorney, U.S. Department of Justice

Jack Starcher, Attorney, U.S. Department of Justice

Steven A. Myers, Attorney, U.S. Department of Justice

David L. Peters, Attorney, U.S. Department of Justice

Lisa Brown, General Counsel, U.S. Department of Education

*/s/ Natalie D. Thompson*
Natalie D. Thompson
*Counsel for Appellee Rapides Parish School Board*

# TABLE OF CONTENTS

Certificate of Interested Persons ..............................................i

Table of Authorities.............................................................v

Introduction.....................................................................1

Background.......................................................................3

Argument.........................................................................8

I.  The Government is unlikely to succeed in proving that the
    district court's preliminary injunction is improper.........................8

    A.  Severance is not required at this preliminary stage.....................9

    B.  The Government has not shown the Rule is severable......................10

        1.  The Government has not shown that the Rule can
            stand without the challenged provisions...........................10

        2.  The Government has not shown that the stay and
            injunction below is overbroad as to certain
            applications of the challenged provisions.........................14

    C.  The Government forfeited its severance argument.........................19

II. The remaining factors favor preserving the status quo......................20

    A.  Piecemeal compliance costs are extraordinary...........................21

    B.  Piecemeal compliance would create confusion............................22

Conclusion......................................................................23

Certificate of Compliance.......................................................24

Certificate of Service..........................................................25

# TABLE OF AUTHORITIES

**Cases**

*Adams ex rel. Kasper v. School Board of St. Johns County*,
57 F.4th 791 (11th Cir. 2022)..............................................16

*Alaska Airlines, Inc. v. Brock*,
480 U.S. 678 (1987) .....................................................9–10

*Balow v. Michigan State University*,
24 F.4th 1051 (6th Cir. 2022)................................................9

*Bostock v. Clayton County*,
590 U.S. 644 (2020) ...............................................4, 16–17

*Cohen v. Brown University*,
101 F.3d 155 (1st Cir. 1996)................................................17

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*,
526 U.S. 629 (1999) ............................................................6

*DHS v. Regents of the University of California*,
591 U.S. 1 (2020) .............................................................18

*Doster v. Kendall*,
114 S. Ct. 481 (2023) .........................................................8

*Doster v. Kendall*,
54 F.4th 398 (6th Cir. 2022)..............................................8–9

*F.D.I.C. v. Mijalis*,
15 F.3d 1314 (5th Cir. 1994) ...............................................20

*Jackson v. Birmingham Board of Education*,
544 U.S. 167 (2005) ..........................................................16

*Janvey v. Alguire*,
647 F.3d 585 (5th Cir. 2011) .................................................9

*Kansas v. United States Department of Education*,
2024 WL 3273285 (D. Kan. July 2, 2024) ...................2, 14–15

*Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog,*
945 F.2d 150 (6th Cir. 1991) ..........................................................8

*Minnesota v. Mille Lacs Band of Chippewa Indians,*
526 U.S. 172 (1999) ......................................................................13

*Nebraska v. Biden,*
52 F.4th 1044 (8th Cir. 2022) ......................................................20

*Nken v. Holder,*
556 U.S. 418 (2009) ........................................................................8

*Ohio v. EPA,*
603 U.S. ---, 2024 WL 3187768 (U.S. June 27, 2024) ..............12–13

*Roe v. Department of Defense,*
947 F.3d 207 (4th Cir. 2020) ..........................................................9

*Sackett v. EPA,*
598 U.S. 651 (2023) ......................................................................18

*Tennessee v. Cardona,*
2024 WL 3019146 (E.D. Ky. June 17, 2024) ..................2, 14, 16–17

*Texas v. Cardona,*
2024 WL 2947022 (N.D. Tex. June 11, 2024) ..............................15

*Trump v. International Refugee Assistance Project,*
137 S. Ct. 2080 (2017) ....................................................................9

*United States v. Booker,*
543 U.S. 220 (2005) ......................................................................13

*United States v. Jackson,*
390 U.S. 570 (1968) ......................................................................12

*United States v. Kieffer,*
991 F.3d 630 (5th Cir. 2021) ........................................................20

*United States v. Scroggins,*
599 F.3d 433 (5th Cir. 2010) ........................................................19

*United States v. Virginia,*
　　518 U.S. 515 (1996) ...................................................................... 16

*Wages & White Lion Investments, LLC v. FDA,*
　　16 F.4th 1130 (5th Cir. 2021) ...................................................... 21

