# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

State of Louisiana, by and through its Attorney General, Elizabeth B. Murrill; Louisiana Department of Education; State of Mississippi, by and through its Attorney General, Lynn Fitch; State of Montana, by and through its Attorney General, Austin Knudsen; State of Idaho, by and through its Attorney General, Raul Labrador; School Board of Webster Parish; School Board of Red River Parish; School Board of Bossier Parish; School Board Sabine Parish; School Board of Grant Parish; School Board of West Carroll Parish; School Board of Caddo Parish; School Board of Natchitoches Parish; School Board of Caldwell Parish; School Board of Allen Parish; School Board LaSalle Parish; School Board Jefferson Davis Parish; School Board of Ouachita Parish; School Board of Franklin Parish; School Board of Acadia Parish; School Board of Desoto Parish; School Board of St. Tammany Parish; All Plaintiffs,

*Plaintiffs-Appellees,*

v.

United States Department of Education; Miguel Cardona, in his official capacity as Secretary of Education; Office for Civil Rights, United States Department of Education; Catherine Lhamon, in her official capacity as the Assistant Secretary for Civil Rights; United States Department of Justice; Merrick B. Garland, in his official capacity as the Attorney General of the United States; Kristen Clarke, in her official capacity as Assistant Attorney General for the Civil Rights Division of United States Department of Justice,

*Defendants-Appellants.*

School Board Rapides Parish,

*Plaintiff-Appellee,*

v.

United States Department of Education; Miguel Cardona, in his official capacity as Secretary of Education; Catherine Lhamon, in her official capacity as the Assistant Secretary for Civil Rights; United States Department of Justice; Merrick B. Garland, in his official capacity as the Attorney General of the United States; Kristen Clarke, in her official capacity as Assistant Attorney General for the Civil Rights Division of United States Department of Justice,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Louisiana, Monroe Division
No. 3:24-cv-563; 1:24-cv-567 (Hon. Terry A. Doughty)

## BRIEF FOR APPELLANTS

(Attorneys Listed On Following Page)

*Of Counsel:*

LISA BROWN
 *General Counsel*
 *U.S. Department of Education*

BRIAN M. BOYNTON
 *Principal Deputy Assistant Attorney*
 *General*

MELISSA N. PATTERSON
STEPHANIE R. MARCUS
JACK STARCHER
DAVID L. PETERS
STEVEN A. MYERS

 *Attorneys, Appellate Staff*
 *Civil Division, Room 7232*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 305-1754*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required under Fifth Circuit Rule 28.2.1, as appellants are all governmental parties.

_s/ Steven A. Myers_
Steven A. Myers

**STATEMENT REGARDING ORAL ARGUMENT**

The district court's sweeping injunction prevents the Department of Education from implementing an important rule that is necessary to fully effectuate Title IX's prohibition against sex discrimination in education. And in granting that injunction, the district court's analysis is inconsistent with decisions from numerous other federal courts of appeals and district courts. The government therefore believes that oral argument would aid in the consideration of this appeal.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION ......................................................3

STATEMENT OF THE ISSUE ............................................................3

STATEMENT OF THE CASE ..............................................................4

    A.     Title IX and the Final Rule............................................................4

    B.     Prior Proceedings........................................................................7

        1.     District Court Proceedings ..................................................7

        2.     Appellate and Supreme Court Proceedings ....................10

SUMMARY OF ARGUMENT..............................................................13

STANDARD OF REVIEW ...................................................................18

ARGUMENT ...........................................................................................19

I.     Plaintiffs Are Unlikely to Prevail on the Merits of Their Challenges.................19

    A.     Gender-Identity Discrimination Is Necessarily a Form of Discrimination on the Basis of Sex..................................................19

    B.     The Rule's Treatment of Sex-Separate Spaces Effectuates Title IX's Text and Reflects the Department's Consideration of Relevant Issues................................................26

    C.     The Rule's Prohibition on Hostile-Environment Harassment Raises No First Amendment Concerns......................................................34

II.     The Remaining Factors Weigh Against Preliminary Injunctive Relief...............38

    A.     Plaintiffs Failed to Establish Irreparable Harm. .........................38

    B.     The Equities and Public Interest Weigh Against an Injunction. ..............41

III.    At a Minimum, the Injunction Is Overbroad........................................................ 42

CONCLUSION ................................................................................................................. 50

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

**Cases:**                                                                      **Page(s)**

*A.C. ex rel. M.C. v. Metropolitan Sch. Dist. of Martinsville*,
    75 F.4th 760 (7th Cir. 2023) ......................................................... 22, 29

*Alabama v. Cardona*,
    No. 7:24-cv-533-ACA, 2024 WL 3607492 (N.D. Ala. July 30, 2024),
    *mot. for inj. pending appeal granted*,
    No. 24-12444 (11th Cir. Aug. 22, 2024) ........................................ 7

*Arkansas v. U.S. Dep't of Educ.*, --- F. Supp. 3d ---,
    No. 4:24-CV-636-RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024) ...................... 7

*Arnold, Constable & Co. v. United States*,
    147 U.S. 494 (1893) ...................................................................... 25

*Barr v. American Ass'n of Political Consultants*,
    591 U.S. 610 (2020) ...................................................................... 46

*Bostock v. Clayton County*,
    590 U.S. 644 (2020) ........................... 2, 5, 6, 13, 14, 19, 20, 21, 22, 23, 24, 26, 30, 47

*Braidwood Mgmt., Inc. v. EEOC*,
    70 F.4th 914 (5th Cir. 2023) ....................................................... 24

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ...................................................................... 42

*Cannon v. University of Chi.*,
    441 U.S. 677 (1979) ...................................................................... 42

*Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*,--- F. Supp. 3d ---,
    No. 4:24-cv-461-O, 2024 WL 3381901 (N.D. Tex. July 11, 2024) ........................ 7

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*,
    526 U.S. 629 (1999) ...................................................................... 35

*Department of Educ. v. Louisiana*, --- S. Ct. ---,
    No. 24A78, 2024 WL 3841071 (U.S. Aug. 16, 2024) ...................... 12, 13, 20, 48, 49

*Florida v. Department of Health & Human Servs.*,
    19 F.4th 1271 (11th Cir. 2021) ................................................... 41

*Frey v. U.S. Dep't of Health and Human Servs.*,
    920 F.3d 319 (5th Cir. 2019) ..................................................... 29

*Gill v. Whitford,*
   585 U.S. 48 (2018) ................................................................. 18

*Grabowski v. Arizona Bd. of Regents,*
   69 F.4th 1110 (9th Cir. 2023) .............................................. 22

*Grimm v. Gloucester Cty. Sch. Bd.,*
   972 F.3d 586 (4th Cir.), *as amended* (Aug. 28, 2020) ...................... 21-22, 29

*Gross v. FBL Fin. Servs., Inc.,*
   557 U.S. 167 (2009) ............................................................. 24

*Haaland v. Brackeen,*
   599 U.S. 255 (2023) ............................................................. 40

*Harris v. Forklift Sys., Inc.,*
   510 U.S. 17 (1993) ............................................. 35, 36, 37, 38

*Jackson v. Birmingham Bd. of Educ.,*
   544 U.S. 167 (2005) ......................................... 1, 2, 4, 25, 34

*Kansas v. U.S. Dep't of Educ.,* --- F. Supp. 3d ----,
   No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024),
   *mot. for stay pending appeal pending,* No. 24-3097 (10th Cir.) ...................... 7-8

*Lakoski v. James,*
   66 F.3d 751 (5th Cir. 1995) ............................................. 13, 21, 24

*Louisiana v. Biden,*
   55 F.4th 1017 (5th Cir. 2022) .............................................. 39

*Maryland v. King,*
   567 U.S. 1301 (2012) ........................................................... 42

*Muldrow v. City of St. Louis,*
   601 U.S. 346 (2024) ............................................................. 26

*National Ass'n of Mfrs. v. SEC,*
   105 F.4th 802 (5th Cir. 2024) .............................................. 46

*New York v. U.S. Dep't of Educ.,*
   477 F. Supp. 3d 279 (S.D.N.Y. 2020) ................................... 39, 40

*Nichols v. Alcatel USA, Inc.,*
   532 F.3d 365 (5th Cir. 2008) .............................................. 49

*Oklahoma v. Cardona*, --- F. Supp. 3d ---,
    No. CIV-24-461-JD, 2024 WL 3609109 (W.D. Okla. July 31, 2024) ........................ 7

*Pederson v. Louisiana State Univ.*,
    213 F.3d 858 (5th Cir. 2000) .................................................................... 47

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ................................................................................. 41

*Pennsylvania v. DeVos*,
    480 F. Supp. 3d 47 (D.D.C. 2020) ............................................................ 39

*Rowles v. Curators of the Univ. of Mo.*,
    983 F.3d 345 (8th Cir. 2020) .................................................................... 38

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ............................................................................... 37

*Tennessee v. Cardona*, --- F. Supp. 3d ---,
    No. 2:24-72-DCR, 2024 WL 3019146 (E.D. Ky. June 17, 2024),
    *stay denied*, No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024) ................... 7

*Texas v. United States*,
    No. 2:24-CV-86-Z, 2024 WL 3405342 (N.D. Tex. July 11, 2024) ........................... 7

*Van Arsdel v. Texas A&M Univ.*,
    628 F.2d 344 (5th Cir. 1980) .................................................................... 39

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................... 38, 42, 43, 44

*Women's Med. Ctr. of Nw. Hous. v. Bell*,
    248 F.3d 411 (5th Cir. 2001) .................................................................... 18

**Statutes:**

5 U.S.C. §§ 701-706 ....................................................................................... 3

20 U.S.C. § 1234g(a) ...................................................................................... 4

20 U.S.C. § 1681(a) .......................................................... 4, 19, 21, 22, 23, 26, 47

20 U.S.C. § 1681(a)(6)(A) ............................................................................ 6, 27

20 U.S.C. § 1681(a)(6)(B) ................................................................................ 27

20 U.S.C. § 1682 ................................................................ 4, 41

20 U.S.C. §§ 1682-1683 ...................................................... 4

20 U.S.C. § 1686 ........................................................... 4, 6, 27

28 U.S.C. § 1292(a)(1) ......................................................... 3

28 U.S.C. § 1331 ................................................................. 3

28 U.S.C. § 1361 ................................................................. 3

42 U.S.C. § 2000e-2(a)(1) ............................................... 5, 20

42 U.S.C. § 2000e-2(e) ......................................................24

Education Amendments of 1974,
   Pub. L. No. 93-380, tit. VIII, pt. D, § 844,
   88 Stat. 484, 612 ........................................................27

