# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

———————————

STATE OF LOUISIANA et al.,
                    PLAINTIFFS-APPELLEES,

v.

UNITED STATES DEPARTMENT OF EDUCATION et al.,
                    DEFENDANTS-APPELLANTS.

———————————

SCHOOL BOARD RAPIDES PARISH,
                    PLAINTIFF-APPELLEE,

v.

UNITED STATES DEPARTMENT OF EDUCATION et al.,
                    DEFENDANTS-APPELLANTS.

———————————

On Appeal from the United States District Court
for the Western District of Louisiana
Case Nos. 1:24-CV-567, 3:24-CV-563

———————————

**BRIEF OF AMICI CURIAE NEW JERSEY, CALIFORNIA, PENNSYLVANIA, COLORADO, CONNECTICUT, DELAWARE, DISTRICT OF COLUMBIA, HAWAII, ILLINOIS, MAINE, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA, NEW YORK, OREGON, RHODE ISLAND, VERMONT, AND WASHINGTON IN SUPPORT OF DEFENDANTS-APPELLANTS AND REVERSAL**

———————————

MATTHEW J. PLATKIN
  *Attorney General of New Jersey*

ROB BONTA
  *Attorney General of California*

MICHELLE A. HENRY
  *Attorney General of Pennsylvania*

AMANDA I. MOREJÓN
  *Deputy Attorney General*
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5279
Amanda.Morejon@law.njoag.gov

*Attorney for Amici Curiae States*

*[additional counsel listed on signature page]*

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................1

Interests of Amici Curiae ...........................................................................2

Argument....................................................................................................4

I.    AMICI STATES' EXPERIENCE CONFIRMS THAT THE FINAL
RULE WILL YIELD BENEFITS WITHOUT COMPROMISING
STUDENT PRIVACY OR SAFETY, OR IMPOSING
SIGNIFICANT COSTS....................................................................4

    A.    The Final Rule Will Foster Positive Health Outcomes for
Students. ...............................................................................5

    B.    The Final Rule's Benefits Will Not Compromise Student
Privacy or Safety. .................................................................9

    C.    The Final Rule Will Not Impose Significant Compliance Costs........13

II.   THE FINAL RULE'S CLARIFICATION OF THE SCOPE OF SEX-
BASED DISCRIMINATION AND HARASSMENT IS
CONSISTENT WITH TITLE IX. ..................................................15

    A.    The Final Rule's Understanding of Sex Discrimination Aligns
with the Plain Text and Judicial Interpretations of Title IX. ..............15

    B.    The Prohibition of "Severe or Pervasive" Harassment
Effectuates Title IX's Plain Text Without Burdening or
Surprising States....................................................................19

III.  THE FINAL RULE DOES NOT VIOLATE THE SPENDING
CLAUSE OR OTHER CONSTITUTIONAL PROVISIONS. .....................23

Conclusion ...............................................................................................27

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*,
   75 F.4th 760 (7th Cir. 2023) ...............................................................17

*Bennett v. Ky. Dep't of Educ.*,
   470 U.S. 656 (1985)...........................................................................23

*Benning v. Georgia*,
   391 F.3d 1299 (11th Cir. 2004). ........................................................23

*Bostock v. Clayton County*,
   590 U.S. 644 (2020)............................................................ 1, 2, 13, 17

*Boyden v. Conlin*,
   341 F. Supp. 3d 979 (W.D. Wis. 2018) .............................................25

*Brown v. Bd. of Educ.*,
   347 U.S. 483  (1954)................................................................... 9, 13

*Carmichael v. Galbraith*,
   574 F. App'x 286 (5th Cir. 2014) ......................................................16

*Cutter v. Wilkinson*,
   423 F.3d 579 (6th Cir. 2005) .............................................................23

*Davis v. Monroe Cnty. Bd. of Educ.*,
   526 U.S. 629 (1999)...........................................................................20

*Dodds v. U.S. Dep't of Educ.*,
   845 F.3d 217 (6th Cir. 2016) .............................................................17

*Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*,
   153 F.3d 211 (5th Cir. 1998) .............................................................16

*Doe v. Boyertown Area Sch. Dist.*,
   897 F.3d 518 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 2636 (2019)....17

*Feminist Majority Found. v. Hurley*,
   911 F.3d 674 (4th Cir. 2018) .............................................................19

*Fennell v. Marion Indep. Sch. Dist.*,
   804 F.3d 398 (5th Cir. 2015) .............................................................19

# TABLE OF AUTHORITIES
## (continued)

*Franklin v. Gwinnett Cnty. Pub. Schs.*,
  503 U.S. 60 (1992) ................................................................ 1, 21, 24

*Gebser v. Lago Vista Indep. Sch. Dist.*,
  524 U.S. 274 (1998) ........................................................................20

*Grabowski v. Ariz. Bd. of Regents*,
  69 F.4th 1110 (9th Cir. 2023). ......................................................17

*Grace v. Bd. of Trs.*,
  85 F.4th 1 (1st Cir. 2023) ..............................................................17

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ............................................... 17, 18, 24

*J.A.W. v. Evansville Vanderburgh Sch. Corp.*,
  396 F. Supp. 3d 833 (S.D. Ind. 2019) ...........................................24

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005) ............................................................... 1, 16, 24

*Mahanoy Area Sch. Dist. v. B.L.*,
  594 U.S. 180 (2021) .........................................................................4

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*,
  584 U.S. 617 (2018) .......................................................................23

*Meritor Sav. Bank, FSB v. Vinson*,
  477 U.S. 57 (1986) ..........................................................................21

*Olmstead v. L.C. ex rel. Zimring*,
  527 U.S. 581 (1999) .................................................................... 1, 16

*Oncale v. Sundowner Offshore Servs.*,
  523 U.S. 75 (1998) ..........................................................................23

*Pennhurst State Sch. and Hosp. v. Halderman*,
  451 U.S. 1 (1981). ..........................................................................24

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989) ........................................................................19

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 (1984) ........................................................................13

*Runyon v. McCrary*,
  427 U.S. 160 (1976) ...................................................................23

*Soule v. Conn. Ass'n of Schs., Inc.*,
  57 F.4th 43 (2d Cir. 2022), *rev'd on other grounds by* 90 F.4th 34 (2d Cir. 2023)
  ...........................................................................................17

*Tennessee v. U.S. Dep't of Agric.*,
  665 F. Supp. 3d 880 (E.D. Tenn. 2023) .................................25

*Tovar v. Essentia Health*,
  342 F. Supp. 3d 947 (D. Minn. 2018) .....................................25

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
  858 F.3d 1034 (7th Cir. 2017) ...............................................18

**Statutes**

20 U.S.C. § 1681 ............................................................... 1, 15

20 U.S.C. § 1682 ....................................................................20

20 U.S.C. § 1686 ....................................................................13

S. Rep. No. 100-64 (1987). ....................................................16

**Federal Regulatory Materials**

*Nondiscrimination on the Basis of Sex in Education Programs or Activities
  Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020)
  ................................................................................ passim

*Nondiscrimination on the Basis of Sex in Education Programs or Activities
  Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ..1,
  18, 19

Off. of Elementary & Secondary Educ., U.S. Dep't of Educ., *Safe & Supportive
  Schools* (August 28, 2024), ...................................................11