*West Virginia v. EPA,*
　　597 U.S. 697 (2022) ...................................................................... 18

*Williams v. Standard Oil Company of Louisiana,*
　　278 U.S. 235 (1929) ...................................................................... 14

## Statutes

20 U.S.C. § 1681(a) ............................................................................ 3

20 U.S.C. § 1686 ................................................................................ 3

5 U.S.C. § 705 .................................................................................... 9

Education Amendments of 1972, Pub. L. No. 92-318, title IX, § 901,
　　June 23, 1972, 86 Stat. 373 ............................................................ 3

## Other Authorities

118 Cong. Rec. 5807 (1972) (Sen. Bayh) ............................................ 3

U.S. Bureau of Labor Statistics, *A look at women's education and
　　earnings since the 1970s*, TED: The Economics Daily (Dec.
　　27, 2017) .......................................................................................... 3

Women's Sports Found., *50 Years of Title IX* (May 2022) ...................... 3

## Regulations

34 C.F.R. § 106.32(a) ........................................................................ 5

34 C.F.R. § 106.33 ........................................................................ 5, 18

34 C.F.R. § 106.34 ............................................................................ 5

34 C.R.R. § 106.41 ............................................................................ 5

Nondiscrimination on the Basis of Sex in Educ. Programs or
    Activities Receiving Fed. Fin. Assistance, 89 Fed. Reg.
    33,474 (Apr. 29, 2024) .................................... 4–6, 11–13, 16–19, 22

Nondiscrimination on the Basis of Sex, 40 Fed. Reg. 24,128
    (June 4, 1974) ...................................................................... 4

# INTRODUCTION

Fifty years ago, Congress revolutionized education by enacting Title IX to help close the gap between women and men, promising equal opportunities for both. The law has been a remarkable success. But a different sort of revolution took place two months ago. Department of Education officials published a new rule that reimagines sex discrimination to cover distinctions Congress never intended, adding concepts like gender identity and sometimes even prioritizing these concepts over sex. The result is Title IX's primary beneficiaries are denied the statute's promised benefits.

This turns Title IX upside down, exchanging a well-established, biological, and binary concept of sex for a recent, subjective, and fluid concept of identity. This usurps Congress's role, enlarges agency power, and makes Title IX incoherent. For example, under the Government's new rule, women must share showers with some men (but not share dorm rooms); and women must share restrooms and overnight accommodations with some men (but not with men who identify as male or non-binary). None of this is justified, and the change will harm many.

In 1972, "sex" meant male or female. It still does today. And the district court correctly concluded that some sex-based distinctions are permissible and even required under Title IX. The Government ignores that common-sense reading where it runs up against its preferred

gender-identity ideology, which requires ignoring biology in favor of a person's self-perceived "gender identity."

To prevent these irreparable harms, the district court issued preliminary relief preventing the rule from going into effect on August 1, 2024, and enjoining its enforcement while litigation proceeds. Two other district courts have done so too. *See Kansas v. U.S. Dep't of Educ.*, No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024); *Tennessee v. Cardona*, No. 2:24-cv-00072, 2024 WL 3019146 (E.D. Ky. June 17, 2024). The Government appealed and seeks to stay the district court's order pending review. Rather than move for a stay on the merits of the rule's key provisions, the Government seeks to limit the injunction's scope, saying it covers more than necessary to remedy the plaintiffs' injuries. But courts need not conduct a severability analysis before entering an order preserving the status quo. Nor has the Government proven the new rule can be severed. Regardless, the Government forfeited this argument below.

As for the equities, the Government seeks a piecemeal rollout of the rule, beginning August 1. That would require schools to comply with and train their teachers quickly and partially, and it would create confusion and waste resources. The district court's order instead lets schools update their policies and practices and re-train their staff just once, if at all, when this litigation ends. That's especially true when the Government has no answer for how certain provisions would apply

without the challenged provisions that comprise the rule's foundation. This morning, the *Tennessee* court denied the Government's materially identical motion to stay. *See Tennessee v. Cardona*, No. 2:24-cv-00072, Doc. 117 (E.D. Ky. July 10, 2024).

This Court should deny the Government's stay request and preserve the status quo that has existed for half a century.