**Administrative Materials:**

34 C.F.R. § 100.7(a)-(d) ...................................................... 4

34 C.F.R. § 100.8(a) ............................................................ 4

34 C.F.R. § 100.8(a)(1) ...................................................... 41

34 C.F.R. § 106.2 ........................................ 6, 7, 10, 34, 36, 44

34 C.F.R. § 106.2 (2024) .................................................... 35

34 C.F.R. § 106.6(d) .......................................................... 36

34 C.F.R. § 106.8(a) ............................................................ 5

34 C.F.R. § 106.8(a) (2020) ............................................... 47

34 C.F.R. § 106.8(c) ............................................................ 5

34 C.F.R. § 106.8(c) (2020) ............................................... 47

34 C.F.R. § 106.8(d) (2020) ............................................... 47

34 C.F.R. § 106.8(f) ............................................................ 5

34 C.F.R. § 106.9 ........................................................................................ 45

34 C.F.R. § 106.10 ............................................................................ 6, 19, 44

34 C.F.R. § 106.16 ...................................................................................... 45

34 C.F.R. § 106.30(a)(2) (2020) .............................................................. 35

34 C.F.R. § 106.31(a)(2) ............................................ 6, 10, 27, 28, 31, 44, 48

34 C.F.R. § 106.33 ................................................................................ 28, 31

34 C.F.R. § 106.41(b) ................................................................................ 27

34 C.F.R. § 106.40(b) ................................................................................ 44

34 C.F.R. § 106.40(b)(3)(v) ...................................................................... 5

34 C.F.R. § 106.44 ...................................................................................... 5

34 C.F.R. § 106.44(j)(2) ............................................................................ 44

34 C.F.R. §§ 106.45-106.46 ................................................................ 5, 44

34 C.F.R. § 106.45(b)(1)(iii) (2020) ........................................................ 39

34 C.F.R. § 106.45(b)(10) (2020) ............................................................ 39

34 C.F.R. § 106.48 ...................................................................................... 45

34 C.F.R. § 106.57(e)(2) ............................................................................ 5

34 C.F.R. § 106.71 ...................................................................................... 44

34 C.F.R. § 106.71 (2020) ........................................................................ 47

34 C.F.R. § 106.71(a) (2020) .................................................................... 47

45 C.F.R. § 86.1 (1975) ............................................................................ 47

45 C.F.R. § 86.3(a)-(b) (1975) ................................................................ 47

45 C.F.R. § 86.4 (1975) ............................................................................ 47

45 C.F.R. § 86.6(a) (1975) ........................................................................ 47

45 C.F.R. § 86.9(a) (1975) ................................................................. 47

45 C.F.R. § 86.9(c) (1975) ................................................................. 47

45 C.F.R. § 86.36(a)-(c) (1975) ......................................................... 47

45 C.F.R. § 86.37(a)(2) (1975) .......................................................... 47

45 C.F.R. § 86.37(b) (1975) .............................................................. 47

45 C.F.R. § 86.38(a) (1975) .............................................................. 47

45 C.F.R. § 86.39 (1975) ................................................................... 47

45 C.F.R. § 86.51(a)(4) (1975) .......................................................... 47

45 C.F.R. § 86.53 (1975) ................................................................... 47

45 C.F.R. § 86.56(b) (1975) .............................................................. 47

45 C.F.R. § 86.59 (1975) ................................................................... 47

45 C.F.R. § 86.1 .............................................................................. 47

Exec. Order No. 14,021, § 2(a),
    86 Fed. Reg. 13,803 (Mar. 8, 2021) ........................................... 5

*Nondiscrimination on the Basis of Sex in Education Programs or*
    *Activities Receiving Federal Financial Assistance,*
    85 Fed. Reg. 30,026 (May 19, 2020) ..................................... 5, 40

*Nondiscrimination on the Basis of Sex in Education Programs or*
    *Activities Receiving Federal Financial Assistance,*
    89 Fed. Reg. 33,474 (Apr. 29, 2024) ................ 1, 6, 7, 19, 22, 25, 26-27, 27, 28, 30,
                                            31, 32, 33, 34, 35, 36, 37, 38, 44, 45, 46

*Revised Sexual Harassment Guidance: Harassment of Students by*
    *School Employees, Other Students, or Third Parties,*
    66 Fed. Reg. 5512 (Jan. 19, 2001) ......................................... 34-35

**Rule:**

Fed. R. App. P. 4(a)(1)(B) ................................................................. 3

## INTRODUCTION

Title IX prohibits sex discrimination in federally funded education programs and activities. As the Supreme Court has made clear, "Congress gave the statute a broad reach" to cover a "wide range of intentional unequal treatment." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). Congress also authorized the Department of Education to issue rules to effectuate the statute's sweeping prohibition on sex discrimination.

In April 2024, the Department exercised that delegated authority by issuing a rule that makes a variety of amendments to its Title IX regulations. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (Rule). The Rule does many things, ranging from revising recordkeeping requirements to guaranteeing access to lactation spaces for breastfeeding students. Only three provisions of the Rule are relevant here—and, in particular, how those provisions apply to discrimination on the basis of gender identity.

The first provision (§ 106.10) clarifies that discrimination on the basis of gender identity is necessarily a form of discrimination on the basis of sex. The second (§ 106.31(a)(2)) provides that schools violate Title IX when they differentiate on the basis of sex in a way that causes a person more than de minimis harm and when that differentiation lacks a statutory basis; as relevant here, it means that individuals must be permitted to use restrooms consistent with their gender identity. And the third

(§ 106.2's definition of hostile-environment harassment) recognizes that unwelcome sex-based conduct that is "subjectively and objectively offensive" and "so severe or pervasive that it limits or denies" a person's ability to benefit from an educational program constitutes hostile-environment harassment. All three provisions effectuate Title IX's "broad" prohibition on sex discrimination, *Jackson*, 544 U.S. at 175, and all three are consistent with precedent of this Court and the Supreme Court.

Plaintiffs' challenges to these provisions are meritless. Section 106.10 flows directly from the plain text of Title IX and the reasoning of the Supreme Court's decision in *Bostock v. Clayton County*, which recognizes that it is "impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." 590 U.S. 644, 660 (2020). That essential insight—which the Supreme Court held followed unambiguously from the plain meaning of the phrase "because of sex"—is not confined to Title VII and applies equally to Title IX's prohibition against discrimination "on the basis of sex." Section 106.31(a)(2) likewise follows directly from the statutory text: Unless Congress has indicated otherwise, it violates Title IX's general nondiscrimination mandate to treat a person differently on the basis of sex when that differential treatment causes more than de minimis harm. And § 106.2's definition of hostile-environment harassment, which requires recipients to address conduct that limits or denies students the right to an education free from sex discrimination, is consistent with the standards

that courts—including this one—have long applied in both the Title IX and Title VII contexts.

The district court nevertheless entered a sweeping preliminary injunction barring the Department from enforcing the entirety of the Rule in Louisiana, Mississippi, Montana, and Idaho. In so doing, the court erred by refusing to apply *Bostock*'s central teaching—*i.e.*, discrimination on the basis of gender identity is necessarily discrimination on the basis of sex—to the materially indistinguishable language of Title IX. Beyond that, the court erroneously found that the ordinary costs associated with implementing the Rule amounted to irreparable harm sufficient to warrant preliminary relief. And the court failed to justify an injunction against the entirety of the Rule when it found only three discrete provisions likely to be unlawful.

This Court should vacate the preliminary injunction.

## STATEMENT OF JURISDICTION

Plaintiffs asserted jurisdiction under 28 U.S.C. §§ 1331 and 1361, as well as 5 U.S.C. §§ 701-706. ROA.29; ROA.2520-2521. The district court entered a preliminary injunction on June 13, 2024. *See* ROA.2388-2389. Defendants timely appealed on June 24, 2024. ROA.2402; Fed. R. App. P. 4(a)(1)(B). This Court has appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

In April 2024, the Department of Education issued a rule making numerous changes to its regulations implementing Title IX of the Education Amendments of

1972.  After finding that plaintiffs were likely to succeed on challenges to three of the new or changed provisions, the district court preliminarily enjoined the Department from enforcing the entire Rule within the four plaintiff states.  The question presented is whether the district court erred in entering the preliminary injunction.

## STATEMENT OF THE CASE

### A.  Title IX and the Final Rule

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  "Congress gave the statute['s]" prohibition on sex discrimination "a broad reach" subject only to a "list of narrow" statutory exceptions and exclusions.  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173, 175 (2005); *see* 20 U.S.C. §§ 1681(a), 1686.  Congress also authorized the Department to "issu[e] rules, regulations, or orders of general applicability … consistent with achievement of the objectives of the statute."  20 U.S.C. § 1682.  And Congress established a detailed administrative enforcement scheme requiring the Department to first attempt to secure compliance through voluntary means before it may suspend or terminate federal financial assistance.  *See id.* §§ 1234g(a), 1682-1683; *see also* 34 C.F.R. §§ 100.7(a)-(d), 100.8(a).

Since Title IX's enactment, the Department has promulgated regulations implementing the statute's prohibition on sex discrimination, including in 2020.  *See*

4

*Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020).  One month after publication of the 2020 rule, the Supreme Court held that the prohibition on discrimination "because of … sex" in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), necessarily encompasses discrimination because of sexual orientation and gender identity.  *See Bostock v. Clayton County*, 590 U.S. 644, 660 (2020).  Following *Bostock*, the President directed the Department to review the 2020 rule and existing guidance "for consistency with governing law."  Exec. Order No. 14,021, § 2(a), 86 Fed. Reg. 13,803, 13,803 (Mar. 8, 2021).

Following an extensive public engagement process, the Department issued the Rule.  Among other things, the Rule streamlines requirements related to Title IX Coordinators, 34 C.F.R. § 106.8(a); revises recipients' notice of nondiscrimination and record-keeping requirements, *id.* § 106.8(c), (f); ensures access to lactation spaces for breastfeeding students and employees, *id.* §§ 106.40(b)(3)(v), 106.57(e)(2); addresses a recipient's response to sex discrimination, *id.* § 106.44; and provides recipients additional flexibility regarding procedures to respond to claims of sex discrimination, including sex-based harassment, *id.* §§ 106.45-106.46.

The district court's preliminary injunction decision concerns other provisions of the Rule.  Section 106.10 describes the scope of prohibited sex discrimination under Title IX.  It provides that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related

conditions, sexual orientation, and gender identity." 34 C.F.R. § 106.10. As the

Department explained, "discrimination on each of those bases is sex discrimination

because each necessarily involves consideration of a person's sex, even if that term is

understood to mean only physiological or 'biological distinctions between male and

female.'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655).