Racial Incidents and Harassment Against Students at Educ. Insts.; Investigative
  Guidance, 59 Fed. Reg. 11,448, 11,449 (Mar. 10, 1994) ....................21

Russlyn Ali, Assistant Sec'y for Civ. Rts., Off. for Civ. Rts., Dear Colleague Letter
  (Apr. 4, 2011, withdrawn Sept. 22, 2017) ..............................21

Sexual Harassment Guidance: Harassment of Students by Sch. Emps., Other Students, or Third Parties, 62 Fed. Reg. 12,034 (Mar. 13, 1997)................ 21, 23

U.S. Dep't of Educ., *2017-18 Civil Rights Data Collection: Sexual Violence in K-12 Schools* (Oct. 2020) .......................................................................................14

U.S. Dep't of Educ., Off. for Civ. Rts., *Letter of Findings to Delaware Valley Administrative Office* (Mar. 1, 2016) ...................................................................25

U.S. Dep't of Educ., Off. for Civ. Rts., *Letter of Findings to Dorchester County School District Two* (June 21, 2016) ...................................................................25

U.S. Dep't of Educ., Off. for Civ. Rts., *Letter of Findings to Downey Unified School District* (Oct. 14, 2014) .........................................................................25

U.S. Dep't of Educ., Off. for Civ. Rts., *Letter of Findings to Taft College* (Oct. 19, 2023) ..................................................................................................................25

U.S. Dep't of Educ., *Q&A on Campus Sexual Misconduct* (Sept. 2017, rescinded Aug. 2020) ...........................................................................................................21

U.S. Dep't of Educ., *Q&A on Title IX and Sexual Violence* (Apr. 24, 2014, withdrawn Sept. 22, 2017) ................................................................................21

U.S. Dep't of Educ., *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 2001, rescinded Aug. 2020) ...................................................................................... 19, 21

**State Statutes and Regulations**

16 Pa. Code § 41.206. ............................................................................................26

53 Pa. Bull. 3188 (June 17, 2023).........................................................................26

Affirming & Inclusive Schs. Task Force, Strengthening Inclusion in Illinois Schools (2020). ....................................................................................................12

Assemb. B. 1266, 2013-2014 Sess. (Cal. 2013) ...................................................10

Cal. Sch. Bds. Ass'n, Final Guidance: AB 1266, Transgender and Gender Nonconforming Students, Privacy, Programs, Activities & Facilities (2014). ...12

Colo. Ass'n of Sch. Bds. et al., Guidance for Educators Working with Transgender and Gender Nonconforming Students (n.d.).......................................................12

Conn. Safe Sch. Coal., Guidelines for Connecticut Schools to Comply with Gender Identity and Expression Non-Discrimination Laws (2012)................................12

D.C. Pub. Schs., Transgender and Gender-Nonconforming Policy Guidance (2015). ........................................................................................................12

Ill. Dep't of Hum. Rts., Non-Regulatory Guidance: Relating to Protection of Transgender, Nonbinary, and Gender Nonconforming Students Under the Illinois Human Rights Act (2021) .........................................................................12

Ill. State Bd. of Educ., Non-Regulatory Guidance: Supporting Transgender, Nonbinary and Gender Nonconforming Students (2020)....................................12

Iowa Code § 216.2(10)................................................................................14

Iowa Code § 216.6 ......................................................................................14

Iowa Code § 216.7 ......................................................................................14

Iowa Code § 216.8 ......................................................................................14

Iowa Code § 216.9 ......................................................................................14

Mass. Dep't of Elementary & Secondary Educ., Guidance for Massachusetts Public Schools: Creating a Safe and Supportive School Environment (Oct. 28, 2021). ....12

Md. State Dep't of Educ., Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination (2015). ....................................................................................................12

Mich. Dep't of Educ., State Board of Education Statement and Guidance on Safe and Supportive Learning Environments for Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) Students (2016). .................................12

Minn. Dep't of Educ., A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students (2017).................................12

N.J. State Dep't of Educ., Transgender Student Guidance for School Districts (2018). ........................................................................................................12

N.M. Stat. Ann. § 28-1-2(Q)........................................................................14

N.M. Stat. Ann. § 28-1-7(A)........................................................................14

N.M. Stat. Ann. § 28-1-7(F) ........................................................................14

N.M. Stat. Ann. § 28-1-7-(G) ................................................................14

N.Y. State Educ. Dep't, *Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices* (June 2023).................................................12

Or. Dep't of Educ., *Supporting Gender Expansive Students: Guidance for Schools* (2023). ...........................................................................................12

R.I. Dep't of Educ., *Guidance for Rhode Island Schools on Transgender and Gender Nonconforming Students* (2016).............................................12

Susanne Beauchaine et al., *Prohibiting Discrimination in Washington Public Schools* (Wash. Off. of Superintendent of Pub. Instruction 2012) .....................11

Utah Code Ann. § 34A-5-106 ...............................................................14

Utah Code Ann. § 57-21-5 .....................................................................14

Vt. Agency of Educ., *Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students* (2017)................................12

**Other Authorities**

Alberto Arenas et al., *7 Reasons for Accommodating Transgender Students at School*, Phi Delta Kappa (Sept. 1, 2016) ............................................10

Alexa Ura, *For Transgender Boy, Bathroom Fight Just Silly*, Tex. Trib. (June 14, 2016) ...................................................................................................10

Beatriz Pagliarini Bagagli et al., *Trans Women and Public Restrooms: The Legal Discourse and Its Violence*, 6 Frontiers Socio. 1 (Mar. 31, 2021) .....................11

Br. of Amici Curiae Sch. Adm'rs from Thirty-One States & D.C. in Supp. of Resp't, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, 580 U.S. 1168 (2017). ........................................................................................................ 9, 11

Christy Mallory et al., Williams Inst., *The Impact of Stigma and Discrimination Against LGBT People in Michigan* (2019) ...........................................15

Crosby Burns et al., Ctr. for Am. Progress & AFSCME, *Gay and Transgender Discrimination in the Public Sector: Why It's a Problem for State and Local Governments, Employees, and Taxpayers* (2012) ...............................................15

Ctrs. For Disease Control, *Youth Risk Behavior Survey: Data Summary & Trends Rep. 2011-2021* (2023), ...................................................................................22

Emily A. Greytak et al., GLSEN, *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools* (2009)...............................................................7

Human Rts. Campaign Found., *2023 LGBTQ+ Youth Report* (2023) .....................6

Joseph G. Kosciw et al., GLSEN, *The 2015 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* (2016)...........................................................................................8

Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* (2022), ............... 6, 7, 8

Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics e20153223 (Mar. 2016), ...........8, 9

Linda Darling-Hammond et al., *Implications for Educational Practice of the Science of Learning and Development*, 24 Applied Dev. Sci. 97 (Feb. 17, 2019) ................................................................................................................ 5, 9, 22

Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students—19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Wkly. Rep. 67 (2019).......................................................6

Movement Advancement Project, *Local Nondiscrimination Ordinances*, https://tinyurl.com/59p55bap (accessed Aug. 22, 2024). ...................................14

Nat'l Ctr. for Educ. Stat., *Digest of Education Statistics*, bl. 304.15 (2023) ...........2