## BACKGROUND

*Title IX.* Congress passed Title IX to ensure equal opportunities for women by prohibiting discrimination in education "on the basis of sex." 20 U.S.C. § 1681(a); *See* Education Amendments of 1972, Pub. L. No. 92-318, title IX, § 901, June 23, 1972, 86 Stat. 373. It has had resounding success. In 2016, just 6% of working women lacked a high-school diploma—before Title IX, it was nearly 34%.[1] In 1972, only 7% of high-school varsity athletes were women; in 2018, it was 43%.[2]

The Act achieved that success by peppering the statute with explicit references to the biological, binary categories of two sexes, including a rule of construction recognizing respect for "personal privacy." 118 Cong. Rec. 5807 (1972) (Sen. Bayh); *see* 20 U.S.C. § 1686. The implementing regulations—both mandated and implicitly approved

---

[1] U.S. Bureau of Labor Statistics, *A look at women's education and earnings since the 1970s*, TED: The Economics Daily (Dec. 27, 2017), https://tinyurl.com/mrrjr75a.

[2] Women's Sports Found., *50 Years of Title IX* at 12 (May 2022), https://perma.cc/TN74-PJ4S.

by Congress (under the so-called Javits Amendments)—that "require[]" a school "to provide separate teams for men and women in situations where the provision of only one team would not 'accommodate the interests and abilities of members of both sexes.'" Nondiscrimination on the Basis of Sex, 40 Fed. Reg. 24,128, 24,134 (June 4, 1974) (now codified at 34 C.F.R. § 106.41(c)(1)).

*The Title IX Rule.* Now, the Government has reimagined Title IX, citing *Bostock v. Clayton County*, 590 U.S. 644 (2020), as cover. Nondiscrimination on the Basis of Sex in Educ. Programs or Activities Receiving Fed. Fin. Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (the "Rule").

Start with the main change. The Rule defines sex discrimination to include distinctions based on "gender identity," "sex stereotypes," and other traits. 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10). Such distinctions violate Title IX, the Rule says, because they "necessarily" require noticing "a person's sex," even if "sex" means the "physiological or 'biological distinctions between male and female,' as the Supreme Court assumed in *Bostock*." *Id.* at 33,802. This fundamentally alters the statute.

Next, the Rule creates a new type of discrimination available only for "gender identity." It allows some sex distinctions and forbids others based on whether they cause "more than de minimis harm." *Id.* at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)). Absent an express

exemption, any policy or "practice that prevents a person from participating in" education "consistent with [their] gender identity" causes more than de minimis harm. *Id.* at 33,820. Together, § 106.10 and § 106.31(a)(2) generally forbid sex-specific distinctions unless students participate "consistent with [their] gender identity." *Id.* at 33,818. This new form of discrimination stretches beyond *Bostock* to favor gender-identity-based claims over sex-based claims.

Even worse, the Rule's exemptions from the new type of discrimination make no sense. The gender-identity proviso applies to longstanding regulations for "separate toilet, locker room, and shower facilities," 34 C.F.R. § 106.33, "[c]ontact sports in physical education classes," lessons on "[h]uman sexuality," *id.* § 106.34(a)(1), (3), and "interscholastic, intercollegiate, club or intramural athletics," *id.* § 106.41(a). That means schools must assign males to the health class covering the female reproductive system. They must allow biological males to play against girls in sports and P.E. class. Yet the Rule permits schools to limit "housing" based on biological sex—but only in dormitories, *id.* § 106.32(a), not in other bathrooms and showers, or in overnight accommodations on field trips, *id.* § 106.33.

What's more, the Rule imposes a "broader standard" for hostile-environment claims. 89 Fed. Reg. at 33,498. Harassment now need only be severe or pervasive. Complainants need not "demonstrate any particular harm," or show that the conduct denied them access to the

educational program. 89 Fed. Reg. at 33,511. Harassment can be anything the student deems "unwelcome" or that "limits" the student's ability to benefit. *Id.* at 33,884 (to be codified at 34 C.F.R. § 106.2). The Government recognizes that this standard is "broader" than the Supreme Court's interpretation of Title IX in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999). 89 Fed. Reg. at 33,498. That is unlawful in itself. Combine it with § 106.10, and § 106.2 imposes a new mandate, forcing students and school staff to avoid saying sex is binary and to endorse gender-identity ideology by using opposite-sex pronouns, among other things. This violates the First Amendment.

These are just two of many examples. The Rule's new definition of sex discrimination affects how many provisions will apply.