Separately, § 106.31(a)(2) details when separation or differentiation on the basis

of sex constitutes prohibited sex discrimination. It sets out the general principle that

Title IX permits "different treatment or separation on the basis of sex" only to the

extent that such differential treatment or separation does not "discriminate[] … by

subjecting a person to more than de minimis harm." 34 C.F.R. § 106.31(a)(2).

Section 106.31(a)(2) further provides that a policy or practice that "prevents a person

from participating in an education program or activity consistent with the person's

gender identity subjects a person to more than de minimis harm on the basis of sex."

*Id.* The provision recognizes, however, that Congress carved out certain contexts in

which a school may permissibly differentiate on the basis of sex even though greater

than de minimis harm may result. *Id.*; *see, e.g.*, 20 U.S.C. § 1681(a)(6)(A) (membership

in fraternities or sororities); *id.* § 1686 (maintenance of sex-separate living facilities).

Finally, § 106.2 defines many terms, including "sex-based harassment." 34

C.F.R. § 106.2. One form of such harassment is "[h]ostile environment harassment,"

defined as "[u]nwelcome sex-based conduct that, based on the totality of the

circumstances, is subjectively and objectively offensive and is so severe or pervasive

that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.*, creates a hostile environment)." *Id.* Section 106.2 explains that "[w]hether a hostile environment has been created is a fact-specific inquiry that includes consideration" of several enumerated factors. *Id.*

Nothing in the Rule alters the existing regulation regarding sex-separate athletic teams, which is the subject of a separate rulemaking. *See* 89 Fed. Reg. at 33,817.

## B.   Prior Proceedings

### 1.   District Court Proceedings

Plaintiffs are Louisiana, Mississippi, Montana, and Idaho, as well as the Louisiana Department of Education and the School Board of Rapides Parish (SBRP).[1] Plaintiffs challenged the Rule's treatment of gender identity discrimination and sought preliminary injunctive relief, claiming that the application of certain Rule provisions to contexts such as bathrooms and pronouns will cause them irreparable harm. *See* ROA.1164-1173; ROA.2665-2671.[2]

---

[1] The court below consolidated the suit brought by SBRP with the suit brought by the plaintiff States and the Louisiana Department of Education. ROA.2059. The court granted both sets of plaintiffs' requests for injunctive relief. ROA.2350-2351.

[2] Numerous other challenges are pending in cases around the country. *See Alabama v. Cardona*, No. 7:24-cv-533-ACA, 2024 WL 3607492 (N.D. Ala. July 30, 2024) (denying preliminary injunction), *mot. for inj. pending appeal granted*, No. 24-12444 (11th Cir. Aug. 22, 2024); *Tennessee v. Cardona*, --- F. Supp. 3d --- , No. 2:24-72-DCR, 2024 WL 3019146 (E.D. Ky. June 17, 2024) (granting preliminary injunction), *stay denied*, No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024); *Kansas v. U.S. Dep't of Educ.*, --- F. Supp. 3d ----, No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024)

*Continued on next page.*

On June 13, 2024, the district court entered a preliminary injunction barring the Department from enforcing all aspects of the Rule within the plaintiff states. ROA.2386-2387. The court held that the inclusion of gender identity in the scope of prohibited sex discrimination was contrary to Title IX, stating that "'sex discrimination' clearly include[s] only discrimination against biological males and females." ROA.2368. The court rejected the Department's reliance on *Bostock*, which it concluded "does not apply to Title IX." ROA.2366. The court noted that "*Bostock* dealt with Title VII" and asserted that "the purpose of Title VII to prohibit discrimination in hiring is different than Title IX's purpose to protect biological women from discrimination in education." ROA.2368.

For similar reasons, the district court concluded that the major-questions doctrine and Spending Clause required clearer congressional authorization for the Rule. ROA.2370-2377. The court reasoned that the inclusion of gender identity in the scope of prohibited discrimination implicated questions of "vast economic and political significance" and that the Department lacked authority to "us[e] *Bostock* to make major changes in Title IX law." ROA.2373-2374. Likewise, the court held that

(granting preliminary injunction), *mot. for stay pending appeal pending*, No. 24-3097 (10th Cir.); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, --- F. Supp. 3d ---, No. 4:24-cv-461-O, 2024 WL 3381901 (N.D. Tex. July 11, 2024) (granting preliminary injunction); *Texas v. United States*, No. 2:24-CV-86-Z, 2024 WL 3405342 (N.D. Tex. July 11, 2024) (granting preliminary injunction); *Arkansas v. U.S. Dep't of Educ.*, --- F. Supp. 3d --- , No. 4:24-CV-636-RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024) (granting preliminary injunction); *Oklahoma v. Cardona*, --- F. Supp. 3d ---, No. CIV-24-461-JD, 2024 WL 3609109 (W.D. Okla. July 31, 2024) (granting preliminary injunction).

the Rule violated the requirement that conditions on federal funding be unambiguous because Title IX's prohibition on sex discrimination did not provide notice "that the term 'sex' included gender identity." ROA.2375.[3]

The district court also concluded that the Rule's treatment of gender identity was arbitrary and capricious. According to the court, the Department failed to address several relevant factors related to compliance, privacy, enforcement, and non-binary students. ROA.2379-2381. The court also "question[ed]" how § 106.31(a)(2)'s de minimis harm standard applied in various contexts, suggesting that the provision was "ambiguous and therefore arbitrary and capricious." ROA.2380-2381.

Separately, the court held that the Rule's definition of hostile-environment sex-based harassment would "require recipients of federal funding … to violate First Amendment rights." ROA.2369. The court concluded that the harassment definition "compel[s] staff and students to use whatever pronouns a person demands" and "prohibits staff and students from expressing their own views" about gender identity. ROA.2369. The court acknowledged defendants' explanation that federal agencies have applied a similar standard in the analogous context of Titles VI and VII "for decades." ROA.2370. But the court concluded that it could not "simply apply the same standard to federally funded educational institutions" because the "implications here are different" than other contexts. *Id.*

---

[3] In light of its other holdings, the court declined to address plaintiffs' contention that the Rule violated the non-delegation doctrine. ROA.2377.

9

As to the remaining factors, the court concluded that plaintiffs faced irreparable harm in the form of compliance costs as well as "violation of First Amendment rights, preemption of state laws, loss of Title IX federal funds, pressure to change their laws, and invasion of state sovereignty." ROA.2384. The court further concluded that the equities weighed in plaintiffs' favor because the interest in "keep[ing] the status quo" outweighed the Department's interests in "preventing discrimination in educational programs and activities." ROA.2384-2385.

In light of other pending challenges to the Rule, the court limited the injunction to plaintiffs. ROA.2385. But the court did not limit the injunction to the provisions or applications of the Rule involving gender identity that the plaintiffs challenged or that the court deemed invalid. Instead, the court enjoined the Rule in its entirety without addressing why it was appropriate to enjoin sections of the Rule that plaintiffs did not challenge, that did not cause plaintiffs any harm, and that the court had not addressed in its opinion. ROA.2386-2387.

## 2. Appellate and Supreme Court Proceedings

The Department filed an emergency motion in this Court seeking to partially stay the injunction. *See* Emergency Mot. for Partial Stay Pending Appeal (July 1, 2024). The Department asked the Court to stay the injunction except as to the following 2024 Rule provisions: (i) 34 C.F.R. § 106.31(a)(2), and (ii) 34 C.F.R. § 106.2's definition of hostile-environment harassment as applied to discrimination on the basis of gender identity.

A divided panel of this Court denied that motion.  Per Curiam Court Order (July 17, 2024) (Stay Order).  The panel majority first held that the Department had not shown a "likelihood of success in challenging the breadth of the district court's preliminary injunction."  Stay Order 5.  The majority acknowledged that the Department had argued below that "the Rule's severability provision should enable the rest of the Rule to escape the preliminary injunction," but nonetheless believed that "the possibility of a partial preliminary injunction" was not "adequately identified as an option to the district court."  Stay Order 4.  The majority also stated that granting a partial stay would require it to "mak[e] predictions without record support from the [Department] about the interrelated effects of the remainder of the Rule."  Stay Order 5.  Notwithstanding the Department's severability determinations set out within the Rule itself, the majority opined that the provisions that the Department had asked the Court to preserve "might or might not have been formulated in the absence of the heart of the Rule."  *Id.*

The panel majority further determined that the other factors also weighed against a partial stay, which it believed would inflict substantial "administrative costs" and "legal uncertainty" on recipients of federal funds.  Stay Order 5-6.  Meanwhile, the majority did not believe that the injunction would cause irreparable harm to the Department because it "does not prevent the [Department] from enforcing Title IX or longstanding regulations to prevent sex discrimination."  Stay Order 6.  And the majority asserted that "the public interest would not be served by a temporary judicial

rewriting of the Rule that may be partly or fully undone by a final court judgment." *Id.* Judge Douglas, however, would have granted the Department's motion. Stay Order 2 n.*.

The Solicitor General filed applications asking the Supreme Court to partially stay the injunction pending appeal in this case and in a related case from the Sixth Circuit. *See* Application for a Partial Stay of the Injunction Entered by the United States District Court for the Western District of Louisiana, *Department of Educ. v. Louisiana*, No. 24A78 (U.S. July 22, 2024). The Court denied the applications, reasoning that "[i]n this emergency posture in this Court, the burden is on the Government as applicant" to show entitlement to relief and that "[o]n this limited record and in its emergency applications, the Government has not provided this Court a sufficient basis to disturb the lower courts' interim conclusions that the three provisions found likely to be unlawful are intertwined with and affect other provisions of the rule." *Department of Educ. v. Louisiana*, --- S. Ct. --- , No. 24A78, 2024 WL 3841071, at *1 (U.S. Aug. 16, 2024) (per curiam). The Court also stated that it "today accept[ed] that the plaintiffs were entitled to preliminary injunctive relief as to [the] three provisions of the rule" they challenged, noting that the dispute before the Court concerned whether "other provisions of the new rule should still be permitted to take effect in the interim period while the Government's appeals of the preliminary injunctions are pending in the Courts of Appeals." *Id.* Justice Sotomayor—joined by Justices Kagan, Gorsuch, and Jackson—dissented, explaining that the "injunctions are

overbroad" because they "bar the Government from enforcing the entire rule—including provisions that bear no apparent relationship to [the plaintiffs'] alleged injuries." *Id.* at *2 (Sotomayor, J., dissenting in part from the denial of applications for stays).