Nat'l Ctr. for Educ. Stat., *Digest of Education Statistics*, tbl. 203.40 (2023) ...........2

Nat'l Ctr. for Educ. Stat., *Digest of Education Statistics*, tbl. 235.20 (2023) ...........2

Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence* (Apr. 2017)............................22

Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* (Dec. 2016) ..............................................................6, 7

*Separation and Stigma: Transgender Youth and School Facilities*, Movement Advancement Project & GLSEN (2017) ..............................................................6

Stephen Russell et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, J. of Adolescent Health (2018) ..............................................................8

Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemp. Sch. Psych. 3 (Aug. 2020) ..............................................22

The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People* (2023)...................................................................... 7, 10

The Trevor Project, *The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces* (Dec. 2020) ..............................................................8

Toomey et al., *Gender-Affirming Policies Support Transgender and Gender Diverse Youth's Health*, Soc'y for Rsch. in Child Dev. (Jan. 27, 2022)............27

World Professional Association for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, Int'l J. of Transgender Health S107 (Sept. 2022)..................................................8

**INTRODUCTION**

In clarifying that sex discrimination includes discrimination based on sexual orientation or gender identity, the U.S. Department of Education's ("ED") new final rule, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ("Final Rule"), is consistent with the plain text of Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. § 1681, Supreme Court precedent, decisions in at least seven circuits, and Title IX's congressional purpose.

Title IX broadly prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681(a); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174-75 (2005) (emphasizing "repeated holdings construing 'discrimination' under Title IX broadly"). There is no distinction between the term "because of sex" used in Title VII and the term "on the basis of sex" used in Title IX. *See Bostock v. Clayton County*, 590 U.S. 644, 650, 680 (2020) (using "because of" and "on the basis of" interchangeably). Accordingly, the Supreme Court and multiple circuit courts have long interpreted Title IX in light of Title VII. *E.g.*, *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 616 n.1 (1999) (Thomas, J., dissenting) (citing *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992)). Thus, given "the straightforward application of legal terms with plain and settled meanings," the prohibition of sex

1

discrimination under Title IX likewise covers discrimination based on one's sexual orientation or gender identity. *See Bostock*, 590 U.S. at 662.

Because the Final Rule comports with Title IX and the U.S. Constitution, and better enables states to advance their compelling interests in preventing harassment and discrimination and protecting students from harm, Amici Curiae States ("Amici States") submit this brief in support of Appellants and urge the Court to reverse the preliminary injunction.

## INTERESTS OF AMICI CURIAE

Amici States have compelling interests in the robust enforcement of Title IX to ensure that our schools operate in a manner that is free from sex discrimination. As sovereign jurisdictions charged with enforcing state antidiscrimination laws and shaping school policies that foster safe and supportive environments for all students, Amici States take the implementation of Title IX regulations seriously. Amici States, which all accept federal funding subject to Title IX, are home to tens of millions of students attending tens of thousands of public elementary, secondary, and postsecondary schools. [1] Amici States also have numerous private and charter schools, vocational and technical training programs, and private postsecondary

---

[1] *See* Nat'l Ctr. for Educ. Stat., *Digest of Education Statistics*, tbl. 235.20 (2023), https://tinyurl.com/43aaxkz4; *id.*, tbl. 203.40, https://tinyurl.com/2p95z9s9; *id.*, tbl. 304.15, https://tinyurl.com/48raka46.

institutions that may accept federal educational funding. Amici States thus have concrete, compelling interests in Title IX's prompt and full enforcement.

In Amici States' experience, sex discrimination and harassment based on sexual orientation or gender identity cause direct economic, physical, and emotional harm to students. To prevent these tangible injuries, Amici States have adopted laws and policies that combat sex discrimination against students on the basis that they appear, act, and identify as a sex different from their sex assigned at birth, or that they are attracted to someone of the same sex. The Final Rule validly effectuates the plain text of Title IX and Congress's nondiscrimination mandate, ensuring strong protections against sex discrimination for all students.

As Amici States' experience confirms, preventing sex-based discrimination, protecting against sexual harassment, and ensuring equal access to educational opportunities for all students confer broad benefits, without imposing substantial costs on schools or compromising student privacy or safety. The same is true under the Final Rule, which includes explicit protections for LGBTQ students and rectifies the harm caused to our schools and communities through ED's prior rule, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) ("2020 Rule"). The 2020 Rule undermined Title IX's nondiscrimination mandate by arbitrarily narrowing Title IX's sexual harassment protections. A return to the 2020

Rule would reduce protections for students and reintroduce the harms associated with its implementation.

Amici States submit this brief to demonstrate, in our sovereign states' unique experience, how discrimination and exclusion on the basis of sex can cause direct economic, physical, and emotional harms to our students, their communities, and society as a whole, and that the balance of equities and public interest cut against the extraordinary relief the district court granted to Appellees. This Court should therefore reverse the preliminary injunction.

## ARGUMENT

I. **AMICI STATES' EXPERIENCE CONFIRMS THAT THE FINAL RULE WILL YIELD BENEFITS WITHOUT COMPROMISING STUDENT PRIVACY OR SAFETY, OR IMPOSING SIGNIFICANT COSTS.**

States' responsibility to provide public education encompasses a concomitant duty to protect students from harm. *See Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 189 (2021); *id.* at 201 (Alito, J., concurring) (noting that "the school has a duty to protect students while in school"). The Final Rule will promote states' efforts to protect students from harms of all kinds—in part by clarifying that Title IX protections against sex discrimination bar discrimination or harassment based on sexual orientation or gender identity—and will thus provide broad, significant benefits to students nationwide. As Amici States' experiences establish, the Final Rule achieves those benefits without compromising student privacy or safety, and without imposing substantial costs on schools.

4

## A. The Final Rule Will Foster Positive Health Outcomes for Students.

The equities and public interest advanced by the Final Rule are clear. Beyond straightforwardly following the language of Title IX and *Bostock*, *see infra* at 15-22, the Final Rule protects students from discrimination based on sexual orientation or gender identity—in turn protecting their well-being and health.

Amici States' experience provides significant evidence of these benefits. There can be no serious dispute that LGBTQ students suffer concrete harms when they are denied Title IX's protections against discrimination and harassment—including a greater risk of mental health issues and worse educational outcomes. A child's social, emotional, and academic development is closely related to their educational environment,[2] and the negative effects of discrimination and harassment can impede a child's cognitive development, disrupt the learning process, and endanger psychological well-being.

The numbers are stark. In a recent study, almost 90% of LGBTQ students reported hearing homophobic slurs from their peers, while more than 68% reported feeling unsafe in schools due to their gender identity, gender expression, or sexual

---

[2] Linda Darling-Hammond et al., *Implications for Educational Practice of the Science of Learning and Development*, 24 Applied Dev. Sci. 97, 97-98 (Feb. 17, 2019), https://tinyurl.com/5f97nkbx.

orientation.[3] In a 2022 survey, 56.9% of LGBTQ youth reported being verbally or physically harassed at least once in the past thirty days.[4] Of students known or perceived to be transgender, 77% reported negative experiences at school, including harassment and physical assault.[5] And as many as 75% of transgender students surveyed in 2017 felt unsafe at school as a result of their gender identity or gender expression.[6] As a group, transgender students are up to five times more likely than cisgender students to report being bullied at school, threatened or injured with a weapon at school, and sexually assaulted.[7] Another 2022 survey found that 64% of transgender and nonbinary youth reported being discriminated against because of

---

[3] Joseph G. Kosciw et al., GLSEN, *The 2021 National School Climate Survey: The Experiences of LGBTQ+ Youth in Our Nation's Schools* xv-xvi, 83, 93 (2022), https://tinyurl.com/2aabcfe4 [hereinafter Kosciw 2021].