*Rapides Parish School Board*. The school board administers a school district comprising 40 K-12 schools and serving over 20,000 students in Rapides Parish, Louisiana. In the 2024 fiscal year, the school board received about $30 million from these and other federal funding sources. A1887. Federal funds account for around 10% of the school board's annual budget, *id.*, and losing eligibility for this funding would cause significant financial harm, *id.* ¶ 9. But to comply with the Rule's conditions would force the school board to amend many policies and procedures at significant cost—amendment and adopting new

policies and practices, for example—and spend time analyzing and discussing the Rule. *See* A535, A1887–89.

*Procedural History.* The school board filed suit challenging the Rule under the Administrative Procedure Act (APA) on April 30, 2024, and sought a delay of effective date and preliminary injunction. The case was consolidated with the related challenge filed by the States of Louisiana, Idaho, Mississippi, and Montana. The district court granted preliminary relief preventing the Rule from going into effect on August 1, 2024, and enjoining Defendants from enforcing it while this litigation proceeds. A39–40.

The Government appealed. It also moved the district court to stay its order to the extent the order reaches beyond 34 C.F.R. § 106.31(a)(2) and 34 C.F.R. § 106.2's definition of "hostile environment harassment" as applied to discrimination on the basis of gender identity. Per the Government, preliminary relief should not affect certain provisions or applications of the Rule not challenged by the plaintiffs. The parties have briefed this matter before the trial court, but no ruling has issued. On July 1, the Government moved this Court for a stay on appeal. Emergency Mot. for a Partial Stay Pending Appeal (Emergency Mot.). This Court should deny that request and preserve the status quo.

**ARGUMENT**

To determine whether to grant a stay pending appeal, this Court considers (1) likelihood of success on appeal; (2) whether the applicant will suffer irreparable injury; (3) the hardship a stay inflicts on other parties; and (4) the public interest. *Nken v. Holder*, 556 U.S. 418, 434 (2009). The Government must prove that the challenged ruling will likely be reversed. *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). It cannot meet that burden.

## I.  The Government is unlikely to succeed in proving that the district court's preliminary injunction is improper.

The Government says the injunction below is "overbroad" because the plaintiffs do not challenge every provision and possible application of the Rule. Emergency Mot. 10–20. It says most revisions "have nothing to do with gender identity," so the Rule can be severed. *Id.* at 11. But courts need not pick through new rules with a fine-tooth comb before preliminarily staying their effective date. And the Government hasn't shown the Rule is severable anyway—misapplying *Bostock* and showing only a handful of applications out of hundreds is not enough to make its case. That errant and "bare-bones argument" does not suffice. *Doster v. Kendall*, 54 F.4th 398, 442 (6th Cir. 2022), *vacated for mootness*, 114 S. Ct. 481 (2023). And in any event, the Government forfeited this argument.

**A.      Severance is not required at this preliminary stage.**

The Government says the district court should have severed the rule. Emergency Mot. 10. But severability considers whether "what is left is fully operative as a law." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987). It's a finishing tool. The Government "confuses the role of a preliminary injunction with that of a permanent one." *Doster*, 54 F.4th at 441. Preliminary injunctions seek to "preserve the status quo … until the court has a meaningful chance to resolve the case on the merits." *Id.*; *see also Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). Preservation supersedes precision at this stage.

Indeed, courts have "wide latitude" in crafting temporary relief. *Doster*, 54 F.4th at 442 (citing *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (per curiam)). This includes the freedom to give "status-quo relief" that is "broader than the ultimate relief" a party may receive. *Id.*; *accord Balow v. Mich. State Univ.*, 24 F.4th 1051, 1061 (6th Cir. 2022); *Roe v. Dep't of Def.*, 947 F.3d 207, 232–34 (4th Cir. 2020). The district court exercised its discretion in crafting relief to do so here. A36–38.

Such relief is especially apt here. It both stays a partial rollout that would confuse and impose expensive compliance costs on regulated parties, *see* § II, and respects the APA—which directs courts to delay "the effective date" of agency action when required to stop irreparable harm and "to preserve" the status quo pending review. 5 U.S.C. § 705.

Because the Rule has but one effective date and is but one agency action, its provisions stick together at this stage.

No matter whether the Rule would be severable at final judgment, the district court rightly preserved the status quo for now.