## SUMMARY OF ARGUMENT

**I.**     The district court erred in holding that the challenged Rule provisions—and, specifically, their application to certain contexts involving gender-identity discrimination—were likely unlawful.

**A.**     The Rule provision addressing the scope of prohibited sex discrimination (§ 106.10) properly recognizes that gender-identity discrimination is necessarily a form of sex discrimination. That conclusion follows directly from the statute's plain text and the reasoning of *Bostock v. Clayton County*, 590 U.S. 644 (2020), which interpreted materially identical language in Title VII and concluded that gender-identity discrimination necessarily involves sex discrimination. That is so, as *Bostock* made clear, even assuming that "sex" is understood to refer only to physiological or "biological distinctions between male and female." *Id.* at 655 (quotation marks omitted).

None of the district court's reasons for distinguishing *Bostock* withstand scrutiny. As this Court has recognized, "the prohibitions of discrimination on the basis of sex [in] Title IX and Title VII are the same." *Lakoski v. James*, 66 F.3d 751, 756-57, 756 n.3 (5th Cir. 1995). Title VII and Title IX set out the same but-for

13

causation standards, and this Court has consistently looked to Title VII case law to interpret Title IX. The texts of the two provisions demonstrate that they serve the same relevant purpose of eradicating sex discrimination, and Title IX's various statutory exemptions do not suggest that Title IX's core prohibition against discrimination "on the basis of sex" can be read differently than Title VII's prohibition on discrimination "because of sex." The district court ran afoul of basic rules of statutory interpretation by relying on nebulous, atextual considerations like the court's sense of Title IX's history and purposes to conclude that "sex discrimination" carries different meanings in materially identical statutory text.

For largely the same reasons, the district court was wrong to conclude that the Rule likely violates the Spending Clause and the major-questions doctrine. Both holdings turned on the district court's erroneous conclusion that the Rule rewrites Title IX's definition of sex discrimination. But as the Supreme Court made clear in *Bostock*, the conclusion that gender-identity discrimination is a form of sex discrimination flows clearly from the statutory text, even if the definition of sex is limited to physiological or "biological distinctions between male and female." 590 U.S. at 655. Because Title IX itself unambiguously prohibits discrimination on the basis of gender identity, clear-statement principles premised on the major-questions doctrine and Spending Clause have no application to the Rule.

**B.** Section 106.31(a)(2) sets out the circumstances in which drawing sex-based distinctions constitutes prohibited discrimination. Title IX does not prohibit all

sex-based distinctions; rather, it bars only those distinctions that cause cognizable—

*i.e.*, more than de minimis—harm. At the same time, Congress identified certain

contexts, such as fraternity membership and living facilities, in which recipients may

draw sex-based distinctions—even if they cause harm—notwithstanding Title IX's

prohibition on sex discrimination. Section 106.31(a)(2) thus effectuates Title IX's text

and structure in providing that, unless a statutory basis for the exception applies, a

recipient may not separate or differentiate on the basis of sex in a manner that

subjects a person to more than de minimis harm.

The Rule also details how § 106.31(a)(2)'s standard applies to gender-identity

discrimination. The Rule explains that preventing individuals from accessing sex-

separate facilities and activities consistent with their gender identity subjects

individuals to cognizable harm. Recipients thus must permit individuals to access sex-

separate facilities or activities consistent with their gender identity, unless those

programs or facilities fall within a congressionally recognized exception. Applying

those principles to restrooms, separation of facilities by sex generally does not violate

Title IX because a cisgender male suffers no sex-based harm from being excluded

from a comparable women's restroom, and vice versa. But because restrooms are not

exempt from Title IX's nondiscrimination mandate and denying individuals the ability

to access sex-separate restrooms consistent with their gender identity causes

cognizable harm, preventing transgender students from accessing restrooms that align

with their gender identity would violate Title IX, as various courts have found.

15

The district court erred in concluding that the Department failed to adequately account for privacy, safety, and compliance concerns related to § 106.31(a)(2)'s application to sex-separate facilities. The Rule affirmed the importance of privacy and safety, and explained that nothing in the Rule prevents recipients from ensuring the privacy and safety of all students in sex-separate facilities, including by enforcing existing prohibitions on harassment and other forms of misconduct. The Rule further explained that the Department found no credible evidence that transgender students pose a particular risk to their cisgender peers or that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interests. And the Rule explained that recipients may take reasonable measures to verify an individual's gender identity for purposes of compliance with § 106.31(a)(2).

C.     The district court further erred in holding that § 106.2's definition of hostile-environment harassment contravenes the First Amendment. The standard announced in § 106.2 closely tracks the Department's longstanding interpretation of Title IX as well as the standard applied for evaluating hostile-environment harassment under Title VII. No court had previously found those standards in conflict with the First Amendment; to the contrary, various courts—including this one—have upheld those proscriptions on hostile-environment harassment without raising any First Amendment concerns. And if any doubt remained, the Rule makes clear that no

provision requires or authorizes a recipient to violate anyone's First Amendment rights when addressing sex-based harassment.

The district court misapprehended the Rule's operation in suggesting that the hostile-environment standard is facially invalid under the First Amendment. The Rule defines the scope of prohibited harassment narrowly in terms of specific and required elements, using a standard with common usage in the nondiscrimination context. That standard does not compel any individual to use any particular speech, nor does it require recipients to silence any particular viewpoints. That courts—including this Court—have long applied analogous standards in both the Title VII and Title IX contexts without raising speech-related concerns demonstrates that § 106.2's definition of hostile-environment harassment comports with the First Amendment.

**II.** The remaining preliminary-injunction factors favor the government. Most importantly, plaintiffs failed to establish irreparable harm stemming from the provisions of the Rule they challenge. The ordinary, annual costs of complying with federal regulations—which plaintiffs will need to do whether operating under the Rule or its predecessor—do not amount to irreparable harm, particularly where (as here) plaintiffs made no showing that their costs were sufficiently unusual or extensive to justify the extraordinary remedy of a preliminary injunction. Equally unavailing was the court's abstract invocation of First Amendment rights, as plaintiffs identified no individual facing an objective and concrete threat of specific future harm. In contrast, the equities plainly favor the implementation of a regulation intended to fight sex

17

discrimination and to help ensure that all students can access federally funded educational opportunities.

**III.** Finally, the preliminary injunction was at minimum substantively overbroad. The district court found only three provisions of the Rule invalid, and even then, only their application to specific contexts involving gender-identity discrimination. The Department's severability determinations make clear that the remaining provisions could and should take effect even if those three provisions were enjoined; no judicial guesswork is required to divine the Department's intent in this regard. The district court's expansive injunction vastly exceeded what was necessary to redress "the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). And contrary to the motions panel's decision, the government squarely presented arguments about severability and limiting the scope of the injunction before the district court.

## STANDARD OF REVIEW

This Court reviews the district court's "ultimate decision whether to grant or deny a preliminary injunction" for "abuse of discretion," but any legal conclusions supporting that decision are reviewed "de novo." *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 418-19 (5th Cir. 2001).

# ARGUMENT

## I. Plaintiffs Are Unlikely to Prevail on the Merits of Their Challenges.

### A. Gender-Identity Discrimination Is Necessarily a Form of Discrimination on the Basis of Sex.

Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Section 106.10 describes the scope of that prohibition, explaining that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," 34 C.F.R. § 106.10, "because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female,'" 89 Fed. Reg. at 33,802 (quoting *Bostock v. Clayton County*, 590 U.S. 644, 655 (2020)). Section 106.10 thus makes clear that Title IX's prohibition on sex discrimination covers actions like excluding a student from homecoming for being pregnant, giving a student detention for being gay, or barring a student from band for being transgender.

The district court's decision—mirroring plaintiffs' challenges—focused on § 106.10's inclusion of gender identity. *See* ROA.2364-2369; *see also* ROA.1164-1173; ROA.2665-2671. On that score, the court rejected the Rule's recognition that the Supreme Court's reasoning in *Bostock*, when applied to the text of Title IX, leads naturally to the conclusion that discrimination based on gender identity is necessarily a form of discrimination "on the basis of sex." *See* ROA.2366-2369. But the reasons

19

the district court gave for that conclusion have no foundation in the text of the statute and cannot be squared with the analysis in *Bostock*.[4]

    **1.**    Section 106.10 reflects a straightforward application of *Bostock*'s reasoning. There, the Supreme Court confronted the provision of Title VII making it unlawful "for an employer … to discriminate against any individual … because of such individual's … sex." *Bostock*, 590 U.S. at 655 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Court explained that Title VII's "because of" language "incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 656 (quotation marks omitted). "[S]ex is necessarily a but-for cause" of discrimination on the basis of sexual orientation or gender identity, the Court explained, "because it is impossible to

---

[4] In denying the Department's stay applications, the Supreme Court did not address—or even mention—the applicability of *Bostock* to Title IX's text. Nor did it otherwise resolve the merits of the Department's appeals from the preliminary injunctions. The brief per curiam order merely noted that "all Members of the Court today accept[ed]" that the plaintiffs there were entitled to preliminary relief as to the challenged provisions, a statement describing only a stay-stage determination regarding the preliminary injunctions, as the dissent made clear. *Department of Educ. v. Louisiana*, --- S. Ct. -----, No. 24A78, 2024 WL 3841071, at *1 (U.S. Aug. 16, 2024) (per curiam); *see id.* at *2 (Sotomayor, J., dissenting in part from denials of applications for stays) ("For now, on the briefing and record currently before us, I would stay the preliminary injunctions except as to the three [challenged] provisions."). The Court's and dissent's analysis concerned only the separate question of whether "other provisions of the new rule should still be permitted to take effect in the interim period while the Government's appeals of the preliminary injunctions are pending in the Courts of Appeals"—and again, addressed only whether the Department had satisfied its "burden … as applicant to show" in that "emergency posture" that it was entitled to a stay, without purporting to weigh in on the appeals that the Court noted were ongoing. *Id.* at *1 (per curiam); *see id.* at *2 (Sotomayor, J., dissenting in part from the denials of applications for stays).

discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660-61 (emphasis omitted). Such discrimination would, for example, "penalize[] a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 660. That is true even on the assumption that "sex" in Title VII "refer[s] only to biological distinctions between male and female," *id.* at 655 (quotation marks omitted), and even without having to decide how the insight applies to sex differentiation in contexts such as "bathrooms, locker rooms, and dress codes," *id.* at 681.