[4] Human Rts. Campaign Found., *2023 LGBTQ+ Youth Report* (2023), https://tinyurl.com/2zrnav26.

[5] Sandy E. James et al., Nat'l Ctr. for Transgender Equal., *The Report of the 2015 U.S. Transgender Survey* 132-34 (Dec. 2016), https://tinyurl.com/46fkp2th .

[6] *Separation and Stigma: Transgender Youth and School Facilities*, Movement Advancement Project & GLSEN 3-4 (2017), https://tinyurl.com/ukvkv8tf.

[7] Michelle M. Johns et al., *Transgender Identity and Experiences of Violence Victimization, Substance Use, Suicide Risk, and Sexual Risk Behaviors Among High School Students—19 States and Large Urban School Districts, 2017*, 68 Morbidity & Mortality Wkly. Rep. 67, 69 (2019), https://tinyurl.com/5bpxzvfy.

their gender identity.[8] In the largest survey of transgender people to date, 17% of respondents reported that they left K-12 school because of the mistreatment they suffered as a result of their gender expression.[9] And a 2009 study found that 40% of students who experienced frequent verbal harassment because of their gender expression did not plan to continue on to college.[10]

Policies can have a direct impact on those statistics. The evidence shows that discriminatory policies cause LGBTQ students to feel less connected to their schools and fellow students, and exacerbate harms to their education.[11] For example, one 2021 survey showed that LGBTQ students who experienced discrimination in their schools were almost three times as likely (43.3% versus 16.4%) to have missed school because they felt unsafe or uncomfortable.[12] Those students who experienced discriminatory policies and practices had lower grades, lower levels of educational

---

[8] The Trevor Project, *2023 U.S. National Survey on the Mental Health of LGBTQ Young People* 16 (2023), https://tinyurl.com/mvbmabrw [hereinafter Trevor Project 2023 National Survey].

[9] James, *supra* note 5, at 135.

[10] Emily A. Greytak et al., GLSEN, *Harsh Realities: The Experiences of Transgender Youth in Our Nation's Schools* 25-27 (2009), https://tinyurl.com/3bpt9py5.

[11] Kosciw 2021, *supra* note 3, at xviii-xix, 36.

[12] *Id.* at 36.

achievement and aspiration, lower self-esteem, and higher levels of depression than other students who had not encountered such discrimination.[13]

But the converse is also true: LGBTQ students who are supported by school staff are less likely to feel unsafe, miss school, or say that they may not graduate school because of their sexual orientation or gender expression, and are more likely to have higher grades and feel a greater sense of belonging to their school community.[14] When transgender youth are protected from discrimination on the basis of their gender identity, their mental health outcomes mirror those of their cisgender peers: they experience reduced suicidal ideation, fewer suicide attempts, and enhanced well-being and functioning.[15]

---

[13] *Id.* at 35-36, 41-45; Joseph G. Kosciw et al., GLSEN, *The 2015 National School Climate Survey: The Experiences of Lesbian, Gay, Bisexual, Transgender, and Queer Youth in Our Nation's Schools* xviii-xix, 41-45, 48-49 (2016), https://tinyurl.com/5av274d3 [hereinafter Kosciw 2015].

[14] Kosciw 2015, *supra* note 13, at xx-xxi.

[15] Kristina R. Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics e20153223, at 5-7 (Mar. 2016), https://tinyurl.com/47fuas7h; *see also* World Professional Association for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, Int'l J. of Transgender Health S107 (Sept. 2022), https://tinyurl.com/y86j5jnp; Stephen Russell et al., *Chosen Name Use Is Linked to Reduced Depressive Symptoms, Suicidal Ideation, and Suicidal Behavior Among Transgender Youth*, J. of Adolescent Health 503 (2018), https://tinyurl.com/465z8reh; The Trevor Project, *The Trevor Project Research Brief: LGBTQ & Gender-Affirming Spaces* (Dec. 2020), https://tinyurl.com/2c2p7zkf.

While discriminatory environments that cause fear and anxiety weaken a child's cognitive capacity and disrupt effective learning, safe and supportive school environments instead allow students to develop positive relationships, regulate their emotions and behavior, and maintain their physical, psychological, and academic well-being.[16] Accordingly, transgender students, when allowed to use the facilities consistent with their gender identity, experience better mental health outcomes that are more comparable to their cisgender peers.[17] Put differently, providing equal access to facilities that align with one's gender identity—in accordance with the Final Rule—directly promotes these positive outcomes and helps reduce the harms that LGBTQ students otherwise face. This, in turn, benefits society as a whole, since equal education better prepares students to contribute to society, both culturally and economically. *Cf. Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954).

## B. The Final Rule's Benefits Will Not Compromise Student Privacy or Safety.

Although Appellees have argued that the Final Rule must still be preliminarily enjoined because it undermines the privacy and safety of other students and imposes costs on the states, Appellees are incorrect—Amici States' own experiences show otherwise. Appellees focus myopically on the Final Rule's treatment of sex-

---

[16] *See* Darling-Hammond, *supra* note 2, at 97-98, 102.

[17] *See* Olson, *supra* note 15, at 5-7; Br. of Amici Curiae Sch. Adm'rs from Thirty-One States & D.C. in Supp. of Resp't [hereinafter Br. of Amici Curiae Sch. Adm'rs] at 4, *Gloucester Cnty. Sch. Bd. v. G.G. ex rel. Grimm*, 580 U.S. 1168 (2017).

separated facilities and LGBTQ students—just one piece of Title IX's and the Final Rule's overall protections against sex discrimination and harassment. But even accepting their narrow focus, the record shows that policies that allow transgender students to use facilities consistent with their gender identity significantly benefit those students without risking the privacy or safety of others. For example, allowing students to use the bathrooms consistent with their gender identity helps to safeguard against harms common to transgender students, such as forgoing drinking or eating during the school day to avoid using the restroom for fear of exclusion, reprimand, or bullying.[18]

Research also indicates that allowing transgender students to access facilities that correspond with their gender identity does not result in increased privacy or safety concerns in public schools or any reported instances of transgender students harassing cisgender students when using restrooms or locker rooms consistent with their gender identity.[19] The documented experience of school administrators in

---

[18] *See* Assemb. B. 1266, 2013-2014 Sess. (Cal. 2013); Alexa Ura, *For Transgender Boy, Bathroom Fight Just Silly*, Tex. Trib. (June 14, 2016), https://tinyurl.com/mtpescst; *see also* Trevor Project 2023 National Survey, *supra* note 8, at 5 (noting that approximately half of transgender and nonbinary youth reported in 2023 having seriously considered suicide in the past twelve months).