**B.    The Government has not shown the Rule is severable.**

The Government has not shown the Rule is severable anyway. To determine severability, courts test whether unchallenged provisions will still operate as the agency intended. *Alaska Airlines*, 480 U.S. at 685. A coherent balance of remaining provisions is necessary but not sufficient. *Id.* at 684. It must "function in a *manner* consistent with" the agency's intent. *Id.* at 685. Even then, courts must determine whether the Government would've enacted the remainder without the unlawful provisions. If not, the whole rule must be set aside. *Id.* Here, the Government has not proven the Rule is severable.

**1.    The Government has not shown that the Rule can stand without the challenged provisions.**

First, the challenged provisions are essential; the other provisions cannot function as designed without them. Take 34 C.F.R. § 106.10, which redefines sex discrimination to cover distinctions based on gender identity and other conduct. This redefinition informs and pervades the entire Rule, including provisions the Government deems severable. For example, the Government points to future 34 C.F.R. § 106.8, which addresses the appointment and duties of Title IX coordinators, the

recipient's duty to publish a notice of nondiscrimination, and the requirement that it maintain records for at least seven years. But compliance with these provisions depends on whether the challenged provisions—34 C.F.R. §§ 106.10, 106.31(a)(2), and 106.2—are in effect.

Consider that a school must record "each notification the Title IX Coordinator receives of information about conduct that reasonably may constitute sex discrimination." 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.8(f)(2)). Whether "conduct reasonably may constitute sex discrimination" turns on the meaning of sex discrimination, which in turn depends both on the Rule's new definition and on whether the de-minimis-harm provision applies. A school cannot maintain compliant records—much less investigate anything that "*may* constitute sex discrimination"—without knowing what sex discrimination means.

The Government's other examples are also intertwined with the Rule's unlawful provisions. It cites a "recipient's response" duty to sex-discrimination claims, 89 Fed. Reg. at 33,888–91 (to be codified at 34 C.F.R. § 106.44), new "grievance procedures" for such claims, "including sex-based harassment," 89 Fed. Reg. at 33,888–95 (to be codified at 34 C.F.R. §§ 106.45–106.46), and new "prohibitions on retaliation," 89 Fed. Reg. at 33,896 (to be codified at 34 C.F.R. §§ 106.2, 106.71). Emergency Mot. 11. Schools cannot implement these provisions without knowing the *meaning* of sex discrimination and what defines harassment, the latter of which even the Government's proposed partial stay would not

fully supply. The Government fails to say how schools can be sure they are in compliance.

The Government also cites a provision requiring "access [to] a lactation space," which cannot be a bathroom, must be "clean, shielded …, free from intrusion …, and may be used … for expressing breast milk or breastfeeding as needed." 89 Fed. Reg. at 33,888 (to be codified at 34 C.F.R. § 106.40(b)(3)(v)). But the application of this lactation provision appears to change depending on whether the de-minimis-harm provision is in effect. For example, the de-minimis-harm provision would seem to require males who identify as female to access these private lactation spaces, just as the Rule requires for restrooms, showers, and locker rooms. Even if the de-minimis-harm provision were ultimately held valid and severable, piecemeal implementation of the Rule alone would overburden schools needlessly.

Second, the Government has not shown it would have enacted the provisions it seeks to sever absent the unlawful portions. To be sure, the Government cites a routine severability clause, but "the ultimate determination of severability will rarely turn on … such a clause." *United States v. Jackson*, 390 U.S. 570, 585 n.27 (1968). Such a clause cannot save a rule when the remaining provisions are otherwise unjustified. *Ohio v. EPA*, No. 23A349, 603 U.S. ---, 2024 WL 3187768, at *8 (U.S. June 27, 2024).

Here, the Government justifies the Rule and its high costs based on benefits it expects from implementing the challenged provisions. 89 Fed. Reg. at 33,861–62. But without those benefits, the Government does not show the costs are worth it. And the Government relied on extensive estimates of costs that the Rule would impose on schools. 89 Fed. Reg. at 33,860–81. If the Rule is rolled out in stages through severance, it will duplicate many of those costs in a way the Government's reasoned estimates did not contemplate. *Cf. Ohio v. EPA*, 2024 WL 3187768, at *7–8 (staying a rule that imposed different burdens than the Government estimated).