*Bostock*'s reasoning applies with equal force to Title IX's prohibition against discrimination "on the basis of sex." 20 U.S.C. § 1681(a). Title IX imposes a causation standard no more stringent than but-for causation under Title VII. *See Lakoski v. James*, 66 F.3d 751, 756-57, 756 n.3 (5th Cir. 1995) ("[T]he prohibitions of discrimination on the basis of sex [in] Title IX and Title VII are the same."). And as *Bostock* made clear, "sex is necessarily a but-for cause" of discrimination on the basis of sexual orientation or gender identity. 590 U.S. at 661 (emphasis omitted). A school, no less than an employer, engages in sex discrimination when it "penalizes a person … for traits or actions that it tolerates" in persons identified as a different sex "at birth." *Id.* at 660. That is why various courts have concluded that, in light of *Bostock*, discrimination on the basis of sexual orientation and gender identity are necessarily forms of prohibited sex discrimination under Title IX. *See, e.g., Grimm v.*

*Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir.), *as amended* (Aug. 28, 2020); *A.C. ex rel. M.C. v. Metropolitan Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Grabowski v. Arizona Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023). That conclusion does not depend, the Department explained, on viewing the term "sex" in Title IX to mean anything other than "physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655).

**2.** None of the district court's reasons for rejecting that conclusion is valid. As an initial matter, the district court's reasoning appeared to stem from a fundamentally incorrect understanding of Title IX: The district court repeatedly stated that Title IX is intended to protect only "biological women from discrimination." *E.g.*, ROA.2367, 2368. But that claim has no basis in the text of the statute, which states that "[n]o person" shall be subject to discrimination on the basis of sex." 20 U.S.C. § 1681(a). That expansive language reflects Congress's broad purpose of eliminating all forms of sex discrimination against people of any sex.

The court also stated that the ordinary meaning of "sex discrimination" at the time of Title IX's passage referred only to discrimination against "biological males and females." ROA.2366 (quotation marks omitted). And the court found no definition "that defined 'sex' [to] include[e] gender identity." ROA.2366. But § 106.10 does not purport to redefine sex—it simply applies the analysis that was applied in *Bostock* to determine that discrimination on the basis of gender identity is necessarily

discrimination on the basis of sex even assuming a definition of sex tied to "biological distinctions between male and female." *Bostock*, 590 U.S. at 655.

The district court also dismissed *Bostock*'s relevance on the ground that the decision was about the meaning of Title VII. ROA.2368. But *Bostock*'s core insight— that "it is impossible to discriminate against a person for being … transgender without discriminating against that individual *based on* sex," 590 U.S. at 660 (emphasis added)—applies equally to Title IX. If an employer "fires a transgender person who was identified as a male at birth but who now identifies as a female" yet "retains an otherwise identical employee who was identified as female at birth," the employer has engaged in discrimination based on sex assigned at birth because it has "intentionally penalize[d] a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* Exactly the same is true under Title IX: A school that excludes or punishes a female student for being transgender has engaged in discrimination "on the basis of sex," 20 U.S.C. § 1681(a), because it has penalized her for traits it would have tolerated in an otherwise identical student identified as female at birth.

The district court nowhere explained how Title VII's prohibition on discrimination "because of" sex means something different from Title IX's prohibition on discrimination "on the basis of" sex. In *Bostock* itself, the Supreme Court substituted the phrase "on the basis of" for Title VII's "because of" formulation at least eight times. *See, e.g.*, 590 U.S. at 650 (noting that "in Title VII,

Congress outlawed discrimination in the workplace *on the basis of* race, color, religion, sex, or national origin" (emphasis added)); *see Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 918 (5th Cir. 2023) (explaining *Bostock*'s holding that Title VII bars discrimination based on sexual orientation because it is "discrimination ... 'on the basis of sex'"). And in other contexts, the Supreme Court has explained that the ordinary meaning of "the phrase 'based on' indicates a but-for causal relationship" and that the phrase "has the same meaning as the phrase, 'because of.'" *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (quotation marks omitted).

The district court also suggested that the "purpose" of Title VII and Title IX differ. ROA.2368. But broad invocations of statutory purpose cannot undermine the straightforward textual analysis set out above. In any event, the relevant purpose of both statutes is the same: to root out sex discrimination in all its forms, albeit in different settings. *Lakoski*, 66 F.3d at 756-57, 756 n.3. As for the fact that Title IX contains statutory provisions allowing sex separation in some contexts, ROA.2367-2368, those provisions hardly compel a different understanding as to the scope of prohibited sex discrimination in the first instance. Title VII also contains statutory exceptions, *see* 42 U.S.C. § 2000e-2(e) (bona fide qualifications), and has long been understood to allow certain forms of sex separation in certain contexts, like "sex-segregated bathrooms, locker rooms, and dress codes," *Bostock*, 590 U.S. at 681. Yet the Supreme Court still held that gender-identity discrimination is necessarily a form of sex discrimination. The presence of statutory provisions that allow for sex

24

separation in certain contexts only reinforces the Rule's conclusion: They show that Congress understood Title IX's general prohibition against sex discrimination otherwise could have been applied to such separation or differentiation. *See Arnold, Constable & Co. v. United States*, 147 U.S. 494, 499 (1893) ("[T]he exception of a particular thing from general words proves that, in the opinion of the lawgiver, the thing excepted would be within the general clause had the exception not been made." (quotation marks omitted)).

**3.**     Finally, the district court erred in concluding that the Rule is suspect under the major-questions doctrine and the Spending Clause. ROA.2370-2377. On both scores, the district court's holding stemmed from its erroneous conclusion that the Rule somehow redefined "sex" to be synonymous with gender identity. ROA.2374, 2376. As already explained, discrimination on the basis of gender identity is necessarily a form of sex discrimination covered by Title IX's text, even if sex "is understood to mean only physiological or 'biological distinctions between male and female,'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655); *see supra* pp.19-26. Because Title IX itself unambiguously prohibits discrimination on the basis of gender identity, clear-statement principles premised on the major-questions doctrine and Spending Clause have no bearing on the scope of prohibited discrimination in § 106.10. The statute places recipients of federal funds clearly on notice that they must comply with the prohibition on sex-based discrimination in all of its forms. *Cf. Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174-75 (2005) (holding that Title IX's

private right of action encompasses retaliation claims even though the statute does not specifically mention retaliation).  And just as the major-questions doctrine posed no obstacle to *Bostock*'s recognition that Title VII prohibits gender-identity discrimination, as the Equal Employment Opportunity Commission had already concluded, it poses no obstacle to recognizing that the Department has correctly interpreted the parallel text of Title IX.

**B.**     **The Rule's Treatment of Sex-Separate Spaces Effectuates Title IX's Text and Reflects the Department's Consideration of Relevant Issues.**

Section 106.31(a)(2) is the provision detailing when otherwise permissible separation or differentiation on the basis of sex constitutes prohibited sex discrimination.  It provides that subject to certain congressionally recognized exceptions, recipients may not differentiate on the basis of sex when doing so causes more than de minimis harm.  The district court concluded that § 106.31(a)(2)'s application to restrooms and locker rooms was arbitrary and capricious, ROA.2380-2382.  That conclusion does not withstand scrutiny.

**1.**     Section 106.31(a)(2) effectuates Title IX's plain text, which prohibits "discrimination" on the basis of sex.  20 U.S.C. § 1681(a).  As the Supreme Court has explained, "the term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals."  *Bostock*, 590 U.S. at 681 (quotation marks omitted); *see Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (similar).  Because "the concept of discrimination includes an element of injury or harm," 89 Fed. Reg. at

33,815, the Department "does not interpret Title IX to prohibit all sex-based distinctions or separation," *id.* at 33,814. Rather, Title IX prohibits "only" those sex-based distinctions "that subject[] any person to legally cognizable injury—*i.e.*, more than de minimis harm." *Id.* The Rule thus explains that recipients generally may not separate or differentiate on the basis of sex where doing so causes harm.

At the same time, the Rule recognizes that in certain contexts Congress permitted recipients to separate or distinguish on the basis of sex, even if doing so causes cognizable harm. *See* 89 Fed. Reg. at 33,816. Those limited contexts permit, among other things, sex-separate fraternities and sororities, 20 U.S.C. § 1681(a)(6)(A); voluntary youth service organizations, *id.* § 1681(a)(6)(B); and "living facilities," *id.* § 1686. The Rule effectuates Congress's decision to treat those contexts differently by exempting them from § 106.31(a)(2)'s de minimis harm standard. 89 Fed. Reg. at 33,816.[5]

---

[5] Congress also legislated separately regarding Title IX's application to athletics, *see* Education Amendments of 1974, Pub. L. No. 93-380, tit. VIII, pt. D, § 844, 88 Stat. 484, 612. Insofar as the district court raised concerns that "the … Rule will arguably apply to athletic teams," despite disclaiming this issue as a consideration in its decision, ROA.2372, it erred. As § 106.31(a)(2) makes clear in its text, it does not apply where sex separation or differentiation is "permitted by … [34 C.F.R.] § 106.41(b)," an existing regulation concerning sex-separate athletics teams. 34 C.F.R. § 106.31(a)(2). This case does not implicate the existing regulations regarding athletics, which are the subject of a different, ongoing rulemaking. *See* 89 Fed. Reg. at 33,817.

The Rule further specifies how § 106.31(a)(2) applies to gender-identity discrimination.[6] The Rule explains that, except as provided in the recognized exceptions, recipients must permit individuals to access sex-separate facilities and activities consistent with their gender identity because "prevent[ing] a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex." 34 C.F.R. § 106.31(a)(2). As relevant here, the Department has long recognized that sex separation "in the context of bathrooms or locker rooms[] is not presumptively unlawful sex discrimination" because a cisgender male suffers no sex-based harm from being excluded from a comparable women's restroom or locker room, and vice versa. 89 Fed. Reg. at 33,818. That is why existing regulations permit sex-separate "toilet, locker room, and shower facilities," so long as the facilities are "comparable." 34 C.F.R. § 106.33. But it violates Title IX to bar transgender students from accessing restrooms that align with their gender identity because doing so *does* cause cognizable harm and because restrooms are not exempted from the statute's general nondiscrimination mandate. 89 Fed. Reg. at 33,818. Consistent with that conclusion, various courts have held—both before and after *Bostock*—that school policies that

_____

[6] Section 106.31(a)(2)'s protections are not limited to that context, instead applying "with equal force to all students." 89 Fed. Reg. at 33,818.

prevent students from accessing the restrooms that correspond to their gender identity violate Title IX. *See, e.g.*, *A.C.*, 75 F.4th at 769; *Grimm*, 972 F.3d at 616.

**2.** The district court did not dispute that Title IX's nondiscrimination mandate generally prohibits sex differentiation or separation that causes more than de minimis harm. Nor did the court dispute the Department's conclusion—supported by ample case law—that preventing a person from participating in an education program or activity, including accessing a sex-separate facility, consistent with their gender identity subjects the person to harm.