[19] *See* Alberto Arenas et al., *7 Reasons for Accommodating Transgender Students at School*, Phi Delta Kappa (Sept. 1, 2016), https://tinyurl.com/224mzep4; Beatriz Pagliarini Bagagli et al., *Trans Women and Public Restrooms: The Legal Discourse*

thirty-one states and the District of Columbia instead demonstrates that sex-based protections for gender identity in bathroom- and locker room-use policies result in no safety or privacy risks, nor is there evidence that cisgender students pose as transgender to gain improper restroom access.[20]

The Final Rule also affords ample flexibility for schools to implement policies that address privacy concerns, and Amici States have increased privacy options for all students in a cost-effective manner without singling out students. For example, schools in Washington must provide any student "who has a need or desire for increased privacy, regardless of the underlying reason," with "access to an alternative restroom," "a reasonable alternative changing area, such as the use of a private area (e.g., a nearby restroom stall with a door), or a separate changing schedule." [21] At least thirteen other states and the District of Columbia offer comparable guidance to ensure that school districts can comply with

---

*and Its Violence*, 6 Frontiers Socio. 1, 8 (Mar. 31, 2021), https://tinyurl.com/2s2ucz9t.

[20] *See* Br. of Amici Curiae Sch. Adm'rs, *supra* note 17, at 14-16; Off. of Elementary & Secondary Educ., U.S. Dep't of Educ., *Safe & Supportive Schools* (August 28, 2024), https://tinyurl.com/yv397h94.

[21] *See* Susanne Beauchaine et al., *Prohibiting Discrimination in Washington Public Schools* 30-31 (Wash. Off. of Superintendent of Pub. Instruction 2012), https://tinyurl.com/yk26eb96.

nondiscrimination policies and address privacy concerns.[22] Solutions range from offering privacy curtains to separate restroom and changing rooms to all who so desire, none of which requires costly construction or remodeling.

---

[22] *See, e.g.*, **California**: Cal. Sch. Bds. Ass'n, Final Guidance: AB 1266, Transgender and Gender Nonconforming Students, Privacy, Programs, Activities & Facilities 2 (2014). **Colorado**: Colo. Ass'n of Sch. Bds. et al., Guidance for Educators Working with Transgender and Gender Nonconforming Students 4-5 (n.d.). **Connecticut**: Conn. Safe Sch. Coal., Guidelines for Connecticut Schools to Comply with Gender Identity and Expression Non-Discrimination Laws 9-10 (2012). **Illinois**: Ill. Dep't of Hum. Rts., Non-Regulatory Guidance: Relating to Protection of Transgender, Nonbinary, and Gender Nonconforming Students Under the Illinois Human Rights Act 6-7 (2021); Ill. State Bd. of Educ., Non-Regulatory Guidance: Supporting Transgender, Nonbinary and Gender Nonconforming Students 10-11 (2020); Affirming & Inclusive Schs. Task Force, Strengthening Inclusion in Illinois Schools 19-21 (2020). **Maryland**: Md. State Dep't of Educ., Providing Safe Spaces for Transgender and Gender Non-Conforming Youth: Guidelines for Gender Identity Non-Discrimination 13-14 (2015). **Massachusetts**: Mass. Dep't of Elementary & Secondary Educ., Guidance for Massachusetts Public Schools: Creating a Safe and Supportive School Environment (Oct. 28, 2021). **Michigan**: Mich. Dep't of Educ., State Board of Education Statement and Guidance on Safe and Supportive Learning Environments for Lesbian, Gay, Bisexual, Transgender, and Questioning (LGBTQ) Students 5-6 (2016). **Minnesota**: Minn. Dep't of Educ., A Toolkit for Ensuring Safe and Supportive Schools for Transgender and Gender Nonconforming Students 10 (2017). **New Jersey**: N.J. State Dep't of Educ., Transgender Student Guidance for School Districts 7 (2018). **New York**: N.Y. State Educ. Dep't, Creating a Safe, Supportive, and Affirming School Environment for Transgender and Gender Expansive Students: 2023 Legal Update and Best Practices 22-24 (June 2023). **Oregon**: Or. Dep't of Educ., Supporting Gender Expansive Students: Guidance for Schools 24-26 (2023). **Rhode Island**: R.I. Dep't of Educ., Guidance for Rhode Island Schools on Transgender and Gender Nonconforming Students 8-9 (2016). **Vermont**: Vt. Agency of Educ., Continuing Best Practices for Schools Regarding Transgender and Gender Nonconforming Students 6, 8 (2017). **District of Columbia**: D.C. Pub. Schs., Transgender and Gender-Nonconforming Policy Guidance 9 (2015).

Maintaining sex-separated spaces while allowing transgender students to use facilities that align with their gender identity results in positive educational and health outcomes for students and promotes Amici States' compelling interest in "removing the barriers to economic advancement and political and social integration that have historically plagued certain disadvantaged groups." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 626 (1984). Ensuring equal access to facilities that align with gender identity is consistent with not only Title IX's provision for sex-separated facilities, 20 U.S.C. § 1686, but also the constitutional guarantee that education be "made available to all on equal terms," *Brown*, 347 U.S. at 493. And as Amici States' experiences show, it does not harm other students in the process.

### C. The Final Rule Will Not Impose Significant Compliance Costs.

Although the district court found that the expenses of compliance with the Final Rule—costs of recordkeeping, training, and construction—will inflict irreparable harm on the States and their school systems, ROA.24-30399.2383, Amici States' experience confirms that the alleged harms are unfounded. Every state in the Union must already prohibit discrimination based on sexual orientation or gender identity for all employees in its school districts under Title VII. *See Bostock*, 590 U.S. at 659-62. Training staff members and implementing policies to ensure that the same protections extend to all students at risk of discrimination or harassment on the basis of sex under Title IX is not a "significant expenditure[]," and would not require any

"construction of new facilities or creation of new programs." Final Rule, 89 Fed. Reg. at 33,876; *see also id.* at 33,862-77 (in any event, benefits "far outweigh" costs). Further, at least twenty-three states and the District of Columbia, and at least 374 municipalities,[23] already offer express protections against discrimination based on sexual orientation or gender identity in areas such as education, housing, public accommodations, and employment—all demonstrating that the Final Rule's protections are entirely feasible.

By contrast, a return to the 2020 Rule's regulatory scheme would result in tens of thousands of student complaints of sexual harassment going unaddressed each year—by ED's own estimation at the time, a shocking 50% fewer complaints would be investigated in K-12 schools alone.[24] When students experience unremedied discrimination and harassment, the costs are steep. Students denied protections under Title IX are likely to experience absenteeism, dropout, lost income, unemployment,

---

[23] *See, e.g.*, Iowa Code § 216.2(10) (definition); *id.* § 216.6 (employment); *id.* § 216.7 (public accommodations); *id.* § 216.8 (housing); *id.* § 216.9 (education); N.M. Stat. Ann. § 28-1-2(Q) (definition); *id.* § 28-1-7(A) (employment); *id.* § 28-1-7(F) (public accommodations); *id.* § 28-1-7-(G) (housing); Utah Code Ann. § 34A-5-106 (employment); *id.* § 57-21-5 (housing); Movement Advancement Project, *Local Nondiscrimination Ordinances*, https://tinyurl.com/59p55bap (accessed Aug. 22, 2024).