Litigation positions aside, this Court should not assume the Government "would have preferred to apply the [Rule] in as many" situations "as possible" if "key" provisions were held invalid. *United States v. Booker*, 543 U.S. 220, 248 (2005). The Rule is "highly complex" and riddled with "interrelated provisions." *Id.* It is "one coherent policy," *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 194 (1999), principally ensuring that students are not denied educational opportunities, *see* 89 Fed. Reg. at 33,476 (Rule aims "to fully effectuate … sex discrimination prohibition."). And the Government has said its provision redefining sex discrimination is "essential" to this goal. *Id.* at 33,500. The Government would likely not have been content without it.

In sum, the challenged provisions are essential to the Rule. And the other provisions cannot function as intended without them. The Government has not proven the Rule is severable.

> **2.** **The Government has not shown that the stay and injunction below is overbroad as to certain applications of the challenged provisions.**

Moving from provisions to applications, the Government says the Rule's redefinition of sex discrimination in § 106.10 should take effect as planned, as should the new sex-based harassment standard except as it applies to gender identity. Emergency Mot. 14–19. That is wrong, and it would make the Rule unworkable.

**i.** As to § 106.10, the Government says *Bostock* requires the change and the plaintiffs "identify no harm … from that provision." *Id.* at 15. Not so. First, even if § 106.10 imposed no burden on the plaintiffs, that would not mean it is severable. *E.g.*, *Williams v. Standard Oil Co. of La.*, 278 U.S. 235, 242–44 (1929) (holding inseverable provisions that did not burden parties). But § 106.10, which is the heart of the rule, does harm schools. It redefines sex discrimination to "include[ ] discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 34 C.F.R. § 106.10. As two district courts have recognized, this provision "permeates the entire rule." *Kansas*, 2024 WL 3273285, at *18; *accord Tennessee*, 2024 WL 3019146, at *43. On top of that, the

provision is arbitrary and capricious—rendering the entire Rule procedurally improper. *See Kansas*, 2024 WL 3273285, at \*18.

In any event, the Government's "claim that this expansion does not cause Plaintiffs any injury is plainly without merit." *Tennessee*, No. 2:24-cv-00072, Doc. No. 117 at 12. The plaintiffs' harm is directly traced to the pervasive change to the meaning of "sex-based discrimination" in § 106.10. The Government has repeatedly broadcast that it believes distinguishing based on sex, not gender identity, *does* treat transgender students worse. *See* Br. for the United States as Amicus Curiae at 24–27, *B.P.J. v. W. Va. State Bd. of Educ.*, Nos. 23-1078, 23-1130 (4th Cir. April 4, 2023) (school sports teams); En Banc Br. for the United States as Amicus Curiae in Supp. of Pl.-Appellee and Urging Affirmance, *Adams v. Sch. Bd. of St. Johns Cnty.*, No. 18-13592, 2021 WL 5630400, at \*23–24 (11th Cir. Nov. 26, 2021) (school restrooms).

So if the school board maintains its policy of assigning restrooms, locker rooms, and physical education classes based on sex, according to the Government the school will have treated that student "worse" than others who do not identify as transgender. The Government has spent the past three years contending that *Bostock* requires using gender identity instead of sex in school bathrooms, locker rooms, and sports. *See Texas v. Cardona*, No. 4:23-CV-00604-O, 2024 WL 2947022, at \*4 (N.D. Tex. June 11, 2024) (vacating ED's prior guidance documents on

this issue). The Government cannot now claim that its core *Bostock* provision causes no harm.

Moreover, *Bostock* does not justify the change. First, *Bostock* did not change the meaning of "sex" in Title VII or Title IX but accepted that "sex" means biologically male or female. *Tennessee*, 2024 WL 3019146, at *10–13. Nor do the new rules purport to equate gender identity and sex. *E.g.*, 89 Fed. Reg. at 33,807. That is fatal because *Bostock* said gender-identity discrimination is a form of sex discrimination; it did not say all sex distinctions are a form of gender-identity discrimination. If that were true, Title IX would be at war with itself because it permits sex-separated facilities and sports teams.

Second, *Bostock* dealt with hiring and firing in employment, while Title IX deals with educational opportunities. "[T]he school is not the workplace." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 808 (11th Cir. 2022). "Title VII … is a vastly different statute from Title IX." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). *Bostock* didn't "purport to address bathrooms, locker rooms, or anything else of the kind." 590 U.S. at 681. And Title IX accounts for the "physical differences between men and women," which "are … enduring." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (cleaned up).