The district court nevertheless concluded that the Rule's treatment of gender-identity discrimination in sex-separate spaces is arbitrary and capricious. ROA.2377-2383. None of the district court's bases for that conclusion has merit. The arbitrary and capricious standard is "deferential" and requires only a "rational" explanation for the agency's actions. *Frey v. U.S. Dep't of Health and Human Servs.*, 920 F.3d 319, 326 (5th Cir. 2019) (quotation marks omitted). The Rule's extensive discussion of § 106.31(a)(2)'s applications to sex-separate facilities—including issues related to safety, privacy, and compliance—easily satisfies this "highly deferential" standard. *Id.* (quotation marks omitted).

The district court expressed concern that § 106.31(a)(2)'s standard is "ambiguous" as to how it will apply in circumstances where Congress permitted recipients to separate or distinguish on the basis of sex. ROA.2380. But as discussed above, there is no such ambiguity. The Rule clearly effectuates the distinctions

Congress drew by recognizing that Title IX requires that "a recipient must not provide sex-separate facilities or activities in a manner that subjects any person to legally cognizable injury"—including by preventing individuals from participating in a sex-separate program or activity consistent with their gender identity—"*unless there is a statutory basis for allowing otherwise.*" 89 Fed. Reg. at 33,814 (emphasis added). The Department's specific recognition of the statutory exemptions hardly renders the regulation "ambiguous," nor does it make those exemptions "meaningless." ROA.2380-2381. On the contrary, that recognition makes it plain that statutory exemptions to Title IX's general nondiscrimination mandate certainly *can* "be relied on to allow sex separation." ROA.2381.

No statutory exception exists, however, regarding bathrooms and locker rooms. To the extent that the district court suggested that the de minimis harm standard's application to sex-separate restrooms and locker rooms failed to account for, or cannot be reconciled with, exceptions for, *e.g.*, fraternities, it erred. In enacting Title IX, *Congress* chose which contexts to exempt from the statute's general nondiscrimination mandate. Congress "could have, but did not," include an exemption for sex-separate restrooms and locker rooms, 89 Fed. Reg. at 33,821, and § 106.31(a)(2) reflects that legislative choice to apply Title IX's general nondiscrimination mandate to such contexts. The Supreme Court "has explained many times" that courts may not "disregard [a statute's] plain terms based on some extratextual consideration." *Bostock*, 590 U.S. at 673-74. As it has for decades, the

30

Department continues to permit recipients to maintain sex-separate restrooms and locker rooms, *see* 34 C.F.R. § 106.33, but the ways in which recipients control access to those facilities may not discriminate—*i.e.*, cause cognizable harm—on the basis of sex, *id.* § 106.31(a)(2).

The district court also opined that the Rule "failed to consider" concerns related to privacy and safety in restrooms and locker rooms. ROA.2379-2382. The Rule, however, thoroughly addressed these concerns, explaining that the Department "agrees that recipients have a legitimate interest in protecting all students' safety and privacy" and that such goals are not "inconsistent with § 106.31(a)(2)." 89 Fed. Reg. at 33,820. The Rule emphasized that nothing prevents recipients from taking steps "to ensure privacy and safety for all students in a recipient's sex-separate facilities— steps that many recipients already take consistent with their general codes of conduct, including rules prohibiting harassment, assault, and other forms of misconduct." *Id.* The Rule further explained that recipients may "offer[] single-occupancy facilities, among other accommodations, to any students who seek additional privacy for any reason." *Id.*[7]

---

[7] The Rule explained that recipients are not required to provide "single-occupancy facilities" both "because such facilities are not the only way a recipient could provide nondiscriminatory access to its facilities" and because it "would likely carry significant cost implications." 89 Fed. Reg. at 33,820. Contrary to the district court, then, the Department did consider the "additional costs" to recipients for providing such facilities. ROA.2380.

The court nonetheless insisted that the Rule "failed to consider" the purported privacy harms to cisgender students from sharing restrooms and locker rooms with transgender students, ROA.2381-2382, including by "fail[ing] to consider" that men and women "have different body parts," ROA.2379. But the Department reasonably explained that, based on its "enforcement experience, listening sessions with stakeholders, and its review of Federal case law," it disagreed that "transgender students pose a safety risk to cisgender students, or that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interest." 89 Fed. Reg. at 33,820. The Department pointed to the experience of schools across the country who attested that, when "integrat[ing] transgender students into gender-specific facilities," "hypothetical fears and concerns" regarding safety and privacy have been "wholly unfounded in practice." Amici Curiae Brief of School Administrators, *Grimm v. Gloucester Cty. Sch. Bd.*, No. 19-1952 (4th Cir. Nov. 25, 2019), 2019 WL 6341095, at *18-19; *see* 89 Fed. Reg. at 33,820; *see also* Amici Brief of California, et al. at 4-14, *Tennessee v. Miguel Cardona*, No. 24-5588 (6th Cir. Aug. 13, 2024) (discussing "documented experience of school administrators in thirty-one states and the District of Columbia" showing that providing access to bathrooms and locker rooms consistent with gender identity does not result in "safety or privacy risks" or abuse). It also noted various court decisions that have rejected "unsubstantiated" and "generalized" claims that "transgender persons' access to sex-separate spaces infringes on other students' privacy or safety." 89 Fed. Reg. at 33,820

(citing examples).  It was thus in no way arbitrary or capricious for the Department to conclude that a "recipient can make and enforce rules that protect all students' safety and privacy without also excluding transgender students from accessing sex-separate facilities and activities consistent with their gender identity."  *Id.*

The district court likewise erred in suggesting that the Rule arbitrarily precludes recipients from taking reasonable measures to verify individuals' gender identity. ROA.2382.  The court appears to have simply misunderstood the Department's explanation to the contrary, which highlights that recipients can indeed rely "on written confirmation of the student's gender identity by the student or student's parent, counselor, coach, or teacher."  89 Fed. Reg. at 33,819 (noting also that recipients may rely on "a student's *consistent* assertion" (emphasis added)).  The Department explained that recipients may not require documentation that would be invasive or burdensome, or where "access to such documentation is prohibited by law."  89 Fed. Reg. at 33,819.  But that hardly amounts to a requirement to allow individuals to access a bathroom by "simply declar[ing that] they have changed gender identities," ROA.2382, where there are indications that gender identity is not "sincere," ROA.2379, or where they announce different "gender identities every day or several times per day," ROA.2379.

### C.	The Rule's Prohibition on Hostile-Environment Harassment Raises No First Amendment Concerns.

The district court also erred in holding that the Rule's prohibition on harassment—particularly, the application of § 106.2's definition of hostile-environment harassment to certain contexts involving transgender individuals—contravenes the First Amendment.  ROA.2369-2370.  The court's conclusion rests on a basic misapprehension of how § 106.2's definition of hostile environment harassment operates, as well as a disregard for longstanding antidiscrimination practice and principles.

**1.**	It is well established that prohibited sex discrimination under Title IX includes sex-based harassment.  *See Jackson*, 544 U.S. at 174.  One form of prohibited harassment is hostile-environment harassment, which § 106.2 defines as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.*, creates a hostile environment)."  34 C.F.R. § 106.2.

The Rule makes a handful of changes to the definition of hostile-environment harassment promulgated in 2020, but the standard announced in § 106.2 is hardly novel.  *See* 89 Fed. Reg. at 33,497.  It closely tracks the Department's "longstanding interpretation of Title IX" and accompanying "enforcement practice" prior to the 2020 amendments.  *Id.* at 33,508; *see Revised Sexual Harassment Guidance: Harassment of*

*Students by School Employees, Other Students, or Third Parties*, 66 Fed. Reg. 5512 (Jan. 19,

2001).[8]  It also mirrors the standards applied in the context of "numerous civil rights

laws, including Title VII." 89 Fed. Reg at 33,508; *see Harris v. Forklift Sys., Inc.*, 510

U.S. 17, 21 (1993) (applying a severe "or" pervasive standard to conduct that

"alter[ed] the conditions" of employment (quotation marks omitted)).

Prior to litigation over the Rule, no court had held that the standards for

evaluating hostile-environment harassment long applied in the Title VII and Title IX

contexts contravened the First Amendment.  To the contrary, the Supreme Court

upheld "similar proscriptions on hostile environment harassment" in both contexts

"without raising any First Amendment concerns."  89 Fed. Reg. at 33,505-06; *see Davis*

*ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) (Title IX);[9] *Harris*,

510 U.S. at 23 (holding Title VII's harassment standard applied to sex-based insults,

---

[8] Whereas the 2020 standard prohibited unwelcome sex-based conduct "determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person" access to an education program or activity, 34 C.F.R. § 106.30(a)(2) (2020), § 106.2 prohibits unwelcome sex-based conduct that "based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies" such access, *id.* § 106.2 (2024).

[9] In *Davis*, the Court addressed the standard for a private damages claim premised on hostile-environment harassment brought under Title IX's implied right of action.  526 U.S. at 650.  Although the *Davis* standard differs from § 106.2 in certain respects, the standard for private damages actions need not control in the administrative enforcement context.  *See* 89 Fed. Reg. at 33,497-501.  The district court, moreover, nowhere suggested that the Rule was invalid for departing from *Davis.*

35

despite First Amendment objections). That makes sense: A recipient can ensure that the classroom, like the workplace, is free from sex-based "intimidation, ridicule, and insult" without governing every "utterance," *Harris*, 510 U.S. at 21 (quotation marks omitted), and while simultaneously safeguarding the right of individuals to speak on contentious issues consistent with the First Amendment.

If any doubt remained, the Rule also makes clear that "nothing in the regulations"—including § 106.2—"requires or authorizes a recipient to violate anyone's First Amendment rights." 89 Fed. Reg. at 33,516; *see also* 34 C.F.R. § 106.6(d). Thus, while recipients must address hostile environments, the Department expressly recognized that the "First Amendment may in certain circumstances constrain the manner in which a recipient responds to sex-based harassment in the form of speech." 89 Fed. Reg. at 33,503.

**2.** Contrary to the district court's description, § 106.2's hostile-environment-harassment standard does not "compel staff and students to use whatever pronouns a person demands." ROA.2369. Section 106.2 neither compels any particular speech by students or staff, nor requires anyone to affirm "any particular view on any issue." 89 Fed. Reg. at 33,505. The Rule merely requires that federal funding *recipients*—like educational institutions and schools—address sex-based harassment that is "subjectively and objectively offensive" and "so severe or pervasive" as to limit or deny a person's ability to access their education programs or activities. 34 C.F.R. § 106.2.