[24] 85 Fed. Reg. at 30,551-52, 30,565-68; *see also* U.S. Dep't of Educ., *2017-18 Civil Rights Data Collection: Sexual Violence in K-12 Schools* 5 (Oct. 2020), https://tinyurl.com/2s3p7had.

and increased healthcare needs; Amici States who serve them face lost revenue and added costs of healthcare services.[25] *See* 2020 Rule, 85 Fed. Reg. at 30,538-48 (acknowledging harms and declining to include them in regulatory impact analyses). The Final Rule remedies the 2020 Rule's flaws without requiring significant implementation costs for states—and in fact avoids other profound costs for states in the process.

## II.   THE FINAL RULE'S CLARIFICATION OF THE SCOPE OF SEX-BASED DISCRIMINATION AND HARASSMENT IS CONSISTENT WITH TITLE IX.

### A.   The Final Rule's Understanding of Sex Discrimination Aligns with the Plain Text and Judicial Interpretations of Title IX.

While the district court concluded that ED exceeded its statutory authority by clarifying that discrimination "on the basis of sex" includes discrimination against a student based on sexual orientation or gender identity, ROA.24-30399.2368-79, the Final Rule is consistent with Title IX's plain text, Supreme Court precedent, and the decisions of at least seven circuits. Appellees are not likely to succeed on this claim.

Congress intended Title IX's prohibition of discrimination "on the basis of sex," 20 U.S.C. § 1681(a), to "be broadly interpreted to provide effective remedies against

---

[25] Discrimination against LGBTQ individuals directly threatens the interests of states. *See, e.g.*, Christy Mallory et al., Williams Inst., *The Impact of Stigma and Discrimination Against LGBT People in Michigan* 56 (2019), https://tinyurl.com/mt9tfvtv; Crosby Burns et al., Ctr. for Am. Progress & AFSCME, *Gay and Transgender Discrimination in the Public Sector: Why It's a Problem for State and Local Governments, Employees, and Taxpayers* 18 (2012), https://tinyurl.com/22knbxuh.

discrimination," S. Rep. No. 100-64 (1987). The Supreme Court has consistently reaffirmed the "broad reach" of Title IX. *Jackson*, 544 U.S. at 174-75. The Final Rule's prohibition of discrimination based on sexual orientation or gender identity effectuates that intended reach of Title IX's plain text.

The Supreme Court "look[s] to its Title VII interpretations of discrimination" when interpreting Title IX. *Olmstead*, 527 U.S. at 616 n.1 (Thomas, J., dissenting) (citing *Franklin*, 503 U.S. at 75). This Court has also long interpreted Title IX in light of Title VII, reasoning that Title VII offers the most appropriate analogue when defining Title IX's substantive standards. *E.g.*, *Doe ex rel. Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 219 (5th Cir. 1998) (relying on Title VII precedent to construe Title IX); *Carmichael v. Galbraith*, 574 F. App'x 286, 293 (5th Cir. 2014) (Dennis, J., concurring) ("In construing Title IX's meaning of harassment 'bas[ed] on sex,' courts, including the Supreme Court and this court, frequently rely on case law construing Title VII's prohibition on workplace harassment 'because of . . . sex.'" (alteration in original)).

That link between Title IX and Title VII is instructive here. In *Bostock*, through "the straightforward application of legal terms with plain and settled meanings," the Supreme Court held that Title VII's protections against sex discrimination cover discrimination based on sexual orientation or gender identity, as such discrimination necessarily "intentionally discriminate[s] against individual men and women in part

because of sex." 590 U.S. at 662; *see also id.* at 660 (concluding that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex"). The same textual result is thus compelled here: protections "on the basis of sex" (Title IX) or "because of sex" (Title VII) include protections based on sexual orientation and gender identity.[26]

Numerous circuit cases—in a majority of the federal courts of appeal—have therefore held that Title IX's prohibition on sex discrimination covers discrimination based on sexual orientation or gender identity. *E.g.*, *Grace v. Bd. of Trs.*, 85 F.4th 1, 5-7, 10-14 (1st Cir. 2023); *Soule v. Conn. Ass'n of Schs., Inc.*, 57 F.4th 43, 55-56 (2d Cir. 2022), *rev'd on other grounds by* 90 F.4th 34 (2d Cir. 2023) (en banc); *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 534-35 (3d Cir. 2018), *cert. denied*, 139 S. Ct. 2636 (2019); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020); *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769-70 (7th Cir. 2023); *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023).

---

[26] Indeed, *Bostock* uses both Title VII's phrase "because of sex" and Title IX's "on the basis of sex" interchangeably. *E.g.*, 590 U.S. at 650 ("Congress outlawed discrimination in the workplace *on the basis of* . . . sex . . . ." (emphasis added)); *id.* at 680 ("[E]mployers are prohibited from firing employees *on the basis of* homosexuality or transgender status . . . ." (emphasis added)).

References to "one sex," "the other sex," and "both sexes" in Title IX do not exclude transgender students from Title IX's protections. The Final Rule simply provides that transgender students may access the sex-separate bathrooms, activities, and organizations that match their gender identity, if denying access would cause more than "de minimis" harm (and when no other exception applies). 89 Fed. Reg. at 33,814-16; *accord Grimm*, 972 F.3d at 617-19 (holding exclusion "from the sex-separated restroom matching [the student's] gender identity" violated Title IX); *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1045, 1049-50 (7th Cir. 2017) (same); *Boyertown*, 897 F.3d at 529-30 ("When transgender students face discrimination in schools, the risk to their wellbeing . . . can be life threatening."). Appellees may not substitute their own "notions of what 'sex' means" for the text of Title IX to exclude covered students from its protections. *Grimm*, 972 F.3d at 618.

Appellees' position is further belied by the fact that the 2020 Rule already prohibits gender-based harassment. 85 Fed. Reg. at 30,146 (explaining that 2020 Rule covered "gender harassment"); *id.* at 30,179 ("These [2020] regulations include sexual harassment as unwelcome conduct . . . [which] includes but is not limited to unwelcome conduct of a sexual nature, and may consist of unwelcome conduct based on sex or sex stereotyping. [ED] will not tolerate sexual harassment as defined in § 106.30 against any student, including LGBTQ students."). So too have decades

of ED's policy and practice. *E.g.*, U.S. Dep't of Educ., *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* (Jan. 2001, rescinded Aug. 2020) [hereinafter 2001 Guidance], at v; *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 239-40 (1989) (plurality opinion) (Title VII forbids gender-based discrimination).

### B. The Prohibition of "Severe or Pervasive" Harassment Effectuates Title IX's Plain Text Without Burdening or Surprising States.

The Final Rule's definition of sex-based harassment as conduct that "is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity," 89 Fed. Reg. at 33,884, comports with the text and purpose of Title IX and enables affected individuals to prohibit harassment and redress hostile environments. In Amici States' experience, sex-based harassment need not be severe *and* pervasive to create tangible injury to a student's education. For example, a teacher's repeated inappropriate sexual comments and intrusions of personal space may not be "severe," but could be so pervasive that a student feels unsafe and avoids classes, and is effectively excluded from education. *See, e.g.*, *Fennell v. Marion Indep. Sch. Dist.*, 804 F.3d 398, 409 (5th Cir. 2015) (noting that "offensive remarks made every few months over three years" raised genuine dispute regarding Title VII hostile environment); *Feminist Majority Found. v. Hurley,* 911 F.3d 674, 680-82, 687-89, 693 (4th Cir. 2018) (series

of harassing social media posts sent over campus wireless network could support Title IX harassment claim).