Third, *Bostock* held that "sex is not relevant to the selection, evaluation, or compensation of employees" under Title VII, which treats sex

like race, national, origin, and other protected classifications. 590 U.S. at 660 (cleaned up). But Title IX *only* covers sex, which often *is* relevant to promoting educational opportunities. *Tennessee*, 2024 WL 3019146, at *11–12. Take sports. Under *Bostock*, employers cannot consider sex when hiring or firing employees. Applied to sports, that logic would mean schools cannot consider sex when creating sports teams. But "athletics programs *necessarily* allocate opportunities separately for male and female students." *Cohen v. Brown Univ.*, 101 F.3d 155, 177 (1st Cir. 1996). Title IX sometimes requires schools to consider sex to protect equal opportunities for students, particularly female athletes.

Fourth, *Bostock*'s logic contradicts the Rule's new distinctions. For example, the Rule in theory allows boys' and girls' restrooms, just assigned by gender identity instead of sex. 89 Fed. Reg. at 33,818. But according to the Rule, facilities designated by gender identity still discriminate based on sex: "it is impossible to discriminate against a person because of their … gender identity without discriminating against that individual based on sex." *Id.* at 33,816 (cleaned up). On the Government's logic, the Rule draws distinctions forbidden by Title IX's general prohibition. So the *statute* forbids schools from considering sex, per the Government's take on *Bostock*, while the Rule sometimes overrides the statute, discards *Bostock*, and allows these forbidden distinctions. In other words, "sex" means "sex," except when it means gender identity. Nothing supports this illogic.

The Government's logic works only if the rule allowing sex-specific facilities in fact redefines "sex" to mean "gender identity." *E.g.*, 34 C.F.R. § 106.33. But the Government has disclaimed that argument, *e.g.*, 89 Fed. Reg. at 33,807, barring the agency from raising it now, *see DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20 (2020) (holding review is "limited to the grounds that the agency invoked when it took the action" (cleaned up)).

The Rule's redefinition of sex discrimination is no mere "straightforward application of *Bostock*." Emergency Mot. 17. It is a "highly consequential" and "transformative" change to our nation's educational system. *West Virginia v. EPA*, 597 U.S. 697, 724 (2022). The Government seeks to crucially disrupt "the balance between federal and state power" in an area traditionally regulated by the states. *Sackett v. EPA*, 598 U.S. 651, 679 (2023). And it does so with no "clear statement" from Congress. A523–26. Such a change exceeds the Government's power.

**ii.** The Government's partial stay is unworkable when it comes to policing sex-based harassment. The Government says the new sex-based harassment provision injures schools only when it comes to speech related to gender identity. Emergency Mot. 19–20. That is not so. While the vague and undefined terms in the Rule contribute to the First Amendment harms that will flow from the Rule, the definition of sex-based harassment is independently unlawful because it creates an amorphous, "broader standard" for hostile-environment claims. 89 Fed.

18

Reg. at 33,498. Harassment can be anything that the student considers "unwelcome" or that "limits" the student's ability to benefit. *Id.* at 33,884 (to be codified at 34 C.F.R. § 106.2). Contrary to the Government's characterization, this second First Amendment problem is not limited to "discrimination on the basis of gender identity." Emergency Mot. 19–20. The Rule would require schools to police speech far beyond the *Davis* standard.

The Government would have schools apply the existing standard to alleged hostile environment harassment based on gender identity but the prior standard (based on *Davis*) to everything else. If offers no suggestions for how schools are supposed to do that. When harassment is alleged, it's not obvious at the outset exactly what was said or done. And applying a different standard to students whose gender identity does not match their sex than to all other students is itself sex-based discrimination itself, at least under the Rule. That is not a workable approach for schools, and it would harm the very students Title IX is meant to protect.

### C.    The Government forfeited its severance argument.

Critically, the Government forfeited its severance argument below by failing to timely or meaningfully brief the point. To preserve an argument, "it is not enough to merely mention or allude to a legal theory." *United States v. Scroggins*, 599 F.3d 433, 446 (5th Cir. 2010).

Rather, the party "must press and not merely intimate the argument during the proceedings before the district court." *F.D.I.C. v. Mijalis*, 15 F.3d 1314, 1327 (5th Cir. 1994). And it must provide enough legal and factual detail "to focus the district judge's mind" on the issue. *United States v. Kieffer*, 991 F.3d 630, 639 (5th Cir. 2021) (Oldham, J., concurring).