Requiring schools to address sex-based harassment—even where it involves speech—is different in kind from "telling" individual students and staff "what they must say." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 61 (2006). The government can ensure that the classroom, no less than the workplace, is free from sex-based "intimidation, ridicule, and insult" without governing every "utterance," *Harris*, 510 U.S. at 21 (quotation marks omitted), and while preserving the right of individuals to be free from compelled speech under the First Amendment.

Nor does the Rule mean that recipients will be exposed to liability just because students or faculty refuse to use preferred pronouns. The Department explained that "whether verbal conduct constitutes sex-based harassment is necessarily [a] fact-specific" inquiry but that "a stray remark, such as a misuse of language, would not constitute" harassment. 89 Fed. Reg. at 33,516. Even if there were circumstances in which the persistent or acute refusal to use pronouns consistent with a student's gender identity contributed to a claim of hostile-environment harassment, nothing in the Rule would "require[] or authorize[]" the recipient to take remedial measures that would "violate anyone's First Amendment rights." *Id.* And nothing in the Rule requires or authorizes the recipient to "silenc[e]" opposing viewpoints, ROA.2369.

The hostile-environment standard also poses no overbreadth problems. It "covers only sex-based conduct that is unwelcome, both subjectively and objectively offensive, and so severe or pervasive that it limits or denies a person's ability to participate in" an "education program or activity." 89 Fed. Reg. at 33,503. The Rule

"only prohibit[s] conduct that meets all the[se] elements" and requires an evaluation based on the "totality of the circumstances" to ensure that no "required element[] … is ignored." *Id.* at 33,506. Courts and agencies have long applied analogous harassment standards in the Title VII and Title IX contexts. *See Harris*, 510 U.S. at 23; *Rowles v. Curators of the Univ. of Mo.*, 983 F.3d 345, 352, 355 (8th Cir. 2020) (rejecting overbreadth challenge to standard nearly identical to § 106.2's hostile-environment standard). The district court's wholly unexplained contention that "the implications here are different than implication[s] in something like a Title VII case," ROA.2370, provides no basis for concluding that the Rule's return to a well-established standard is likely to facially violate the First Amendment.

## II. The Remaining Factors Weigh Against Preliminary Injunctive Relief.

The preliminary injunction should be vacated for the independent reason that plaintiffs have not made the requisite "clear showing" that the remaining preliminary injunction factors are satisfied. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Plaintiffs have not established that they will suffer immediate and irreparable harm absent the injunction. Nor have they demonstrated that the balance of harms and public interest weigh in favor of preliminary relief.

### A. Plaintiffs Failed to Establish Irreparable Harm.

"A preliminary injunction is an extraordinary remedy which the district court should grant only when necessary to protect the plaintiff from irreparable injury."

*Van Arsdel v. Texas A&M Univ.*, 628 F.2d 344, 346 (5th Cir. 1980). The district court erred in concluding that plaintiffs made that showing.

The district court first held that plaintiffs established irreparable harm in the form of compliance costs. ROA.2383-2384. But to establish that compliance costs constitute irreparable harm, a plaintiff must show that costs associated with the challenged aspects of the government action are "more than 'speculative'" and based on "'more than an unfounded fear'" on the part of the movant. *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022). Here, the overwhelming majority of the costs about which plaintiffs have speculated relate to unchallenged provisions of the Rule. *See, e.g.*, ROA.2383 (pointing to costs associated with Rule's training requirements and recordkeeping costs). Those costs—associated with provisions that the district court did not find likely to be unlawful—do not harm plaintiffs at all, let alone irreparably; they are the sort of garden-variety expenses that school districts incur every year in exchange for receiving substantial federal funds. Indeed, training and recordkeeping were already required by the 2020 rule. *See* 34 C.F.R. § 106.45(b)(1)(iii), (10) (2020).

Absent a showing that any particular compliance costs are caused by provisions that plaintiff has established are likely to be held unlawful, courts routinely reject claims of irreparable harm. *See Pennsylvania v. DeVos*, 480 F. Supp. 3d 47, 68 (D.D.C. 2020) (rejecting claims of irreparable harm premised on undifferentiated costs in challenge to 2020 Title IX Rule); *New York v. U.S. Dep't of Educ.*, 477 F. Supp. 3d 279, 304-05 (S.D.N.Y. 2020) (same). And while the district court believed that the "short

39

time Plaintiffs have to comply" weighed in favor of irreparable harm, ROA.2384, the 2020 rule gave schools a similar period to comply. *See* 85 Fed. Reg. at 30,028 (published May 19, 2020; effective August 14, 2020).

Similarly, the district court's abstract concerns about First Amendment rights cannot justify a preliminary injunction. The court nowhere specified whose First Amendment rights were immediately threatened or how. *See* ROA.2384. And as discussed above, *supra* pp.34-38, the district court's assessment that plaintiffs had shown a "substantial likelihood" that the Rule's harassment standard would cause First Amendment violations, ROA.2384, is wrong. In any event, the plaintiff states cannot assert the constitutional rights of their citizens, as a "State does not have standing as *parens patriae* to bring an action against the Federal Government." *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023) (quotation marks omitted).

The district court's suggestion that plaintiffs face irreparable harm in the form of lost federal funding, ROA.2384, is plainly wrong. Plaintiffs made no showing that any recipient within their states faced an imminent loss of federal funding. That is hardly surprising, for "Title IX clearly provides that an agency may not take administrative action to revoke a recipient's funding until notice and opportunity to cure has been provided." *New York*, 477 F. Supp. 3d at 304 n.12. In particular, funding cannot be terminated until (1) the Department has unsuccessfully endeavored to obtain voluntary compliance, (2) the recipient has had an opportunity to contest the Department's allegations at an administrative hearing, (3) the Department has

provided notification to Congress, and (4) 30 days have passed.  *See* 20 U.S.C. § 1682.[10]  The extensive review process renders any claim of harm premised on the loss of federal funding entirely theoretical and not at all imminent.

Equally unavailing is the district court's conclusion that the Rule causes them sovereign harm by preempting conflicting state law.  ROA.2384.  The Rule does not actually prevent the states from enforcing their laws; in implementing Spending Clause legislation, it operates "in the nature of a contract: in return for federal funds, the [s]tates *agree* to comply with federally imposed conditions," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (emphasis added).  States have no right to demand the federal government's money while rejecting the terms on which the federal government has elected to make that money available.  In any event, "it is black-letter law that the federal government does not invade areas of state sovereignty simply because it exercises its authority in a way that preempts conflicting state laws." *Florida v. Department of Health & Human Servs.*, 19 F.4th 1271, 1291 (11th Cir. 2021) (alteration and quotation marks omitted).

## B.    The Equities and Public Interest Weigh Against an Injunction.

The remaining factors tilt decisively towards the Department.  Every time the federal government "is enjoined by a court from effectuating statutes enacted by

_____

[10] After unsuccessfully seeking voluntary compliance, the Department also has the option of referring the matter to the Department of Justice to bring a civil action. *See* 20 U.S.C. § 1682; 34 C.F.R. § 100.8(a)(1).

representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation marks omitted). The Rule effectuates Title IX's goals of "avoid[ing] the use of federal resources to support discriminatory practices … [and] provid[ing] individual citizens effective protection against those practices." *Cannon v. University of Chi.*, 441 U.S. 677, 704 (1979). No one disputes that preventing discrimination serves a compelling public interest.

Plaintiffs, by contrast, have established no cognizable harm from complying with the Rule while they litigate their claims. *See supra* pp.38-41. In any case, any such harms would be dramatically outweighed by the government's interest in stamping out sex discrimination and ensuring all students have equal access to federally funded educational opportunities. *Cf. Winter*, 555 U.S. at 23 (public interest in naval training "outweighed" irreparable injury to wildlife).

## III. At a Minimum, the Injunction Is Overbroad.

Finally, at a minimum, the preliminary injunction was substantively overbroad, for "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs" on their valid claims. *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

**A.** Contrary to the decision of the motions panel, the government "adequately identified" the "possibility" of a more tailored injunction "as an option to the district court." Stay Order 4. The government's opposition to respondents'

motion for a preliminary injunction included an entire section arguing that any relief "should be limited in accordance with the [Administrative Procedure Act] and equitable principles." ROA.2201; *see* ROA.2201-2204. And the government invoked precisely the same equitable principles it is invoking here, emphasizing that preliminary relief should be limited to "portions of the Rule as to which the Court has found that Plaintiffs have established a likelihood of success" and "'should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" ROA.2201-2208. Before the district court had issued a ruling finding any provision of the Rule likely invalid, it would be unreasonable to expect the government to have more specifically explained how the remaining portions of the Rule would continue to operate in the absence of that as-yet-unidentified provision.

In demanding more, the panel majority seriously departed from the traditional limits on the equitable powers of Article III courts. The majority appeared to assume that a showing that any provision of an omnibus rule is likely invalid presumptively justifies a preliminary injunction against enforcement of the entire rule, shifting the burden to the government to justify any exceptions. But that is backwards. A preliminary injunction is an "extraordinary" exercise of equitable authority that may be awarded only "upon a clear showing" by the *plaintiff* that they are "entitled to such relief." *Winter*, 555 U.S. at 22. A district court thus has no power to preliminarily enjoin any provision of a rule unless the party seeking relief has established that the

43

relevant provision is both likely invalid and likely to cause irreparable harm absent relief. *Id.* at 20.

**B.** Accordingly, the district court plainly erred in enjoining provisions of the Rule that plaintiffs did not challenge and that the court did not find unlawful. As explained, the district court's conclusions concern only three discrete provisions of the Rule related to gender identity: 34 C.F.R. § 106.10, 34 C.F.R. § 106.31(a)(2), and 34 C.F.R. § 106.2's definition of hostile-environment harassment. But the Rule makes dozens of unrelated changes, most of which have nothing to do with gender identity. To identify a few specific examples:

- The Rule requires schools to provide pregnant and post-partum students with reasonable modifications and to inform pregnant students of their rights. 34 C.F.R. §§ 106.40(b).

- The Rule alters the definition of "complainant" to permit complaints by former students and employees who suffered discrimination while participating or attempting to participate in a covered program. *Id.* § 106.2; *see* 89 Fed. Reg. at 33,481-84.

- The Rule clarifies that funding recipients must prohibit retaliation, including peer retaliation, and take appropriate action in response to information about conduct that reasonably may constitute retaliation. 34 C.F.R. § 106.71.

- The Rule provides schools with more flexibility regarding the timing and structure of their grievance procedures. *Id.* §§ 106.45-106.46.