By covering both severe *or* pervasive forms of harassment, the Final Rule also effectuates the breadth of 20 U.S.C. § 1681(a), and advances Congress' objectives, because "the scope of the behavior that Title IX proscribes" is not limited to "severe, pervasive, and objectively offensive" conduct. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 639, 652 (1999). Congress established an administrative scheme authorizing ED "to give effect to" Title IX. *Id.* at 638-39; *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 280-81 (1998); 20 U.S.C. § 1682.[27] The Final Rule protects students from both severe incidents of harassment, as well as a series of lesser, unwelcome incidents that become pervasive.

Amici States' experience also reflects that no sovereign jurisdiction would be burdened or surprised by the Final Rule's return to the "severe or pervasive" standard. For more than thirty years, ED defined harassment as conduct that was "sufficiently severe, pervasive or persistent" to *interfere with, limit, or adversely affect*, rather than *deny*, a student's ability to participate in or benefit from an education program

---

[27] Below, Appellees mistakenly relied on *Davis* to argue that harassment must be "severe, pervasive, and objectively offensive." But *Davis* makes clear that its rule applies only to private damages claims, 526 U.S. at 652; *see also Gebser*, 524 U.S. at 283-84, 287, and does not otherwise limit ED's regulatory authority, *see Gebser*, 524 U.S. at 292.

or activity, and consistently applied this definition to address harassment under Title IX and Title VI.[28] Amici States have long understood that this definition applies to their schools, and the Final Rule correctly returns to ED's longstanding definition and provides appropriate baseline protections against sexual harassment in our schools. *See, e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (protecting employees, including student employees, from sexual harassment that is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment'"); *Franklin*, 503 U.S. at 75 (holding that sexual harassment constitutes discrimination).

Finally, a definition of harassment that encompasses both severe harassment and pervasive forms of harassment is essential to ensure the safety that students need

---

[28] *See, e.g.*, Racial Incidents and Harassment Against Students at Educ. Insts.; Investigative Guidance, 59 Fed. Reg. 11,448, 11,449 (Mar. 10, 1994); Sexual Harassment Guidance: Harassment of Students by Sch. Emps., Other Students, or Third Parties, 62 Fed. Reg. 12,034 (Mar. 13, 1997) ("[S]exual harassment must be sufficiently severe, persistent, or pervasive that it adversely affects a student's education"); 2001 Guidance, at v, 6 (noting that harassment must "deny or limit" student's education, and single "sufficiently severe" incident of sexual harassment can create hostile environment); Russlyn Ali, Assistant Sec'y for Civ. Rts., Off. for Civ. Rts., Dear Colleague Letter (Apr. 4, 2011, withdrawn Sept. 22, 2017) ("The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment . . . ."); U.S. Dep't of Educ., *Q&A on Title IX and Sexual Violence* (Apr. 24, 2014, withdrawn Sept. 22, 2017) (same); U.S. Dep't of Educ., *Q&A on Campus Sexual Misconduct* 1 (Sept. 2017, rescinded Aug. 2020) (applying "severe, persistent, or pervasive" and "deny or limit" standards).

to learn and thrive. Students who experience safe and supportive school climates see improvements in academic achievement and healthy development, and such schools are more effective at preventing violence and retaining teachers.[29] On the other hand, ED itself estimated that the 2020 Rule's narrow interpretation of Title IX's protections would reduce investigations of sexual harassment by 50% in K-12 schools,[30] exacerbating the effects of severe underreporting shown by research finding that sexual harassment and assault occur at alarming rates. For example, more than 20% of girls between the ages of fourteen and eighteen have been kissed or touched without their consent, but no more than 3% reported the incidents to police or school administrators.[31] The Final Rule's definition of harassment provides students with protection from severe or pervasive sexual harassment, and its

---

[29] *See, e.g.*, Jenna Howard Terrell et al., *Conceptualizing and Measuring Safe and Supportive Schools*, 24 Contemp. Sch. Psych. 3 (Aug. 2020); Darling-Hammond, *supra* note 2*,* at 97-98; *see also* Ctrs. For Disease Control, Youth Risk Behavior Survey: Data Summary & Trends Rep. 2011-2021 72 (2023), https://tinyurl.com/2p6w6yrv.

[30] 85 Fed. Reg. at 30,551-52, 30,565-68.

[31] Nat'l Women's Law Ctr., *Let Her Learn: Stopping School Pushout for Girls Who Have Suffered Harassment and Sexual Violence* 1-2 (Apr. 2017), https://tinyurl.com/u53eawk2.

devastating impacts on academic performance and emotional and physical well-being.[32]

## III. THE FINAL RULE DOES NOT VIOLATE THE SPENDING CLAUSE OR OTHER CONSTITUTIONAL PROVISIONS.

The district court also agreed with Appellees that the Final Rule likely violates the Spending Clause's clear-statement rule. ROA.24-30399.2375 - 24-30399.2376. This holding runs contrary to Amici States' actual experience.[33]

The clear-statement rule does not require perfect clarity on the applicability of a condition in every conceivable circumstance. *See Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 665-66 (1985) (Congress need not "specifically identif[y] and proscrib[e]" each condition on funding); *Cutter v. Wilkinson*, 423 F.3d 579, 586 (6th Cir. 2005); *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004). It only requires that states have clear notice of the conditions, such that recipients "voluntarily and knowingly" accept them. *Pennhurst State Sch. and Hosp. v.*

---

[32] 62 Fed. Reg. at 12,034 ("[S]exual harassment can interfere with a student's academic performance and emotional and physical well-being, and . . . preventing and remedying sexual harassment in schools is essential to ensure nondiscriminatory, safe environments in which students can learn.").

[33] None of Appellees' constitutional claims fare any better, as Supreme Court precedent also forecloses their First and Fourteenth Amendment challenges. *See, e.g.*, *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 82 (1998) (Title VII can prohibit verbal harassment); *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 584 U.S. 617, 631 (2018) (Free Exercise Clause does not allow discrimination in violation of "neutral and generally applicable . . . law"); *Runyon v. McCrary*, 427 U.S. 160, 177 (1976) (narrowly limiting parental rights in school context).

*Halderman*, 451 U.S. 1, 17 (1981). The Supreme Court has held that Congress intended Title IX to prohibit "a wide range of intentional unequal treatment," and has repeatedly affirmed that "Congress gave the statute a broad reach." *Jackson*, 544 U.S. at 174-75. Indeed, "Congress did not list *any* specific discriminatory practices when it wrote Title IX," but "its failure to mention" specific practices does not limit Title IX's ambit. *Id.* at 175 (recognizing retaliation as a form of sex discrimination under Title IX); *Franklin*, 503 U.S. at 75 (same for sexual harassment). Because "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex," *Bostock*, 590 U.S. at 660, states can hardly claim to be surprised that Title IX's prohibition against sex discrimination is broad enough to protect students from discrimination based on sexual orientation or gender identity.