To be sure, the Government mentions "severability" in the last two sentences of its preliminary-injunction response. A1204–05. But this scant reference does not preserve the argument. The Government failed to brief the issue or meaningfully "press" the point. *Mijalis*, 15 F.3d at 1327. It did not specify in sufficient detail how or why the challenged provisions of the rule could be severed, much less articulate its theory that § 106.10 causes no injury. The Government failed to preserve this issue, and that suffices to reject its motion.

## II. The remaining factors favor preserving the status quo.

The remaining factors favor the plaintiffs. A36–38; *see* A530–32. At this stage of the litigation, a line-item injunction "would be impractical." *Nebraska v. Biden*, 52 F.4th 1044, 1048 (8th Cir. 2022) (per curiam). That's because a piecemeal rollout would impose significant, unnecessary compliance costs and create significant "uncertainty" among educators and students. *Id.*

### A. Piecemeal compliance costs are extraordinary.

Start with compliance costs. Unrecoverable compliance costs—like the costs to update policies and train educators and students—impose irreparable harm. *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021); *see* A12 (discussing evidence of significant compliance costs for school districts). The Government's request for a *partial* stay only worsens the harm. Schools would have to comply not just once, but *at least* twice.

Within days, the Government would have schools amend their policies, alter their procedures, and train their employees on the new Rule. Schools must do this with no idea how to interpret sex discrimination in 34 C.F.R. § 106.10 consistent with Title IX's many allowable sex distinctions. And they must apply the Rule's "broader" harassment provision, but not if the complaint alleges gender-identity harassment, in which case the prior regulations presumably remain in place. That piecemeal approach is troubling enough.

And then the Government would have every school do it all over again at the end of this litigation. It believes the whole Rule is lawful, Emergency Mot. 2, but its motion does not defend the de-minimis-harm provision or the harassment standard as applied to gender-identity discrimination. In other words, the Government would require training and re-training to partially enforce its new Rule, which forces schools to potentially suffer twice the compliance costs. This is inconsistent with

the costs the Government itself estimated, 89 Fed. Reg. at 33,860–81, and irreparably injures those the Government is supposed to serve.

## B. Piecemeal compliance would create confusion.

The district court's order rightly delays the compliance date for the new rule entirely. It allows schools to avoid wholesale changes to their policies and practices until the conclusion of litigation, sparing teachers and students the confusion and headache of trying to learn and comply with shifting requirements. And make no mistake, piecemeal compliance would create confusion. For example, the Government never explains how schools can comply with § 106.10 if it goes into effect but § 106.31(a)(2) does not. How can schools prevent discrimination based on gender identity under § 106.10 *and* prevent discrimination based on sex in circumstances where they cannot do both? No one knows.

Forcing teachers to enforce such contradictory requirements will mire them in regulatory mud and impede their ability to engage their students. The district court reasonably prevented the Rule from taking effect and enjoined its enforcement entirely until litigation ends. *Cf. Ohio State Conf. of NAACP*, 769 F.3d at 389 (refusing to stay preliminary injunction when it would create "confusion" among affected individuals and risk placing regulated officials in a "position of trying to communicate" multiple, conflicting instructions). There is no good reason to disturb that ruling and replace it with chaos.

## CONCLUSION

The district court properly exercised its discretion in issuing preliminary relief to maintain the status quo. The Motion for Partial Stay Pending Appeal should be denied.

Dated: July 10, 2024

Respectfully submitted,

*/s/Natalie D. Thompson*
John J. Bursch
Matthew S. Bowman
Natalie D. Thompson
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
mbowman@ADFlegal.org
nthompson@ADFlegal.org

Julie Marie Blake
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jblake@ADFlegal.org

Jonathan A. Scruggs
ALLIANCE DEFENDING FREEDOM
15100 N. 90th St.
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@adflegal.org

*Counsel for Plaintiff-Appellee*
*Rapides Parish School Board*

## CERTIFICATE OF COMPLIANCE

This response complies with the word limit of Fed. R. App. P. 27(d)(2)(A) because it contains 5,123 words, excluding parts of the motion exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Office 365.

This response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.

Dated: July 10, 2024

*s/Natalie D. Thompson*
Natalie D. Thompson
*Counsel for Appellee Rapides Parish School Board*

## CERTIFICATE OF SERVICE

I hereby certify that on July 10, 2024, I electronically filed the foregoing response with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

*s/Natalie D. Thompson*
Natalie D. Thompson
*Counsel for Appellee Rapides Parish School Board*