- The Rule affirms that recipients may disclose certain information to parents and legal guardians about their minor children. *Id.* § 106.44(j)(2).

The district court did not find any of those provisions unlawful, and there was thus no basis to enjoin the Department from enforcing them. Nor do any of those

amendments depend in any way on the challenged provisions addressing gender-identity discrimination and harassment. All of them would remain fully operative if the challenged provisions were enjoined in whole or in part, and each of them could easily have been issued as separate rules.

Indeed, contrary to the motions panel's suggestion, Stay Order 5, there is no need for "judicial rewriting of the Rule" or any guesswork as to whether the Department would have promulgated the remainder of the Rule without the three challenged provisions. As the government explained in district court, the Department included its straightforward determination in the Rule itself that the provisions of the Rule are "intended to operate independently of each other," confirming that pre-existing severability clauses in the Title IX regulations apply to the Rule. 89 Fed. Reg. at 33,848. Those clauses specify that "[i]f any provision of this subpart or its application to any person, act, or practice is held invalid, the remainder of the subpart or the application of its provisions to any person, act, or practice shall not be affected thereby." 34 C.F.R. §§ 106.9, 106.16, 106.48.

The Rule thus expressly instructs that "the potential invalidity of one provision should not affect the other provisions." 89 Fed. Reg. at 33,848. And the Rule explains how the provisions not deemed unlawful, such as "the prohibition on retaliation," "operate separately from the clarification of the scope of sex discrimination under § 106.10." *Id.* As this Court recently reaffirmed in applying a functionally identical severability clause, district courts "'should adhere to the text of a

severability clause' in the absence of extraordinary circumstances,'" *National Ass'n of Mfrs. v. SEC*, 105 F.4th 802, 815 (5th Cir. 2024) (quoting *Barr v. American Ass'n of Political Consultants*, 591 U.S. 610, 624 (2020) (plurality opinion)), because such a clause "dispels any doubt about what the [agency] would have done if the" invalid provisions "were subtracted," *id.* at 816. Accordingly, there was no basis to enjoin the Department from enforcing unrelated provisions.

That many of those provisions refer to sex discrimination does not change this conclusion. The Rule specifies that provisions not deemed unlawful "operate separately from the clarification of the scope of sex discrimination under § 106.10." 89 Fed. Reg. at 33,848. Thus, even if § 106.10 remained enjoined, every other provision of the Rule's amendments would continue to function by simply operating under Title IX's prohibition against discrimination "on the basis of sex," without any further regulatory gloss. That includes the unchallenged definitions in § 106.2; the requirements for Title IX coordinators in § 106.8; the protections for pregnant and post-partum students in § 106.40; the provisions specifying recipients' obligations to respond to sex discrimination in § 106.44; the grievance-procedure provisions in § 106.45 and § 106.46; the duties of employers in § 106.57 and § 106.60; and the clarification regarding retaliation in § 106.71.

Indeed, the Title IX regulations have long operated without such a regulatory gloss. The Department's pre-existing regulations (amended in 2020) repeatedly reference "sex discrimination" without defining that term or clarifying its scope. *See,*

*e.g.*, 34 C.F.R. § 106.8(a) (2020) (Title IX coordinators); *id.* § 106.8(c) (2020) (grievance procedures); *id.* § 106.8(d) (2020) (extraterritoriality); *id.* § 106.71(a) (2020) (retaliation). Earlier regulations, too, have long referred to "discrimination on the basis of sex" and "discrimination based on sex" without defining those terms. *E.g.*, 45 C.F.R. §§ 86.1, 86.3(a)-(b), 86.4, 86.6(a), 86.9(a), (c), 86.36(a)-(c), 86.37(a)(2), (b), 86.38(a), 86.39, 86.51(a)(4), 86.53, 86.56(b), 86.59 (1975). The term "sex discrimination" or its variants has been ubiquitous in the Department's Title IX regulations for decades, and both the Department and regulated entities have understood that term to simply incorporate Title IX's prohibition on discrimination "on the basis of sex," 20 U.S.C. § 1681(a). Indeed, this Court (and many others) have interpreted and applied regulations that discuss "sex" or "sex discrimination" for decades without requiring any regulatory clarification of those terms. *See, e.g.*, *Pederson v. Louisiana State Univ.*, 213 F.3d 858 (5th Cir. 2000). All of this confirms that analogous provisions of the Rule would likewise remain fully operative even if § 106.10 were enjoined.

**C.** The district court also erred in enjoining § 106.10. Even putting aside plaintiffs' failure to demonstrate a likelihood of success as to this provision, *see supra* pp.19-26, plaintiffs do not identify any harm they would suffer if they could not engage in discrimination on the basis of gender identity (let alone the other bases listed in § 106.10, such as pregnancy or sex stereotypes). They have never suggested that they wish to punish transgender students "simply for being … transgender," *Bostock*, 590 U.S. at 651, by, for example, barring them from participating in the

science fair, the marching band, or student government.  And to the extent that plaintiffs claim harms related to restrooms or locker rooms, it is a separate provision—34 C.F.R. § 106.31(a)(2), not § 106.10—that governs access to such spaces, *see supra* p.6.

Finally, even if the district court's analysis were correct, the court erred in enjoining § 106.2 beyond its definition of hostile-environment harassment as applied to discrimination on the basis of gender identity.  Section 106.2 added or amended a score of definitions of terms used throughout the Title IX regulations.  Plaintiffs do not challenge any of these definitions besides hostile-environment harassment, and they principally object to the application of the standard in that definition to discrimination on the basis of gender identity, focusing on pronouns and salutations. *See* ROA.1646-1648.  There was therefore no basis for enjoining any more of § 106.2 than the definition of hostile-environment harassment as applied to gender-identity discrimination.

**D.**     The Supreme Court's denial of the stay applications in this case and the related Sixth Circuit case does not justify upholding the district court's overbroad injunction here.  As the Supreme Court emphasized, the stay applications were evaluated in an "emergency posture" and on a "limited record" where "the burden is on the Government as applicant to show" entitlement to emergency relief. *Department of Educ. v. Louisiana*, --- S. Ct. --- , 2024 WL 3841071, at *1 (U.S. Aug. 16, 2024).  Here, by contrast, the burden is on plaintiffs to justify the district court's sweeping

48

injunction.  *See Nichols v. Alcatel USA, Inc.*, 532 F.3d 365, 372 (5th Cir. 2008) ("A preliminary injunction is an 'extraordinary remedy' and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements.") (citation omitted)).  As explained, plaintiffs cannot do so, as the court "went beyond [its] authority to remedy the discrete harms alleged here" by "blocking the Government from enforcing scores of regulations that [plaintiffs] never challenged and that bear no apparent relationship to [their] alleged injuries."  *Louisiana*, 2024 WL 3841071 at *2 (Sotomayor, J., dissenting in part from the denial of applications for stays).

## CONCLUSION

For the foregoing reasons, this Court should vacate the district court's preliminary injunction.

Respectfully submitted,

*Of Counsel:*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

LISA BROWN
*General Counsel*
*U.S. Department of Education*

MELISSA N. PATTERSON
  */s/ Steven A. Myers*
STEPHANIE R. MARCUS
JACK STARCHER
DAVID L. PETERS
STEVEN A. MYERS

  *Attorneys, Appellate Staff*
  *Civil Division, Room 7232*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 305-1754*
  *steven.a.myers@usdoj.gov*

August 2024

50

**CERTIFICATE OF SERVICE**

I hereby certify that on August 28, 2024, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*s/ Steven A. Myers*
Steven A. Myers

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,128 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Steven A. Myers*
Steven A. Myers

**ADDENDUM**

# TABLE OF CONTENTS

20 U.S.C. § 1681 ................................................................A1

20 U.S.C. § 1682 ................................................................A4

## 20 U.S.C. § 1681

### § 1681. Sex

(a) Prohibition against discrimination; exceptions

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that:

(1) Classes of educational institutions subject to prohibition

in regard to admissions to educational institutions, this section shall apply only to institutions of vocational education, professional education, and graduate higher education, and to public institutions of undergraduate higher education;

(2) Educational institutions commencing planned change in admissions

in regard to admissions to educational institutions, this section shall not apply (A) for one year from June 23, 1972, nor for six years after June 23, 1972, in the case of an educational institution which has begun the process of changing from being an institution which admits only students of one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education or (B) for seven years from the date an educational institution begins the process of changing from being an institution which admits only students of only one sex to being an institution which admits students of both sexes, but only if it is carrying out a plan for such a change which is approved by the Secretary of Education, whichever is the later;

(3) Educational institutions of religious organizations with contrary religious tenets

this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization;

(4) Educational institutions training individuals for military services or merchant marine

this section shall not apply to an educational institution whose primary purpose is the training of individuals for the military services of the United States, or the merchant marine;

(5) Public educational institutions with traditional and continuing admissions policy

in regard to admissions this section shall not apply to any public institution of undergraduate higher education which is an institution that traditionally and

continually from its establishment has had a policy of admitting only students of one sex;

(6) Social fraternities or sororities; voluntary youth service organizations

this section shall not apply to membership practices--

(A) of a social fraternity or social sorority which is exempt from taxation under section 501(a) of Title 26, the active membership of which consists primarily of students in attendance at an institution of higher education, or

(B) of the Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls, and voluntary youth service organizations which are so exempt, the membership of which has traditionally been limited to persons of one sex and principally to persons of less than nineteen years of age;

(7) Boy or Girl conferences

this section shall not apply to--

(A) any program or activity of the American Legion undertaken in connection with the organization or operation of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

(B) any program or activity of any secondary school or educational institution specifically for--

(i) the promotion of any Boys State conference, Boys Nation conference, Girls State conference, or Girls Nation conference; or

(ii) the selection of students to attend any such conference;

(8) Father-son or mother-daughter activities at educational institutions

this section shall not preclude father-son or mother-daughter activities at an educational institution, but if such activities are provided for students of one sex, opportunities for reasonably comparable activities shall be provided for students of the other sex; and

(9) Institution of higher education scholarship awards in "beauty" pageants

this section shall not apply with respect to any scholarship or other financial assistance awarded by an institution of higher education to any individual because such individual has received such award in any pageant in which the attainment of such award is based upon a combination of factors related to the personal appearance, poise, and talent of such individual and in which participation is limited to individuals

of one sex only, so long as such pageant is in compliance with other nondiscrimination provisions of Federal law.

…

## 20 U.S.C. § 1682

### § 1682. Federal administrative enforcement; report to Congressional committees

Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. No such rule, regulation, or order shall become effective unless and until approved by the President. Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made, and shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any other means authorized by law: *Provided, however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.