Many federal courts have already held that discrimination based on sexual orientation or gender identity is sufficiently ascertainable from Title IX's prohibition against sex discrimination, such that the clear-statement rule is satisfied. *See, e.g.*, *Grimm*, 972 F.3d at 619 n.18; *J.A.W. v. Evansville Vanderburgh Sch. Corp.*, 396 F. Supp. 3d 833, 842 (S.D. Ind. 2019) (finding adequate notice to support suit for

damages under Title IX).[34] Indeed, as *Bostock* explained, that is the understanding compelled by the plain text. Additionally, for many years before the adoption of the Final Rule, ED has consistently found that Title IX protects transgender students from sex-based discrimination in school districts across the nation.[35]

---

[34] *See also Tennessee v. U.S. Dep't of Agric.*, 665 F. Supp. 3d 880, 916 (E.D. Tenn. 2023) (concluding rule prohibiting sex discrimination for SNAP and SNAP-Ed funding recipients "unambiguous[ly]" prohibited gender identity discrimination, "and always has"); *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 953 (D. Minn. 2018) ("[t]he plain language of Section 1557 [of the Patient Protection and Affordable Care Act] incorporates Title IX and its prohibition on sex discrimination" and "[d]efendants were on notice that Section 1557's nondiscrimination requirements encompassed gender-identity discrimination."); *Boyden v. Conlin*, 341 F. Supp. 3d 979, 998-99 (W.D. Wis. 2018) (Title IX provided sufficient notice to states that gender identity discrimination is prohibited to effectuate a waiver of Eleventh Amendment sovereign immunity).

[35] *See, e.g.*, U.S. Dep't of Educ., Off. for Civ. Rts., *Letter of Findings to Downey Unified School District* 1-2 (Oct. 14, 2014), https://tinyurl.com/2s37a8am ("All students, including transgender students and students who do not conform to sex stereotypes, are protected from sex-based discrimination under Title IX."); U.S. Dep't of Educ., Off. for Civ. Rts., *Letter of Findings to Delaware Valley Administrative Office* 2 (Mar. 1, 2016), https://tinyurl.com/4smhxm9t ("All students, including transgender students, are protected from sex-based discrimination under Title IX."); U.S. Dep't of Educ., Off. for Civ. Rts., *Letter of Findings to Dorchester County School District Two* 1, 4 (June 21, 2016), https://tinyurl.com/mvfjkkv2 (finding school district violated Title IX by subjecting transgender student to different treatment on the basis of sex when student was required to use separate restrooms rather than those used by general female population); U.S. Dep't of Educ., Off. for Civ. Rts., *Letter of Findings to Taft College* 9-12 (Oct. 19, 2023), https://tinyurl.com/2rha64md (finding that transgender student's allegations of sex-based harassment due to being referred to by their previous name and pronouns were covered under Title IX).

Moreover, a number of states that have adopted express protections for students against discrimination based on sexual orientation or gender identity have taken such steps, at least in part, in order to bring their state laws into conformity with states' understanding of federal law. The Pennsylvania Human Relations Commission ("PHRC"), for instance, updated its regulations under the Pennsylvania Human Relations Act and the Pennsylvania Fair Educational Opportunities Act[36] to clarify that discrimination on the basis of sex includes these forms of discrimination. In doing so, the PHRC stated its intent to provide "clarity regarding the definition of 'sex' which is consistent with the manner in which the term 'sex,' as used in Title VII and Title IX, has been interpreted by Federal courts." 53 Pa. Bull. 3188 (June 17, 2023). A contrary holding now would itself undermine states' expectations.

The Final Rule does not require any state to establish any new programs; rather, it clarifies that established programs must protect students from discrimination on the basis of sex, following the very meaning *Bostock* has already ascribed to that language. Many Amici States have already implemented these protections, and have incurred *de minimis* costs in doing so, while conferring significant benefits to students.[37] The Final Rule does not transgress the constitutional limitations on

---

[36] 16 Pa. Code § 41.206.

[37] School-based gender-affirming policies are linked to dramatic decreases in depression, anxiety, and suicidal ideation among transgender and nonbinary

conditions imposed on federal spending. It requires funding recipients to do only what Title IX has always required: to refrain from discriminating against students on the basis of sex, and to remedy any discrimination that arises. No state should be surprised at the need to perform this longstanding duty.

## CONCLUSION

This Court should reverse the grant of the preliminary injunction.

Dated:  September 4, 2024                                   Respectfully submitted,

MATTHEW J. PLATKIN                              ROB BONTA
*Attorney General*                                      *Attorney General*
*State of New Jersey*                                    *State of California*

*/s/ Amanda I. Morejón*
_____                         MICHELLE HENRY
AMANDA I. MOREJÓN                              *Attorney General*
Deputy Attorney General                           *Commonwealth of Pennsylvania*
New Jersey Attorney General's Office
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5279
Amanda.Morejon@njoag.gov

*Attorney for Amici Curiae States*

---

students. *See* Toomey et al., *Gender-Affirming Policies Support Transgender and Gender Diverse Youth's Health*, Soc'y for Rsch. in Child Dev. (Jan. 27, 2022), https://tinyurl.com/ms6eubb7.

PHILIP J. WEISER
*Attorney General*
*State of Colorado*
1300 Broadway, 10th Floor
Denver, CO 80203

WILLIAM TONG
*Attorney General*
*State of Connecticut*
165 Capitol Avenue
Hartford, CT 06106

KATHLEEN JENNINGS
*Attorney General*
*State of Delaware*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801

BRIAN L. SCHWALB
*Attorney General*
*District of Columbia*
400 6th Street N.W.
Washington, DC 20001

ANNE E. LOPEZ
*Attorney General*
*State of Hawai'i*
425 Queen Street
Honolulu, Hawai'i, 96813

KWAME RAOUL
*Attorney General*
*State of Illinois*
115 South LaSalle Street
Chicago, IL 60603

AARON M. FREY
Attorney General of Maine
6 State House Station
Augusta, ME 04333-0006

ANTHONY G. BROWN
Attorney General of Maryland
200 Saint Paul Place
Baltimore, MD 21202

ANDREA JOY CAMPBELL
*Attorney General*
*Commonwealth of Massachusetts*
One Ashburton Place
Boston, MA 02108

DANA NESSEL
*Attorney General*
*State of Michigan*
P.O. Box 30212
Lansing, Michigan 48909

KEITH ELLISON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
*Attorney General*
*State of Nevada*
100 North Carson Street
Carson City, NV 89701

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

PETER F. NERONHA
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

CHARITY R. CLARK
*Attorney General*
*State of Vermont*
109 State Street
Montpelier, Vermont 05609-1001

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limitation of Fed. R. App. P. 29(a)(5) and 5th Cir. R. 29.3 because this brief contains 6,470 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Times New Roman font.

*/s/ Amanda I. Morejón*
AMANDA I. MOREJÓN

**CERTIFICATE OF SERVICE**

I certify that on September 4, 2024, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I certify that all other participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Amanda I. Morejón
AMANDA I. MOREJÓN