No. 24-30399

# In the United States Court of Appeals for the Fifth Circuit

STATE OF LOUISIANA, BY AND THROUGH ITS ATTORNEY GENERAL,
ELIZABETH B. MURRILL; LOUISIANA DEPARTMENT OF EDUCATION; STATE
OF MISSISSIPPI, BY AND THROUGH ITS ATTORNEY GENERAL, LYNN FITCH;
STATE OF MONTANA, BY AND THROUGH ITS ATTORNEY GENERAL, AUSTIN
KNUDSEN; STATE OF IDAHO, BY AND THROUGH ITS ATTORNEY GENERAL,
RAUL LABRADOR; SCHOOL BOARD OF WEBSTER PARISH; SCHOOL BOARD OF
RED RIVER PARISH; SCHOOL BOARD OF BOSSIER PARISH; SCHOOL BOARD
SABINE PARISH; SCHOOL BOARD OF GRANT PARISH; SCHOOL BOARD OF
WEST CARROLL PARISH; SCHOOL BOARD OF CADDO PARISH; SCHOOL BOARD
OF NATCHITOCHES PARISH; SCHOOL BOARD OF CALDWELL PARISH; SCHOOL
BOARD OF ALLEN PARISH; SCHOOL BOARD OF LASALLE PARISH; SCHOOL
BOARD JEFFERSON DAVIS PARISH; SCHOOL BOARD OF OUACHITA PARISH;
SCHOOL BOARD OF FRANKLIN PARISH; SCHOOL BOARD OF ACADIA PARISH;
SCHOOL BOARD OF DESOTO PARISH; SCHOOL BOARD OF ST. TAMMANY
PARISH,

*Plaintiffs-Appellees,*

v.

UNITED STATES DEPARTMENT OF EDUCATION; MIGUEL CARDONA, IN
HIS OFFICIAL CAPACITY AS SECRETARY OF EDUCATION; OFFICE FOR CIVIL
RIGHTS, UNITED STATES DEPARTMENT OF EDUCATION; CATHERINE
LHAMON, IN HER OFFICIAL CAPACITY AS THE ASSISTANT SECRETARY FOR
CIVIL RIGHTS; UNITED STATES DEPARTMENT OF JUSTICE; MERRICK B.
GARLAND, IN HIS OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE
UNITED STATES; KRISTEN CLARKE, IN HER OFFICIAL CAPACITY AS
ASSISTANT ATTORNEY GENERAL FOR THE CIVIL RIGHTS DIVISION OF
UNITED STATES DEPARTMENT OF JUSTICE,

*Defendants-Appellants*

SCHOOL BOARD RAPIDES PARISH,
*Plaintiff-Appellee*

v.

UNITED STATES DEPARTMENT OF EDUCATION; MIGUEL CARDONA, IN HIS OFFICIAL CAPACITY AS SECRETARY OF EDUCATION; OFFICE FOR CIVIL RIGHTS, UNITED STATES DEPARTMENT OF EDUCATION; CATHERINE LHAMON, IN HER OFFICIAL CAPACITY AS THE ASSISTANT SECRETARY FOR CIVIL RIGHTS; UNITED STATES DEPARTMENT OF JUSTICE; MERRICK B. GARLAND, IN HIS OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE UNITED STATES; KRISTEN CLARKE, IN HER OFFICIAL CAPACITY AS ASSISTANT ATTORNEY GENERAL FOR THE CIVIL RIGHTS DIVISION OF UNITED STATES DEPARTMENT OF JUSTICE,
*Defendants-Appellants*

———————————————

On Appeal from the United States District Court
for the Western District of Louisiana
Nos. 3:24-CV-563, 1:24-CV-567

———————————————

**BRIEF OF LOUISIANA PLAINTIFFS-APPELLEES**

———————————————

Additional Counsel Listed on Next Page

---

ELIZABETH B. MURRILL
Attorney General of Louisiana

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746

J. BENJAMIN AGUIÑAGA
Solicitor General

AUTUMN HAMIT PATTERSON
Special Assistant Solicitor General

*Counsel for Plaintiffs-Appellees State of Louisiana, Louisiana Department of Education, and 17 Plaintiff School Boards*

LYNN FITCH
Attorney General of Mississippi

SCOTT G. STEWART
Solicitor General
JUSTIN L. MATHENY
Deputy Solicitor General
MISSISSIPPI ATTORNEY GENERAL'S
OFFICE
P.O. Box 220
Jackson, Mississippi 39205
(601) 359-3680

*Counsel for Plaintiff-Appellee
State of Mississippi*

RAÚL LABRADOR
Attorney General of Idaho

ALAN HURST
Solicitor General
OFFICE OF THE ATTORNEY
GENERAL OF IDAHO
700 W. Jefferson Street
Suite 201
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400

*Counsel for Plaintiff-Appellee
State of Idaho*

AUSTIN KNUDSEN
Attorney General of Montana

CHRISTIAN B. CORRIGAN
Solicitor General
PETER TORSTENSEN
Deputy Solicitor General
MONTANA DEPARTMENT OF JUSTICE
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707

*Counsel for Plaintiff-Appellee State
of Montana*

DONALD A. DAUGHERTY, JR.
Senior Counsel, Litigation
PAUL ZIMMERMAN
Senior Counsel, Policy and
Regulation
MARTHA A. ASTOR
Counsel, Litigation
DEFENSE OF FREEDOM INSTITUTE
FOR POLICY STUDIES
1455 Pennsylvania Avenue, NW,
Suite 400 Washington, DC 20004
(414) 559-6902

*Counsel for Plaintiff-Appellee States*

## CERTIFICATE OF INTERESTED PERSONS

Under Fifth Circuit Rule 28.2.1, a certificate of interested persons

is not required because Plaintiffs-Appellees are governmental parties.

## STATEMENT REGARDING ORAL ARGUMENT

This Court has ordered that oral argument be heard at 5:00 p.m. on

November 4, 2024.

# TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ...................................ii

TABLE OF AUTHORITIES.......................................................v

INTRODUCTION .................................................................1

ISSUES PRESENTED ...........................................................3

STATEMENT OF THE CASE ...................................................4

   I.  LEGAL BACKGROUND ..........................................................4

     A.  Title IX Promotes Equal Opportunities for Both
       Sexes by Imposing Conditions on Federal Funding..................4

     B.  For Decades, Title IX Has Been Interpreted as
       Prohibiting Sex Discrimination that Bars Access
       to Equal Education Opportunities. .............................................6

   II.  THE CHALLENGED RULE....................................................8

   III. PRIOR PROCEEDINGS.......................................................12

SUMMARY OF THE ARGUMENT ........................................15

STANDARD OF REVIEW......................................................19

ARGUMENT ......................................................................19

   I.  PLAINTIFFS WILL LIKELY SUCCEED ON THE MERITS........................19

     A.  The Rule is Contrary to Law and Exceeds Statutory
       Authority. ............................................................................20

       1.  Sections 106.10 and 106.31(a)(2) flout Title IX. .................21

2.  *Bostock* neither compels nor justifies the Rule. ................... 27

3.  Section 106.2 conflicts with Title IX's text, Supreme
    Court precedent, and the First Amendment. ........................ 32

4.  The major questions doctrine and federalism canon
    reinforce that the Rule exceeds the Department's
    statutory authority ................................................. 38

B.  The Spending Clause Dooms the Rule. ..................................... 41

C.  The Rule is Arbitrary and Capricious. ..................................... 43

II.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT
     CONTINUED PRELIMINARY RELIEF. ...................................... 51

III. THE BALANCE OF EQUITIES FAVORS PLAINTIFFS. ........................... 56

IV.  THE INJUNCTION'S SCOPE IS NECESSARY TO PREVENT
     IRREPARABLE HARM. ...................................................... 59

CONCLUSION ..................................................................... 65

CERTIFICATE OF SERVICE ......................................................... 67

CERTIFICATE OF COMPLIANCE ...................................................... 68

# TABLE OF AUTHORITIES

## Cases

*A.C. v. Metro. Sch. Dist. of Martinsville,*
  75 F.4th 760 (7th Cir. 2023) ................................................. 31

*Abbott v. Perez,*
  585 U.S. 579 (2018) ............................................................. 54

*Adams v. Sch. Bd. of St. Johns Cnty.,*
  57 F.4th 791 (11th Cir. 2022) .......................... 22, 24, 27, 28, 30

*Alabama v. U.S. Dep't of Educ.,*
  No. 24-12444, 2024 WL 3981994
  (11th Cir. Aug. 22, 2024) ...................................... 13, 32, 34

*Arkansas v. U.S. Dep't of Educ.,*
  No. 4:24-CV-636-RWS,
  2024 WL 3518588 (E.D. Mo. July 24, 2024) ........................ 13

*B.P.J. ex rel. v. W. Va. State Bd. of Educ.,*
  98 F.4th 542 (4th Cir. 2024) .......................................... 24, 42

*Biden v. Nebraska,*
  600 U.S. 477 (2023) ....................................................... 38, 39

*Bostock v. Clayton County,*
  590 U.S. 644 (2020) ........................ 16, 23, 24, 27, 28, 30, 31, 40

*BST Holdings, L.L.C. v. OSHA,*
  17 F.4th 604 (5th Cir. 2021) ........................... 39, 52, 54, 57, 58

*Calogero v. Shows, Cali & Walsh, L.L.P.,*
  95 F.4th 951 (5th Cir. 2024) ............................................... 20

*Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.,*
  98 F.4th 220 (5th Cir. 2024) ............................................... 52

*Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*,
  No. 4:24-cv-00461-O, 2024 WL 3381901
  (N.D. Tex. July 11, 2024) ................................................................ 13, 57

*Cascabel Cattle Co., L.L.C. v. United States*,
  955 F.3d 445 (5th Cir. 2020) ................................................................ 21

*Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.*,
  947 F.3d 342 (6th Cir. 2020) ................................................................ 23

*City of Chicago v. Fulton*,
  592 U.S. 154 (2021) ................................................................ 27

*Davis v. Monroe Cnty. Bd. of Educ.*,
  526 U.S. 629 (1999) .................................... 4, 8, 16, 24, 30, 32, 33, 37, 41

*Dep't of Educ. v. Louisiana*,
  144 S. Ct. 2507 (2024) ....................................2, 14, 15, 20, 65

*Doe v. Boyertown Area Sch. Dist.*,
  897 F.3d 518 (3d Cir. 2018) ................................................................ 45

*Elrod v. Burns*,
  427 U.S. 347 (1976) ................................................................ 58

*Florida v. HHS*, 1
  9 F.4th 1271 (11th Cir. 2021) ................................................................ 54

*Gibson v. Collier*,
  920 F.3d 212 (5th Cir. 2019) ................................................................ 10

*Grabowski v. Arizona Bd. of Regents*,
  69 F.4th 1110 (9th Cir. 2023) ................................................................ 31

*Grimm v. Gloucester Cnty. Sch. Bd.*,
  972 F.3d 586 (4th Cir. 2020) ....................................22, 31, 45

*Groff v. DeJoy*,
  600 U.S. 447 (2023) ............................................................... 21

*Grove City Coll. v. Bell*,
  465 U.S. 555 (1984) ............................................................... 25

*Gustafson v. Alloyd Co., Inc.*,
  513 U.S. 561 (1995) ............................................................... 33

*Harris v. Forklift Sys., Inc.*,
  510 U.S. 17 (1993) ................................................................ 38

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005) ......................................................... 24, 28

*Kansas v. U.S. Dep't of Educ.*,
  No. 24-4041-JWB, 2024 WL 3273285
  (D. Kan. July 2, 2024) ........................................................... 13

*Kentucky v. Biden*,
  23 F.4th 585 (6th Cir. 2022) ............................................. 55, 62

*Keyishian v. Bd. of Regents of Univ. of State of N. Y.*,
  385 U.S. 589 (1967) ............................................................... 58

*King v. St. Vincent's Hosp.*,
  502 U.S. 215 (1991) ............................................................... 22

*Kisor v. Wilkie*,
  588 U.S. 558 (2019) ............................................................... 25

*Kluge v. Brownsburg Cmty. Sch. Corp.*,
  No. 21-2475 (7th Cir.) ........................................................... 36

*L.W. ex rel. Williams v. Skrmetti*,
  83 F.4th 460 (6th Cir. 2023) ............................................. 25, 31

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024) ........................................................... 56

*Louisiana v. Biden*,
  55 F.4th 1017 (5th Cir. 2022) ......................................... 19, 57

*Louisiana v. DOE*,
  90 F.4th 461 (5th Cir. 2024) ...............................43, 44, 45, 50

*Louisiana v. U.S. Dep't of Educ.*,
  No. 24-30399, 2024 WL 3452887
  (5th Cir. July 17, 2024) ..................................... 14, 52, 56, 57, 59, 61, 63

*Maryland v. King*,
  567 U.S. 1301 (2012) ............................................................ 56

*Mayor of Baltimore v. Azar*,
  973 F.3d 258 (4th Cir. 2020) ................................................ 64

*MD/DC/DE Broadcasters Ass'n v. FCC*,
  236 F.3d 13 (D.C. Cir. 2001) ................................................ 60

*Meriwether v. Hartop*,
  992 F.3d 492 (6th Cir. 2021) ....................................28, 33, 35

*Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*,
  60 F.4th 956 (5th Cir. 2023) ................................................ 35

*Michigan v. EPA*,
  576 U.S. 743 (2015) .............................................................. 47

*Muldrow v. City of St. Louis*,
  601 U.S. 346  (2024) ......................................................24, 48

*N. Haven Bd. of Ed. v. Bell*,
  456 U.S. 512, (1982) .......................................................... 4, 6

*Nat'l Ass'n of Mfrs. v. SEC*,
  105 F.4th 802 (5th Cir. 2024) ............................ 63

*Nat'l Parks Conservation Ass'n v. EPA*,
  788 F.3d 1134 (9th Cir. 2015) ............................ 47

*Neese v. Becerra*,
  640 F. Supp. 3d 668 (N.D. Tex. 2022) .................... 29

*NFIB v. OSHA*,
  595 U.S. 109 (2022) ...................................... 38

*NFIB v. Sebelius*,
  567 U.S. 519 (2012) ...................................... 43

*Parents Defending Educ. v. Olentangy Local Sch. Dist.
  Bd. Of Educ.*, 109 F.4th 453 (6th Cir. 2024) ............ 35

*Pelcha v. MW Bancorp, Inc.*,
  988 F.3d 318 (6th Cir. 2021) ............................ 28

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989) .................................. 23, 28

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
  374 F.3d 1209 (D.C. Cir. 2004) .......................... 61

*Rest. Law Ctr. v. DOL*,
  66 F.4th 593 (5th Cir. 2023) .............. 19, 51, 52, 53

*Rosa H. v. San Elizario Indep. Sch. Dist.*,
  106 F.3d 648 (5th Cir. 1997) ............................ 29

*Sambrano v. United Airlines, Inc.*,
  No. 21-11159, 2022 WL 486610
  (5th Cir. Feb. 17, 2022) ................................ 55

*Soule v. Conn. Ass'n of Sch., Inc.*,
    90 F.4th 34 (2d Cir. 2023) ................................................................ 29, 30

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ........................................................................ 41, 43

*Southwest Airlines Co. v. Saxon*,
    596 U.S. 450 (2022) .............................................................................. 21

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) ............................................................ 35

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020) ................................................................ 38

*Students for Fair Admissions, Inc. v. President & Fellows*
    *of Harvard Coll.*, 600 U.S. 181 (2023) ................................................ 24

*Tennessee v. Cardona*,
    No. 2:24-cv-00072, 2024 WL 3019146
    (E.D. Ky. June 17, 2024) ........................................................ 13, 29, 51

*Tennessee v. Cardona*,
    No. 24-5588, 2024 WL 3453880
    (6th Cir. July 17, 2024) ............................................ 14, 28, 38, 60, 64

*Tennessee v. Cardona*,
    No. 2:24-cv-00072, 2024 WL 3631032
    (E.D. Ky. July 10, 2024) ........................................................ 56, 57, 58

*Tennessee v. Dep't of Educ.*,
    104 F.4th 577 (6th Cir. 2024) .......................................................... 54, 62

*Texas v. Biden*,
    10 F.4th 538 (5th Cir. 2021) ................................................................ 58

*Texas v. Cardona*,
No. 4:23-CV-00604-O, 2024 WL 3658767
(N.D. Tex. Aug. 5, 2024) .......................................................... 30

*Texas v. Johnson*,
491 U.S. 397 (1989) .................................................................. 34

*Texas v. United States*,
No. 2:24-CV-86-Z, 2024 WL 3405342
(N.D. Tex. July 11, 2024) ................................................... 13, 31

*Texas v. Yellen*,
105 F.4th 755, 769 (5th Cir. 2024) .................................. 41, 42, 43, 55

*United States v. Lopez*,
514 U.S. 549 (1995) .................................................................. 41

*United States v. Varner*,
948 F.3d 250 (5th Cir. 2020) ............................................... 17, 39

*United States v. Virginia*,
518 U.S. 515 (1996) ........................................................ 6, 24, 30

*Util. Air Regulatory Grp. v. EPA*,
573 U.S. 302 (2014) ......................................................... 20, 38

*W. Virginia State Bd. of Educ. v. Barnette*,
319 U.S. 624, 642 (1943) ......................................................... 34

*Wages & White Lion Invs., L.L.C. v. FDA*,
16 F.4th 1130 (5th Cir. 2021) ............................................. 44, 51

*West Virginia v. Dep't of Treasury*,
59 F.4th 1124 (11th Cir. 2023) ................................................. 42

*West Virginia v. EPA*,
597 U.S. 697 (2022) ......................................................... 39, 41

*Whitaker v. Kenosha Unified Sch. Bd. No. 1*,
  858 F.3d 1034 (7th Cir. 2017) ............................................................. 45

*White v. Carlucci*,
  862 F.2d 1209 (5th Cir. 1989) ............................................................. 19

*Winter v. NRDC*,
  555 U.S. 7, 22 (2008) ....................................................................... 60

*Wis. Cent. Ltd. v. United States*,
  585 U.S. 274 (2018) ......................................................................... 21

## Statutes

20 U.S.C. § 1681 ....................................................... 5, 22, 28, 29, 33

20 U.S.C. § 1686 ......................................................... 5, 25, 27, 28

20 U.S.C. § 1687 ............................................................................ 33

20 U.S.C. § 1689 ............................................................................ 22

42 U.S.C. § 2000e-2 ...................................................................... 29

Idaho Code § 33-6703 ................................................................... 53

La. R.S. § 9:62 ............................................................................... 53

La. R.S. § 17:2122 ......................................................................... 53

La. R.S. § 17:221.8 ........................................................................ 63

Miss. Code § 29-18-1 *et seq.* ........................................................ 53

Mont. Code Ann. § 40-6-703(f) ..................................................... 53

## Other Authorities

34 C.F.R. § 106.33 ...................................................................... 7

34 C.F.R. § 106.34 .................................................................... 30

34 C.F.R. § 106.41 .................................................................... 49

34 C.F.R. § 106.43 ................................................................ 7, 30

40 Fed. Reg. 24,128 (Jun. 4, 1975) ................................... 7, 24, 49

44 Fed. Reg. 71,413 (Dec. 11, 1979) ........................................ 7

45 Fed. Reg. 30,802 (May 9, 1980) .......................................... 7

85 Fed. Reg. 30,026 (May 19, 2020) ....................................... 36

85 Fed. Reg. 37160 (June 19, 2020) ....................................... 10

117 Cong. Rec. 32,476 (Sept. 20, 1971) (Sen. Bayh) ................. 4

118 Cong. Rec. 5803 (Feb. 28, 1972) (Sen. Bayh) .................. 4, 5

*American Heritage Dictionary* (1969) ..................................... 5

EEOC, *Enforcement Guidance on Harassment in the
    Workplace* (Apr. 29, 2024), https://tinyurl.com/yyjcyzf5 ..................... 37

Equality Act, H.R. 5, 117th Cong. § 9(2) (2021) ..................... 41

Pamela Paul, *As Kids, They Thought They Were Trans.
    They No Longer Do.*, N.Y. Times (Feb. 2, 2024),
    https://www.nytimes.com/2024/02/02/opinion/transgender
    -children-gender-dysphoria.html. ......................................... 59

Pamela Paul, *Why is the U.S. Still Pretending We Know Gender-Affirming Care Works?*, N.Y. Times (July 12, 2024), https://www.nytimes.com/2024/07/12/opinion/gender-affirming-care-cass-review.html. ................................ 10

Pub. L. 93-380, 88 Stat. 566-68 ................................................................... 6

Pub. L. No. 93-380, 88 Stat. 612 ................................................................. 6

Title IX Take Responsibility Act of 2021, H.R. 5396, 117th Cong. (2021) ................................................................ 41

*Webster's Third New International Dictionary* (1966) ............................ 6

**INTRODUCTION**

By unilateral executive action, the U.S. Department of Education upended Title IX in a 423-page rule that will transform the classrooms, lunchrooms, bathrooms, and locker rooms of American schools. *See* 89 Fed. Reg. 33,474 (Apr. 29, 2024) (the "Rule"). The Rule's lawlessness is extensive and shocking. So are its harmful consequences.

To take just a few examples: Boys and girls will be forced to share bathrooms, locker rooms, and lodging on overnight field trips with members of the opposite sex, including adults. Students and teachers will be censored if they express purportedly "offensive" views on a host of topics, ranging from gender identity to abortion. Students and teachers will be forced to use whatever pronouns a student demands based on his or her self-professed "gender identity." And Title IX funding recipients (including Plaintiffs)[1] who wish to resist the Rule will run into the Department's coercive power to withhold significant federal funding on which they rely.

The Rule is unlawful across the board. It ignores the text, structure, and context of Title IX—not to mention departs from early and

---

[1] "Plaintiffs" refers to plaintiffs in case number 3:24-CV-563 below. Defendants are referred to collectively as the "Department."

longstanding regulations that were subject to unique congressional review—to advance the Department's political and ideological agenda. The Department has no authority to rewrite Title IX as the Rule does. That lack of authority is reinforced by the major questions doctrine, the federalism canon, and the principle of constitutional avoidance. The Rule's rewrite of Title IX also violates Spending Clause restrictions. To top it off, the Rule fails arbitrary-and-capricious review several times over and will cause irreparable harm.

Given the Rule's myriad legal deficiencies and grievous consequences, it is unsurprising that the district court preliminarily enjoined the Rule. It is likewise unsurprising that *all* members of the Supreme Court confirmed that Plaintiffs are "entitled to preliminary injunctive relief as to three provisions of the rule"—"34 C.F.R. § 106.10 (2023) (defining sex discrimination), § 106.31(a)(2) (prohibiting schools from preventing individuals from accessing certain sex-separated spaces consistent with their gender identity), and § 106.2's definition of hostile environment harassment." *Dep't of Educ. v. Louisiana*, 144 S. Ct. 2507, 2509–10 (2024) (per curiam); *id.* at 2510 (Sotomayor, J., dissenting in part). And it is unsurprising that a Supreme Court majority refused to

carve up the district court's preliminary injunction as the Department now requests.

Nothing in the Department's brief overcomes the Department's recent loss in the Supreme Court or alters the fact that the district court properly exercised its discretion by issuing a preliminary injunction that maintains the decades-long status quo. This Court should affirm.

## ISSUES PRESENTED

1. Whether the district court properly exercised its discretion by preliminarily enjoining enforcement of the Rule, which rewrites Title IX, exceeds statutory authority, disregards Spending Clause restrictions, is arbitrary and capricious, coerces Plaintiffs to change state laws and school board policies, and causes irreparable harm.

2. Whether the district court properly exercised its discretion by preliminarily enjoining enforcement of the entire Rule when Plaintiffs challenged and are harmed by the entire Rule, the core challenged provisions are the crux of the Rule and impact myriad other substantive provisions, and the Department forfeited severability arguments.

# STATEMENT OF THE CASE

I. **LEGAL BACKGROUND**

### A. Title IX Promotes Equal Opportunities for Both Sexes by Imposing Conditions on Federal Funding.

Over 50 years ago, Congress was motivated to address "corrosive and unjustified discrimination against women" in "all facets of education," 118 Cong. Rec. 5803 (Feb. 28, 1972) (Sen. Bayh), and sought to "guarantee that women, too, enjoy the educational opportunity every American deserves." 117 Cong. Rec. 32,476 (Sept. 20, 1971) (Sen. Bayh); *see N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 523, 526–27 (1982) (Senator Bayh was Title IX's sponsor). To that end, Congress enacted Title IX under its Spending Clause power, conditioning federal funds on a requirement that recipients generally not discriminate based on sex in their education programs. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640 (1999).

Title IX generally provides that:

No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance [with statutory exceptions].

20 U.S.C. § 1681(a)(1)–(9). "Sex" refers to a person's biological sex: male or female. *See, e.g.*, *Sex*, *American Heritage Dictionary* 1187 (1969) ("a. The property or quality by which organisms are classified according to their reproduction functions. b. Either of two divisions, designated *male* and *female*, of this classification."). Title IX thus prohibits discrimination based on biological sex in education programs—with some exceptions. Statutory exceptions permit, for example, single-sex groups and activities like sororities, fraternities, Boys State and Girls State conferences, and beauty pageants. *Id.* § 1681(a) (6)–(7), (9).

Title IX also recognizes that not all differential treatment based on sex is discrimination—namely, differentiation where biological differences matter. Title IX allows and sometimes requires recipients to accommodate inherent differences between the sexes. For example, section 1686 instructs that Title IX shall not "be construed" as prohibiting recipients "from maintaining separate living facilities for the different sexes." *Id.* § 1686. This means Title IX "permit[s] differential treatment by sex" when necessary, such as "in sports facilities or other instances where personal privacy must be preserved," 118 Cong. Rec. 5807 (Feb. 28, 1972) (Sen. Bayh). By generally prohibiting sex discrimination while

allowing justifiable differentiation, Title IX promotes dignity, respect, and equal opportunities for both sexes. *Cf. United States v. Virginia*, 518 U.S. 515, 533 (1996) ("[p]hysical differences between men and women … are enduring").[2]

### B. For Decades, Title IX Has Been Interpreted as Prohibiting Sex Discrimination that Bars Access to Equal Education Opportunities.

After Title IX's enactment, Congress enacted a statute requiring Title IX regulations to be published and subjected to a 45-day review period where Congress could disapprove the regulations if it found them inconsistent with Title IX. *See* Pub. L. 93-380, 88 Stat. 566-68; Pub. L. No. 93-380, 88 Stat. 612. The first Title IX regulations (proposed in 1974 and finalized in 1975) were accordingly given special congressional scrutiny, including hearings, before going into effect. *See N. Haven*, 456 U.S. at 532–33 & n.22.

These early 1975 regulations indicate that everyone understood Title IX to prohibit only discrimination based on biological sex—not discrimination based on other grounds and not justifiable differentiation

---

[2] In this opinion, the Court used "gender" as a synonym for biological sex when referring to policies that treat "women" and "men" differently. *Id.* at 532–33 ("gender classifications," "sex classifications"); *see Sex, Webster's Third New International Dictionary* 944 (1966).

where biology matters.[3] And subsequent regulations and agency statements reinforced this understanding for decades. *See, e.g.*, 44 Fed. Reg. 71,413, 71,415 (Dec. 11, 1979); 45 Fed. Reg. 30,802, 30,960, 30,962 (May 9, 1980); ROA.1669, 1673, 1677.

For example, longstanding regulations permit Title IX funding recipients to "separate toilet, locker room, and shower facilities on the basis of sex" as long as "such facilities provided for students of one sex" are "comparable to such facilities provided for students of the other sex." 40 Fed. Reg. at 24,141; 34 C.F.R. § 106.33. And they "requir[e] use of standards for measuring skill or progress in physical education classes which do not adversely affect members of one sex." 40 Fed. Reg. at 24,131; 34 C.F.R. § 106.43.[4] The Department and its predecessor agency thus implemented Title IX for decades as prohibiting only discrimination—not justifiable differentiation—based on biological sex.

---

[3] *See, e.g.*, 40 Fed. Reg. 24,128, 24,132 (Jun. 4, 1975) ("women" and "men"); 24,135 ("male and female teams"); 24,135 ("opposite sex"); 24,134 ("members of either sex"); 24,141 (allowing "separate sessions for boys and girls" when dealing with "human sexuality"); 24,141 (allowing "separation of students by sex within physical education classes or activities during participation in [sports involving bodily contact]").

[4] *See id.* at 24,132 (certain standards "may be virtually out-of-reach for many more women than men because of the difference in strength between the average persons of each sex").

The Department and courts have also recognized that Title IX does not prohibit all misconduct, but rather is focused on recipients' misconduct that denies educational opportunities based on sex. For example, in *Davis*, the Supreme Court explained that "[t]he language of Title IX itself … cabins the range of misconduct that the statute proscribes." 526 U.S. at 644. Title IX's "provision that the discrimination occur 'under any education program or activity' suggests that the behavior be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity." *Id.* at 652. The heightened harassment standard flows from Title IX's specific language and context, and it lessens constitutional concerns. *See id.* at 651–52 (discussing the education context and explaining, in response to the dissent's First Amendment concerns, that the harassment definition does not extend to teasing and name-calling).

## II.    THE CHALLENGED RULE

On April 29, 2024, the Department published the Rule, which purports to "further Title IX's prohibition on sex discrimination" but upends Title IX's entire framework. 89 Fed. Reg. at 33,476. The entire Rule proceeds from one major first step—it redefines (in § 106.10) sex

discrimination to include discrimination based on grounds other than biological sex: "sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." *Id.* at 33,476, 33,886. The Rule then repeats—and builds upon—that expanded scope of sex discrimination throughout its other provisions. Here are a few examples.

The Rule adopts (in § 106.2) an expansive definition of "hostile environment harassment" that requires recipients to monitor speech related to "sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity" and to stop speech if it is "severe or pervasive" and "limits" a person's ability to benefit from the education program. *Id.* at 33,476, 33,884, 33,884, 33,886. The Rule also increases reporting and response requirements regarding potential harassment. The Rule requires teachers and staff to report what "reasonably may" constitute sex discrimination (based on the new definition). *Id.* at 33,888.  And that report then triggers response and recordkeeping obligations. *Id.* at 33,563, 33,886, 33,888–89.

What is more, the Rule (in § 106.31(a)(2)) provides that recipients must, with limited exceptions, treat people consistently with their self-professed gender identity. *Id.* at 33,887. The Rule refuses to define

"gender identity," but "[t]he Department understands gender identity to describe an individual's sense of their gender, which may or may not be different from their sex." *Id.* at 33,809. The Rule extends to every possible self-professed gender identity, including "nonbinary" identities, which often cannot be known "unless the … person volunteers the information." *Id.* at 33,810, 33,819.

Based on guidelines from the World Professional Association for Transgender Health ("WPATH") on which the Rule relies, *see* 89 Fed. Reg. 33,819 n.90,[5] "[n]onbinary is used as an umbrella term referring to individuals who experience their gender as outside of the gender binary." ROA.1691. The term can refer to "people whose genders are comprised of more than one gender identity simultaneously or at different times (e.g., bigender), who do not have a gender identity or have a neutral gender identity (e.g., agender or neutrois), have gender identities that encompass or blend elements of other genders (e.g., polygender, demiboy,

---

[5] WPATH is an advocacy organization that has been widely criticized for ignoring evidence, suppressing research, and issuing unethical guidelines based on ideology rather than science. *See, e.g.*, *Gibson v. Collier*, 920 F.3d 212, 221–23 (5th Cir. 2019); 85 Fed. Reg. 37160, 37198 (June 19, 2020) ("advocacy group"); ROA.1708-10, 2033; Pamela Paul, *Why is the U.S. Still Pretending We Know Gender-Affirming Care Works?*, N.Y. Times (July 12, 2024), https://www.nytimes.com/2024/07/12/opinion/gender-affirming-care-cass-review.html.

demigirl), and/or who have a gender that changes over time (e.g., genderfluid)." *Id.* It can also "function[] as a gender identity in its own right." *Id.*; *see* ROA.1692 (explaining that "those who identify as eunuchs" are "part of the gender diverse umbrella").

Accordingly, the Rule requires that people be treated consistently with their self-professed gender identities—whether male, female, transgender, nonbinary, or something else—in most circumstances, including when it comes to bathrooms, locker rooms, overnight field trip accommodations, and pronouns. *Id.* at 33,816, 33,818, 33,887. And it prevents recipients from meaningfully verifying the sincerity of a claimed identity, such as by requiring a valid gender-dysphoria diagnosis. The Rule provides that a student's self-profession is sufficient and warns recipients not to impose "burdensome documentation requirements." *Id.* at 33,819. Moreover, the Rule applies to "any 'person,' including" "applicants for admission or employment," "parents of minor students," "students from other institutions," and "other community members." *Id.* at 33,816. That means recipients must allow *any* male who self-identifies as female or bigender to use girls-only bathrooms and locker rooms. *Id.* at 33,816–18.

The Rule also interferes with schools' deference to and communication with parents. For example, the Rule may require recipients to comply with students' requests to change their pronouns over their parents' objections. *See id.* at 33,821–22. The Rule also warns against disclosing a student's gender identity because it could lead to harassment, which, when combined with other provisions, means schools will need to (1) assign a male who claims to be a girl to a girls-only room on an overnight field trip and (2) not inform parents that their daughters will be sharing a room with a male. *See, e.g.*, *id.* at 33,622, 33,818.

The Rule itself acknowledges that it will increase recipients' obligations and compliance costs, including imposing costs to revise policies and train employees. *See, e.g.*, *id.* at 33,866–67, 33,877, 33,880–81. The Rule likewise admits its changes can be expected to increase agency complaint investigations and private civil litigation. *See, e.g.*, *id.* at 33,492 (projecting a 10% increase in complaint investigations); *id.* at 33,851, 33,858 (acknowledging potential "costs associated with litigation due to the final regulations").

## III.  PRIOR PROCEEDINGS

Plaintiffs immediately challenged the Rule, filing a detailed

complaint, which was promptly followed by an amended complaint and a motion for preliminary relief. ROA.12-17, 537-1114, 1140-41, 1621-2058. Plaintiffs attacked the entirety of the Rule, highlighting the legal defects in its core provisions: §§ 106.10, 106.2, and 106.31(a)(2). *E.g.*, ROA.560-88, 1639-55.

The district court granted a preliminary injunction and postponed the Rule's effective date in the four Plaintiff States. ROA.2348-89.[6] The court concluded Plaintiffs would likely succeed on their claims that the Rule is contrary to law, exceeds statutory authority, violates the Spending Clause, and is arbitrary and capricious. ROA.2364-83. The court also found Plaintiffs satisfied the other preliminary-injunction factors. ROA.2383-85.

The Department sought a partial stay of the injunction; every court

---

[6] Five district courts considering similar challenges also issued preliminary injunctions. *See Tennessee v. Cardona*, No. 2:24-cv-00072, 2024 WL 3019146 (E.D. Ky. June 17, 2024); *Kansas v. U.S. Dep't of Educ.*, No. 24-4041-JWB, 2024 WL 3273285 (D. Kan. July 2, 2024); *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, No. 4:24-cv-00461-O, 2024 WL 3381901 (N.D. Tex. July 11, 2024); *Texas v. United States*, No. 2:24-CV-86-Z, 2024 WL 3405342 (N.D. Tex. July 11, 2024); *Arkansas v. U.S. Dep't of Educ.*, No. 4:24-CV-636-RWS, 2024 WL 3518588 (E.D. Mo. July 24, 2024). One district court denied relief; however, the Eleventh Circuit granted an injunction pending appeal. *See Alabama v. U.S. Dep't of Educ.*, No. 24-12444, 2024 WL 3981994 (11th Cir. Aug. 22, 2024).

rejected that request.[7] ROA.2508–12; *Louisiana v. U.S. Dep't of Educ.*, No. 24-30399, 2024 WL 3452887 (5th Cir. July 17, 2024) (per curiam); *Louisiana*, 144 S. Ct. 2507. This Court held that the Department "forfeit[ed]" its severability argument and, alternatively, failed to show it would likely succeed "in challenging the breadth of the district court's preliminary injunction." *Louisiana*, 2024 WL 3452887, at *1–2.[8] The Court also disposed of the remaining stay factors in Plaintiffs' favor, concluding (1) Plaintiffs showed "beyond peradventure" that a partial stay would cause "enormous administrative costs and great legal uncertainty," (2) the Department would not suffer irreparable injury absent a stay, and (3) "the public interest would not be served by a temporary judicial rewriting of the Rule that may be partly or fully undone by a final court judgment." *Id.* at *2–3.

The Supreme Court likewise denied the Department's stay application. All members of the Supreme Court agreed that Plaintiffs are "entitled to preliminary injunctive relief as to three provisions of the

---

[7] In an opinion by Chief Judge Sutton, the Sixth Circuit denied a similar stay motion. *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024).

[8] Judge Douglas dissented without an opinion. *Id.* at n.*.

rule": §§ 106.10, 106.31(a)(2), and 106.2's definition of hostile environment harassment. *Louisiana*, 144 S. Ct. at 2509–10; *see id.* at 2510 (Sotomayor, J., dissenting) (agreeing "respondents are entitled to interim relief as to three provisions"). In addition, the majority held there was no "sufficient basis to disturb" the district court's preliminary injunction against enforcement of the entire Rule. *Id.* at 2510.

## SUMMARY OF THE ARGUMENT

The Supreme Court's preliminary determination was correct: Plaintiffs are entitled to a preliminary injunction. There is no justification for upsetting a 50-year status quo while this case proceeds.

Starting with likelihood of success on the merits, Plaintiffs carried their burden several times over. The Rule conflicts with Title IX, exceeds statutory authority, ignores Spending Clause restrictions, and is arbitrary and capricious.

The Rule conflicts with the statutory text it purports to interpret, turning the entire statutory scheme on its head. It ignores Title IX's respect for and acknowledgement of biological differences. And it rewrites a statute intended to protect women from discrimination to require allowing males into girls-only bathrooms and locker rooms based

on their self-professed gender identity. The statutory text, context, and longstanding regulations all demonstrate that the Rule's redefinition of sex discrimination—and its corresponding requirement that schools generally treat persons according to their self-professed gender identities—cannot be squared with Title IX's original meaning.

Despite all that, the Department recycles its failed stay argument—insisting the decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020), compels the Rule's redefinition of sex discrimination under Title IX. That is wrong. For one, *Bostock* expressly did not decide any Title IX questions, which is one of many reasons why *Bostock*'s reasoning regarding sex discrimination does not apply to the Title IX context. For another, even if *Bostock* governed, it would not sanction the Rule's dramatic expansion of sex discrimination to include discrimination based on self-professed gender identity (or any ground besides biological sex).

The Rule's other provisions fare no better, due in part to the Rule's departure from the hostile environment harassment standard articulated in *Davis*. The Rule's harassment standard flouts statutory text and will compel recipients to violate First Amendment rights. Plaintiffs will be required to compel speech (*e.g.*, whatever pronouns,

"neopronouns,"[9] or names a student demands) and censor speech (*e.g.*, supposedly unpopular or offensive viewpoints on gender identity, abortion, or men competing in women's sports).

Because the Department has no authority to rewrite Title IX, the Rule is contrary to law and exceeds statutory authority. This lack of authority is underscored by the major questions doctrine and federalism canon. The Rule decides major questions on significant, hotly debated political issues and encroaches on States' traditional domain, rendering fatal the Department's inability to identify clear legal authority for the Rule. And the Department's disregard of Spending Clause restrictions is yet another reason the Rule is unlawful.

The Rule is also arbitrary and capricious. Logical inconsistencies permeate the entire Rule, and the Department's failure to adequately account for the Rule's harm, provide reasoned explanations, or properly weigh the Rule's costs and benefits infects the Department's entire rulemaking.

---

[9] *See* ROA.1695 ("neopronouns" are less "commonly used" pronouns of which there are "limitless" types); *United States v. Varner*, 948 F.3d 250, 256–57 (5th Cir. 2020) (recognizing that some gender dysphoric people use neologisms such as (f)ae, e/ey, per, ve, xe, or ze/zie); ROA.1691, 1694-1701.

Plaintiffs have likewise carried their burden on the remaining preliminary-injunction factors several times over. The Rule causes Plaintiffs irreparable harm on multiple fronts: It imposes unrecoverable compliance costs, interferes with enforcement of state law, and causes coercive harm. In contrast, an injunction does not harm the Department, which can continue to enforce Title IX in accordance with longstanding regulations. Maintaining the preliminary injunction also serves the public interest by protecting children, safeguarding equal educational opportunities for both sexes, and enforcing statutory and constitutional limits on the Department's authority.

Finally, the Department cannot succeed in showing the geographically limited injunction is overbroad. That is why it minimizes its forfeiture of arguments, relies on mischaracterizations of Plaintiffs' suit, disregards important differences between preliminary and final relief, ignores how the main challenged provisions are integral to other substantive provisions, and downplays that its overbreadth argument has been rejected by every single court to consider it—including the Supreme Court.

## STANDARD OF REVIEW

A preliminary injunction is proper where plaintiffs have shown (1) they are "likely to prevail on the merits," (2) there is "a substantial threat of irreparable injury" absent an injunction, (3) "the threatened injury outweighs any harm" to defendants "if the injunction is granted," and (4) "the injunction will not disserve the public interest." *Rest. Law Ctr. v. DOL*, 66 F.4th 593, 597 (5th Cir. 2023).

The decision to grant "a preliminary injunction lies within the sound discretion of the trial court," *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (quotation omitted). Accordingly, this Court "review[s] a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo*." *Louisiana v. Biden*, 55 F.4th 1017, 1022 (5th Cir. 2022) (quotation omitted). "[I]t is an elementary proposition" that the Court "may affirm the district court's judgment on any grounds supported by the record." *Id.*

## ARGUMENT

### I.   PLAINTIFFS WILL LIKELY SUCCEED ON THE MERITS.

The district court got it right: the Rule is likely unlawful across the board. ROA.2364-83. Because the Department continues to pretend that Plaintiffs challenge only §§ 106.10, 106.2, and 106.31(a)(2) (rebutted in

the stay briefing and below, *see infra* pp. 61–63), it argues only that Plaintiffs are unlikely to show that those three provisions are unlawful. The Department thus forfeits any argument that the Rule's other provisions are lawful. *See Calogero v. Shows, Cali & Walsh, L.L.P.*, 95 F.4th 951, 961 n.1 (5th Cir. 2024). The Department also defends § 106.10 only as it relates to gender identity and sexual orientation, thereby forfeiting any argument relating to § 106.10's other grounds.

What is more, the Department's arguments even as to those three provisions fail. DOE Br. 19–38. As "all members of the [Supreme] Court" have confirmed, Plaintiffs are "entitled to preliminary injunctive relief as to [those] three provisions." *Louisiana*, 144 S. Ct. at 2509–10; *see id.* at 2510 (Sotomayor, J., dissenting). The Supreme Court's preliminary determination thus indicates that Plaintiffs are likely to succeed on the merits as it relates to those provisions (and the entire Rule).

## A. The Rule is Contrary to Law and Exceeds Statutory Authority.

The Department does not have authority to "rewrite clear statutory terms," much less rewrite terms in a way that undercuts a statute's purpose. *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014). Yet that is exactly what the Rule does by (1) redefining sex discrimination to

include discrimination on grounds other than biological sex, (2) generally requiring recipients to treat individuals consistently with their gender identity, and (3) expanding the concept of hostile-environment harassment. *See* 89 Fed. Reg. at 33,884, 33,886–87.

### 1. Sections 106.10 and 106.31(a)(2) flout Title IX.

Notably, the Department glosses over the statutory text that the Rule purportedly implements. That is because § 106.10 and § 106.31(a)(2) are irreconcilable with Title IX's text.

As the Supreme Court has stressed, "statutory interpretation must 'begi[n] with,' and ultimately heed, what a statute actually says." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023). When construing a statute, a court's "job is to interpret the words consistent with their 'ordinary meaning' … at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018). That means "look[ing] to dictionary definitions for help in discerning a word's ordinary meaning," *Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020), and reading the word in context, "not in isolation," *Southwest Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022).

Title IX provides that "[n]o person … shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance [with statutory exceptions]." 20 U.S.C. § 1681(a). "Reputable dictionary definitions of 'sex' from the time of Title IX's enactment show that when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex, i.e., discrimination between males and females." *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 812 (11th Cir. 2022) (en banc) (collecting dictionary definitions); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632–33 (4th Cir. 2020) (Niemeyer, J., dissenting).

This interpretation of "sex" is further confirmed by following the "cardinal rule" of reading the statute "as a whole." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991). Throughout its provisions, Title IX indicates that "sex" means biological sex and refers to the binary nature of sex. *See, e.g.*, 20 U.S.C. §§ 1681(a)(2) ("both sexes"), 1681(a)(8) (referring to "father-son or mother-daughter activities," "one sex," and "the other sex"). Moreover, the statute elsewhere refers to being "lesbian, gay, bisexual, or transgender" as a "status," *id.* § 1689(a)(6), further highlighting that sexual orientation and gender identity are "distinct

concepts" that are not interchangeable with "sex," *see Bostock*, 590 U.S. at 699.

Therefore, Title IX generally prohibits funding recipients from discriminating based on biological sex—not based on any other grounds (such as gender identity)—as the district court correctly held. ROA.2366-69.[10] Although discrimination based on other grounds may sometimes be *evidence* of prohibited sex discrimination, it is not in itself discrimination under Title IX. *See, e.g.*, *Chisholm v. St. Marys City Sch. Dist. Bd. of Educ.*, 947 F.3d 342, 350–52 (6th Cir. 2020); *cf. Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) ("[S]tereotyped remarks can certainly be *evidence* that gender played a part" in an employment decision.).

The question, then, is what constitutes discrimination? That, too, can be answered by the plain text, context, and structure, which show differentiation where biological differences matter is not discrimination under Title IX.

Discrimination means "differential treatment," "less favorable

---

[10] Contrary to the Department's mischaracterization (at 22), the district court recognized that Title IX protects *both* sexes from discrimination, *see, e.g.,* ROA.2366, 68 ("discrimination against biological males and females"). The court simply highlighted what the Department does not dispute—Title IX was motivated by a desire to prevent discrimination against women. ROA.2351-54, 2368.

treatment," and "intentional unequal treatment." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174–75 (2005) (quotation omitted). And someone is "subjected to discrimination" when they are treated "worse than others who are similarly situated." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 288 (2023) (Gorsuch J., concurring) (quoting *Bostock*, 590 U.S. at 657); *see Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024) ("treat worse"); *Davis*, 526 U.S. at 645 (noting a contemporaneous dictionary defines "'subject' as 'to cause to undergo or submit to'").

Men and women (and boys and girls) are not similarly situated when it comes to biological differences. *Cf., e.g.*, *Virginia*, 518 U.S. at 533; *B.P.J. ex rel. v. W. Va. State Bd. of Educ.*, 98 F.4th 542, 567–68, 572, 575–76 (4th Cir. 2024) (Agee, J., concurring and dissenting in part). And treating a person differently where biological differences matter is not necessarily sex discrimination (although it can be if sex-specific facilities are not "comparable," 40 Fed. Reg. at 24,141). To put it simply, there is a difference between a boys-only math class and a boys-only bathroom. *Cf. Adams*, 57 F.4th at 801.

Section 1686 further confirms this, by instructing that Title IX shall

not "be construed" as prohibiting recipients "from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686; *see B.P.J.*, 98 F.4th at 579–80 (Agee, J., concurring) (pointing to § 1686 and explaining "Congress clearly intended to affirm certain aspects of sex separation in education). This rule of construction means separating individuals by sex in contexts where physical differences matter—*e.g.*, dormitories, bathrooms, locker rooms, athletics—is not sex discrimination in the first instance. *See L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 486 (6th Cir. 2023) ("respecting biological sex differences" is not "stereotyping").

Longstanding regulations—including regulations adopted soon after Title IX's enactment at Congress's direction and with Congress's approval—confirm this original public meaning. *See supra* p. 6; *Grove City Coll. v. Bell*, 465 U.S. 555, 567–68 (1984) (discussing "probative value of Title IX's unique postenactment history"). This "early, longstanding, and consistent interpretation" is "powerful *evidence*" of the "original public meaning." *Kisor v. Wilkie*, 588 U.S. 558, 594 (2019) (Gorsuch, J., concurring).

Dictionary definitions, statutory context, precedent, and longstanding agency interpretations all lead to the same conclusion:

(1) Title IX generally prohibits discrimination based on biological sex, not other grounds, and (2) differentiation based on sex where biological differences matter is not discrimination under Title IX. The Rule's contrary conclusions are thus at odds with the statutory text.

The Department offers no meaningful defense of the Rule based on statutory text, context, or longstanding agency interpretations. Because the Department cannot plausibly argue "sex" means anything other than biological sex, it refuses to define the term and purports to assume "sex" means biological sex. DOE Br. 21; ROA.2174. In reality, though, the Rule refuses to interpret "sex" as biological sex and disregards the respect for physical differences between sexes that is built into Title IX. For example, if the Rule interpreted "sex" to mean biological sex, then the Department could not claim "to permit recipients to maintain sex-separate restrooms and locker rooms" while simultaneously demanding recipients allow biological males into girls-only bathrooms and locker rooms if they claim a female gender identity. DOE Br. 31. Under the Rule, "sex-separate" facilities are not limited to one biological sex, so it necessarily redefines "sex" in Title IX to mean something other than biological sex. And if "sex" includes other grounds like gender identity,

then other provisions of Title IX are rendered "meaningless." *Adams*, 57 F.4th at 813; *see City of Chicago v. Fulton*, 592 U.S. 154, 159 (2021) ("The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

Indeed, the Department has no textual defense of the Rule, which is why it attempts to recast § 1686 as an "exception[]" to the general anti-discrimination mandate. DOE Br. 4. But § 1686 is not listed as an exception from the anti-discrimination mandate in § 1681; it is a rule of construction about how to interpret Title IX. *See* 20 U.S.C. § 1686.

### 2. *Bostock* neither compels nor justifies the Rule.

Unable to defend the Rule based on the statutory text, context, or past practice, the Department insists (at 20) the Rule is "a straightforward application of *Bostock*'s reasoning." But, as the district court concluded, *Bostock*'s reasoning "does not apply" to Title IX. ROA.2366. That is so for at least three reasons.

*First*, the Supreme Court said so. It expressly limited *Bostock* to Title VII and the specific question at hand, refusing to "prejudge" whether sex-specific dress codes or bathrooms were permissible even in the *Title VII* context. 590 U.S. at 681; *see, e.g., Pelcha v. MW Bancorp,*

*Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) ("the rule in *Bostock* extends no further than Title VII"). By its own terms, *Bostock* does not decide any question related to sex-specific facilities or any question about Title IX.

*Second*, "Title VII is a vastly different statute" than Title IX. *Jackson*, 544 U.S. at 175. Title VII announces that sex is "not relevant to the selection, evaluation, or compensation of employees" with one exception—"in those very narrow circumstances" where sex is a bona fide occupational qualification. *Price Waterhouse*, 490 U.S. at 239, 244; *accord Bostock*, 590 U.S. at 660. In contrast, multiple exceptions immediately follow Title IX's general anti-discrimination mandate in § 1681(a), and Title IX instructs that maintaining sex-specific living facilities is non-discriminatory in § 1686. The statutes thus differ "in important respects," including that Title IX sometimes requires recipients to take "sex into account" to provide equal opportunities for both sexes. *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021); *see Tennessee*, 2024 WL 3019146, at *12 (contrasting Title VII's one statutory exception with how "Title IX is rife with instances" where "males and females may be separated" and treated differently); *see also Adams*, 57 F.4th at 811; *Soule v. Conn. Ass'n of Sch., Inc.*, 90 F.4th 34, 63 & n.8 (2d

Cir. 2023) (en banc) (Menashi, J., concurring); *Neese v. Becerra*, 640 F. Supp. 3d 668, 680–81 (N.D. Tex. 2022). And the differences between the statutes do not end there.

As Chief Judge Sutton explained, the statutes have "materially different language" ("discrimination 'because of' sex in Title VII and discrimination 'on the basis of' sex in Title IX'"), "have distinct defenses," "serve different goals," and were enacted pursuant to different powers. *Tennessee*, 2024 WL 3453880, at *3 (quoting 42 U.S.C. § 2000e-2(a)(1) and 20 U.S.C. § 1681(a)(1)). Because Title IX was enacted under Congress's Spending Clause power, any conditions it imposes must be clear and unambiguous, while "[t]he same is not true of Title VII." *Id.* Accordingly, this Court, for good reason, has been "reluctant to treat Title IX's anti-discrimination provisions in the same way that [it] treat[s] Title VII's provisions." *Rosa H. v. San Elizario Indep. Sch. Dist.,* 106 F.3d 648, 656–57 (5th Cir. 1997); *see id.* at 654 (emphasizing that Title IX is "Spending Clause legislation"); *cf.* 89 Fed. Reg. at 33,563 ("[T]he Department is not bound by Title VII standards in implementing Title

IX").[11] The statutory differences further underscore *Bostock*'s inapplicability here.

*Third*, the employment context differs from the education context. *See Soule*, 90 F.4th at 64 (Menashi, J., concurring) ("context is important"); *Davis*, 526 U.S. at 651; *Adams*, 57 F.4th at 808. Sex is relevant more often in the education context than the employment context. *See, e.g.*, 34 C.F.R. §§ 106.43, 106.34(a)(1), (3)–(4), (b)–(c); *Virginia*, 518 U.S. at 533 & n.7. Indeed, "equal educational opportunities for men and women necessarily requires differentiation and separation at times." *Texas v. Cardona*, No. 4:23-CV-00604-0, 2024 WL 3658767, at *32 (N.D. Tex. Aug. 5, 2024); *see, e.g.*, *Soule*, 90 F.4th at 63 & n.8 (Menashi, J., concurring); *Adams*, 57 F.4th at 819–21 (Lagoa, J., concurring).

In any event, even if *Bostock* applied in the Title IX context, it still would not compel interpreting Title IX as prohibiting discrimination based on gender identity or sexual orientation. "*Bostock* simply held that firing a homosexual or transgender employee qualifies as sex

---

[11] The Department wrongly cites (at 13) *Lakoski v. James*, 66 F.3d 751 (5th Cir. 1995), to suggest this Court automatically applies Title VII precedent to Title IX. But *Lakoski* has a "modest" holding regarding "discrimination in employment." *Rosa H.*, 106 F.3d at 656–57; *see Lakoski*, 66 F.3d at 757–58.

discrimination when the firing is 'because of' the employee's 'traits or actions' that the employer would otherwise tolerate in an employee of the opposite sex." *Texas*, 2024 WL 3658767, at *38 (quoting 590 U.S. at 660–61). The employers in *Bostock* engaged in sex discrimination when they fired men because of "traits or actions" (being attracted to men or presenting as a woman) that the employer tolerates in female employees. 590 U.S. at 660–61; *see L.W.*, 83 F.4th at 485. But that does not mean that adverse or differential treatment based on gender identity or sexual orientation will *always* be prohibited sex discrimination.

An example bears this out. A religious student group would not be considering sex *at all* if it excludes students who claim a nonbinary gender identity or are bisexual from membership. Instead, the group would not be tolerating the *same* trait—(a) claiming a nonbinary gender identity or (b) being attracted to both sexes—regardless of whether the excluded person is a boy or a girl. Because the trait that is not "tolerated" in both hypotheticals is *identical* for both sexes, Title IX has "nothing to say" even if *Bostock* applied. 590 U.S. at 660.[12]

---

[12] Out-of-circuit cases that are poorly reasoned or address a situation unlike the hypothetical do not lead to a different conclusion. *See A.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023) (interpreting "sex" to mean gender identity); *Grimm*, 972 F.3d at 595–96, 618 (believing WPATH's standards to

### 3. Section 106.2 conflicts with Title IX's text, Supreme Court precedent, and the First Amendment.

The Department's arguments defending the Rule's expansive harassment standard in § 106.2 are "equally as unconvincing." ROA.2370. By redefining hostile environment harassment to include speech relating to any § 106.10 ground that is "severe or pervasive" and that "limits" a person's ability to benefit from the education program, the Department disregards Title IX's text and Supreme Court precedent— and compels First Amendment violations.

The Department again avoids discussing Title IX's text and then goes on to reject the Supreme Court's statutory interpretation in favor of non-binding 2001 agency guidance. DOE Br. 34–35 & n.9. That *Davis* is a private damages action, however, does not permit the Department or this Court to ignore the *Davis* Court's statutory interpretation of Title IX's clear text. *See Alabama*, 2024 WL 3981994, at *5.

---

represent a consensus, addressing only the rights of students who "express a binary gender," and suggesting the school's reliance on biology was a "discriminatory notion[] of what 'sex' means"); *Grabowski v. Arizona Bd. of Regents*, 69 F.4th 1110, 1117 (9th Cir. 2023) (explaining the harassment was "motivated by the stereotype that men should be attracted only to women").

*Davis* concluded—based on "[t]he language of Title IX itself" and its enactment under the Spending Clause—that not all misconduct is prohibited discrimination. 526 U.S. at 644. Instead, the language "'under' 'the operations of' a funding recipient" indicates that the prohibited "harassment must take place in a context subject to the school district's control." *Id.* at 645 (quoting 20 U.S.C. §§ 1681(a), 1687); *see id.* at 659–60 (Kennedy, J., dissenting). And "'under any education program or activity' suggests that the behavior be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity." *Id.* at 652; *accord Meriwether*, 992 F.3d at 511. This conclusion is reinforced by Title IX's "other prohibitions"—"'excluded from participation in' or 'denied the benefits of' any 'education program or activity'" receiving federal funds—that "help give content to the term 'discrimination' in this context." *Davis*, 526 U.S. at 650; *see id.* at 664 (Kennedy, J., dissenting); *cf. Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995) ("a word is known by the company it keeps").

Accordingly, the Rule's broader harassment standard (which even requires a recipient to consider conduct that "occurred *outside* of its education program or activity," 89 Fed. Reg. at 33,530 (emphasis added))

"flies in the face of *Davis*" and cannot be squared with Title IX. *Alabama*, 2024 WL 3981994, at *5. If that were not bad enough, the Rule's standard chills protected speech on a slew of topics including abortion, sexual orientation, and gender identity—many of which implicate religious beliefs. And that effect is amplified by the heightened reporting and response requirements, which will be triggered any time students tease a classmate for being "girly," express views regarding pregnancy, or refuse to use whatever pronouns or "neopronouns" are demanded by a person. *See* 89 Fed. Reg. at 33,514–16 (citing EEOC, *Sexual Orientation and Gender Identity (SOGI) Discrimination*); ROA.1680.

The Rule therefore "raises First Amendment concerns" and disregards how *Davis* "warned against courts 'impos[ing] more sweeping liability than [the Supreme Court] reads Title IX to require.'" *Alabama*, 2024 WL 3981994, at *6 (quoting *Davis*, 526 U.S. at 652) (emphasis omitted). By "prescrib[ing] what shall be orthodox" on existential and controversial questions, the Rule conflicts with the "fixed star in our constitutional constellation." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *see Texas v. Johnson*, 491 U.S. 397, 414 (1989). Indeed, courts have disapproved similar attempts to police speech,

reasoning that expansive, purportedly anti-harassment policies violate Free Speech and Free Exercise rights. *See, e.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125–27 (11th Cir. 2022) (concluding policy is likely "impermissibly overbroad" and "a content- and viewpoint-based restriction of speech"); *id.* at 1129–30 (Marcus, J., concurring) (explaining that treating unpopular ideas that offend people as prohibited harassment "is plainly at odds with the First Amendment and our notion of free speech"); *Meriwether*, 992 F.3d at 498, 509–12 (holding that requiring a professor to use students' "preferred pronoun[s]" violated Free Speech and Free Exercise rights); *Parents Defending Educ. v. Olentangy Local Sch. Dist. Bd. Of Educ.*, 109 F.4th 453, 474–95 (6th Cir. 2024) (Batchelder, J., dissenting). That means Title IX should be construed "against authorizing the Final Rule because to do otherwise would raise grave constitutional concerns," *Mexican Gulf Fishing Co. v. U.S. Dep't of Commerce*, 60 F.4th 956, 966 (5th Cir. 2023).

The Department insists that Plaintiffs' First Amendment concerns are overblown given the Rule's disclaimer that it does not violate constitutional rights. But that self-serving statement is no consolation when the Rule also reasons that its vision of covered "harassment" does

not implicate protected speech. 89 Fed. Reg. at 33,504. The disclaimer is also cold comfort when—as the Department itself previously recognized—use of a similar standard in 1997 and 2001 guidance documents "led to infringement of rights of free speech and academic freedom of students and faculty," 85 Fed. Reg. 30,026, 30,036 n.88 (May 19, 2020); *see id.* at 30,152, 30,155, 30,163–65 (expressing First Amendment concerns about departing from the *Davis* standard). And, while the Department now suggests (at 37) it is possible the Rule does not *compel* pronoun usage, it did not seem to dispute that point below, ROA.2235, and it contradicts the federal government's arguments elsewhere that requested pronouns must be used, *see, e.g.,* U.S. Amicus Curiae Br., *Kluge v. Brownsburg Cmty. Sch. Corp.*, No. 21-2475, 2021 WL 5405970, at \*27–32 (7th Cir.); U.S. Amicus Curiae Br., *Copeland v. Ga. Dep't of Corrs.* at 15, https://tinyurl.com/3aydkec4.

Regardless, even assuming the Rule does not *compel* the use of certain pronouns, it still *prohibits* the use of pronouns that correspond with a person's biological sex if that person identifies as the opposite sex or claims a nonbinary gender identity. *See* 89 Fed. Reg. at 33,512;

ROA.1680.[13] So recipients would still need to police pronouns. And the Department also does not dispute that the Rule requires teachers to report and recipients to respond to what *may* be harassment. So even if an accidental, "stray remark" is not harassment, DOE Br. 37, teachers would still need to report that remark (how could they know it is stray?), and recipients would still need to respond to unpopular or potentially offensive views that are intentionally expressed. The Rule will therefore dramatically chill speech. *See* 89 Fed. Reg. at 33,504 (approvingly citing cases where students are prohibited from using pronouns that align with a classmate's biological sex or from wearing shirts expressing that sex is binary).

Finally, the Department argues (at 35) the Rule's harassment standard is constitutionally permissible based on cases where the Supreme Court reversed the dismissal of harassment claims. But the Department cannot rely on *Davis* to defend the Rule's standard when it expressly departs from *Davis*'s standard. In any event, "[w]hether *Davis* may constitutionally support purely verbal harassment claims … has not

---

[13] *See also* EEOC, *Enforcement Guidance on Harassment in the Workplace* (Apr. 29, 2024), https://tinyurl.com/yyjcyzf5.

been decided by the Supreme Court or this court and seems self-evidently dubious." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 337 n.16 (5th Cir. 2020). Nor does *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)—an opinion that does not even mention the First Amendment—save the Rule's harassment standard. Accordingly, the principle of constitutional avoidance, along with the statutory text and Supreme Court precedent, all show the Rule is contrary to law.

### 4. The major questions doctrine and federalism canon reinforce that the Rule exceeds the Department's statutory authority.

As a "creature[] of statute," the Department has no authority—much less clear authority—to issue regulations that subvert Title IX or require recipients to violate constitutional rights as the Rule does. *NFIB v. OSHA*, 595 U.S. 109, 117 (2022). Because Congress provides authority to *implement* Title IX in § 1682, not *rewrite* it, the Rule exceeds statutory authority. *See* ROA.2374; *Tennessee*, 2024 WL 3453880, at *2; *Util. Air Regulatory Grp.*, 573 U.S. at 328 ("an agency may not rewrite clear statutory terms").

The major questions doctrine "reinforce[s]" this conclusion. *Biden v. Nebraska*, 600 U.S. 477, 507 (2023) (Barrett, J., concurring). That is

because the Rule decides major questions—such as whether to force schools, teachers, and students to treat someone's self-professed, unverifiable gender identity as akin to biological sex—that must be decided by "Congress itself" or, at the very least, by "an agency acting pursuant to a clear delegation from that representative body." *West Virginia v. EPA*, 597 U.S. 697, 735 (2022).

The Department contends (at 25) that the Rule does not decide major questions because (1) the Rule implements Title IX's unambiguous text and (2) *Bostock* was not a major questions case. But the Department itself touted the Rule's changes as "historic," ROA.1866, and the Rule radically changes the understanding of Title IX that has prevailed for 50 years. As the district court ruled, the Rule's changes have enormous political significance, so the Rule clearly decides major questions. ROA.2371*; see West Virginia*, 597 U.S. at 721; *Nebraska*, 600 U.S. at 503–04; *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 617 (5th Cir. 2021). Indeed, how to address and treat people claiming a gender identity that differs from their biological sex is a "hotly-debated issue[]," *Varner*, 948 F.3d at 256, which has prompted state legislation and sparked numerous nationwide and international controversies, ROA.1704-25. Nor does

*Bostock* render these major questions minor. After all, *Bostock* was a statutory interpretation case, not a challenge to an agency regulation, and—unlike the Rule—*Bostock* disavowed making decisions about sex separation *in any statutory context*. 590 U.S. at 681.

Furthermore, the Rule reflects at least three additional hallmarks of a major questions case. *First*, the Rule has significant economic consequences. ROA.2371. It threatens billions of dollars of funding for Plaintiffs, *e.g.*, ROA.1726-49, and will impose enormous compliance costs on Plaintiff School Boards that will need to modify school facilities.[14] *Second*, the Rule is "novel" and "transformative," and Congress "has consistently rejected proposals" to expand Title IX to prohibit discrimination based on sexual orientation and gender identity. *West*

---

[14] *See, e.g.*, ROA.1757 (cost to "redesign restrooms and showers on 11 campuses" would "be significant"); ROA.1767-68 (estimating it would cost approximately $1.2 million to construct or renovate gender-neutral facilities, plus the cost of renting portable toilets); ROA.1778 ("astronomical" costs); ROA.1790 (estimating costs exceeding $2.1 million); ROA.1801 (explaining an estimate for one bathroom was $400,000); ROA.1818 ("approximately $22.2 million to provide a single-user bathroom on each wing of our 37 schools"); ROA.1822-23 (estimating it would cost between $20.3 million to $27.7 million to renovate or construct new facilities); ROA.1845 (explaining the school board would have to locate funding and estimating it would "cost[] hundreds of millions of dollars"); ROA.1861-64 (describing a pilot program to build new bathrooms "to accommodate transgender and nonbinary students" at five schools in Loudoun County, Virginia will cost $11 million and noting it could cost over $211.2 million if the program was expanded to each school in the district).

*Virginia*, 597 U.S. at 716, 724, 731–32; *see, e.g.*, Equality Act, H.R. 5, 117th Cong. § 9(2) (2021); Title IX Take Responsibility Act of 2021, H.R. 5396, 117th Cong. (2021). *Third*, the Rule intrudes on education, which is an area "where States historically have been sovereign," *United States v. Lopez*, 514 U.S. 549, 564 (1995), implicating not only the major questions doctrine, but also the federalism canon, *see West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring). There are thus ample reasons to affirm the district court's conclusion that the Department's inability to point to any statutory authority, much less a clear statement of authority, is fatal to the Rule's validity. ROA.2372-74.

## B. The Spending Clause Dooms the Rule.

The Court can also affirm the judgment because the Rule's rewrite of Title IX runs afoul of the Spending Clause. Title IX was passed under Congress's power to impose conditions on federal funds. *Davis*, 526 U.S. at 640. That means the federal funding must not be unduly coercive. *See South Dakota v. Dole*, 483 U.S. 203, 211 (1987). It also means there are "'restrictions' on the *manner* in which such conditions may be constitutionally imposed." *Texas v. Yellen*, 105 F.4th 755, 769 (5th Cir. 2024). As relevant here, (1) the conditions must be "unambiguous,

'enab[ling] the States to exercise their choice knowingly, cognizant of the consequences'"; (2) not be "unrelated 'to the federal interest in particular national projects'"; and (3) must not induce activities that violate the Constitution. *Id.* These requirements are "equally important" and must be "equally" satisfied. *West Virginia v. Dep't of Treasury*, 59 F.4th 1124, 1142 (11th Cir. 2023).

The Rule violates them all. *First*, the Rule's conditions are "new," ROA.2376; they are not "unambiguously" clear from Title IX, *cf.* DOE Br. 25. By agreeing to Title IX, Plaintiffs did not "voluntarily and knowingly" agree to police and punish speech on a wide swath of topics, ignore the difference between biological sex and self-professed gender identity, abolish sex-specific facilities, or otherwise violate constitutional rights as required by the Rule. *See Adams*, 57 F.4th at 815–16 ("The notion that the School Board could or should have been on notice that its policy of separating male and female bathrooms violates Title IX and its precepts is untenable."); *B.P.J.*, 98 F.4th at 573–74 (Agee, J., concurring).

Nor can the Department backpedal and argue the Rule resolves an ambiguity in the statutory text. There is no ambiguity. And, even if there were, "*statutory* ambiguity" cannot be "vitiated by *regulatory* enactments

42

in the context of the Spending Clause." *Texas*, 105 F.4th at 773. Further, even if the Department could impose conditions that are not clearly authorized by the statutory text, the Rule's new conditions are also not unambiguously clear. *See infra* p. 47.

*Second*, the Rule undercuts the federal interest in promoting equal opportunities to both sexes by depriving women of opportunities and privacy and by increasing the risk of sexual assault. ROA.1876-81, 1884-1923. *Third*, the Rule will impermissibly induce recipients "to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210; *see* ROA.2375-76; *supra* pp. 34–38.

Finally, the Rule is impermissibly coercive. The "threatened loss" of a significant percentage of Plaintiffs' education funding "is economic dragooning that leaves the States with no real option but to acquiesce" to the Rule. *See NFIB v. Sebelius*, 567 U.S. 519, 582 (2012) (Roberts, J., joined by Breyer and Kagan, JJ.); ROA.1726-49, 1988-91, 1995-98.

## C. The Rule is Arbitrary and Capricious.

The Rule also cannot survive because it is not a result of reasoned decisionmaking. Although deferential, arbitrary-and-capricious review still "has 'serious bite.'" *Louisiana v. DOE*, 90 F.4th 461, 470 (5th Cir.

2024). It "requires that agency action be reasonable and reasonably explained," meaning that the agency "has reasonably considered the relevant issues and reasonably explained the decision." *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021) (quotations omitted). "[B]are acknowledgement" of concerns and "conclusory statements" are "no substitute for reasoned consideration," nor do they "constitute adequate agency consideration of an important aspect of a problem." *Louisiana*, 90 F.4th at 473.

The Rule fails arbitrary-and-capricious review on all fronts. As the district court found, the Department "failed to consider several relevant factors when drafting the Final Rule" and "failed to consider several important aspects of the problems." ROA.2379, 2381.

In response to concerns the Rule would undermine a recipient's "legitimate interest" in protecting students' privacy and safety, the Department simply stated it "disagree[s]" the Rule would undermine that interest. 89 Fed. Reg. at 33,820. And the Department responded the same way to "evidence that transgender students pose a safety risk" in girls-only spaces; again, it simply stated it "does not agree." *Id.* These are exactly the sort of "bare acknowledgement[s]" and "conclusory

statements" that are insufficient. *Louisiana*, 90 F.4th at 473. And a few court opinions concluding that parties in *those* cases failed to offer evidence to substantiate their concerns do not relieve the Department of its obligation to reasonably consider the issues based on the larger record before it. DOE Br. 32; 89 Fed. Reg. at 33,820.[15]

Whether or not people who sincerely identify as "transgender" pose a risk, DOE Br. 32, that is no answer to the comments and evidence that the Rule will be exploited by *other* persons, *see, e.g.*, ROA.1876-80, 1884-1923. After all, the Department cannot dispute that the Rule requires recipients to allow *all* males, including adults and school visitors, who self-identity as female to use girls-only bathrooms and locker rooms, nor can it dispute that recipients cannot require meaningful documentation of a medical diagnosis to confirm sincerity. ROA.2238. And while the Department suggests (at 33) the Rule does not allow individuals to

---

[15] Moreover, it does not appear those courts considered the dangers posed by a policy like the Rule that sexual predators can more easily exploit. Many cited cases involved biological girls who were receiving medical treatment and sought access to boys-only bathrooms. *See Grimm*, 972 F.3d at 600–01; *Whitaker v. Kenosha Unified Sch. Bd. No. 1*, 858 F.3d 1034, 1040 (7th Cir. 2017). And one court emphasized that students "claiming to be transgender" had to meet with counselors and receive special authorization to use opposite sex facilities and, when considering privacy concerns, the court repeatedly invoked the policy's "safeguards." *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 524, 526, 533, 535 (3d Cir. 2018).

change gender identities more than once or by a simple declaration, that is not what the Rule says. The Rule says recipients may rely on a "consistent assertion" or "written confirmation" from "the student or student's parent" about a student's gender identity. 89 Fed. Reg. at 33,819. But that is not a reasonable answer to safety and privacy concerns. After all, what counts as consistent when the Rule views gender identity as a subjective, internal "sense of [one's] gender," 89 Fed. Reg. at 33,809, which can change? Furthermore, students could consistently assert that they are bigender or genderfluid (or something else) to gain access to both sex-specific facilities. And written "confirmation" from students looking to exploit the Rule is no safeguard, nor does the Rule provide any means for recipients to prevent exploitation of the Rule by *non-students* (*e.g.*, visitors attending school sporting events).

The Department similarly failed to adequately consider and address concerns about how to provide facilities for students who do not identify as male or female and assert one of the countless gender identities that are "part of the gender diverse umbrella." ROA.1691-92. Saying recipients will figure it out is no answer, *see* 89 Fed. Reg. at 33,818, especially given studies suggesting people who identify as

nonbinary "comprise roughly 25% to over 50% of the larger transgender population, with samples of youth reporting the highest percentage," ROA.1691. And that is just the tip of the iceberg when it comes to the Rule's arbitrary-and-capricious nature.

Despite extensive comments about how the Rule would infringe parental rights, *e.g.*, ROA.1930, 1973-86, the Department merely paid lip service to parental rights, failed to articulate its view regarding the scope of those rights, and refused to answer basic questions like whether "a recipient should comply with a request by a minor student to change the[] name or pronouns used at school if the[] parent opposes the change." 89 Fed. Reg. at 33,821–22. It likewise refused to answer whether specific factual situations would be hostile environment harassment, *id.* at 33,512–13, despite freely providing examples elsewhere, *see, e.g.*, *id.* at 33,813.

The Rule's pervasive inconsistencies further show it is not a product of "reasoned decisionmaking" and a "logical and rational" process. *Michigan v. EPA*, 576 U.S. 743, 750 (2015); *see Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015) ("[A]n internally inconsistent analysis is arbitrary and capricious."). For example, the Rule

states that "sex separation … in the context of bathrooms or locker rooms … is not presumptively unlawful sex discrimination," without explaining the basis of the presumption. 89 Fed. Reg. at 33,818. Of course, the self-evident reason that justifies separating the sexes in those contexts is biological differences that necessitate separation to preserve personal privacy, dignity, and safety. But the Department ignores those biological differences whenever a person claims a gender identity of the opposite sex, so the Department lacks any basis to conclude that sex-specific bathrooms are presumptively nondiscriminatory in the first place—such separation would always be a "stigmatic injur[y]." *Id.* at 33,815. The Department cannot evade this conclusion by simply announcing that some stigmatic harm is legally "cognizable," and some is not. DOE Br. 28. That improperly adds a "significance" requirement to the purported harm of being excluded access, *cf., Muldrow*, 601 U.S. at 355, and discriminates in favor of individuals who assert a gender identity that differs from their sex, *see Adams*, 57 F.4th at 814.

To take another example, the Rule states that "a recipient must not provide sex-separate facilities or activities in a manner that subjects any person to … more than de minimis harm—unless there is a *statutory*

basis for allowing otherwise." 89 Fed. Reg. at 33,814 (emphasis added); DOE Br. 30. But the Rule then turns around and says that a *regulatory* basis alone is sufficient to allow sex-separate athletic teams even when there is more than de minimis harm, because the regulations regarding athletics are "longstanding." *See* 89 Fed. Reg. at 33,816–17. And the Rule then fails to account for the fact that the sex-specific bathroom and locker room regulations that it overhauls are equally longstanding. 40 Fed. Reg. at 24,141.

Another example of inconsistency is how the Rule pretends recipients are not required to "provide gender-neutral or single-occupancy facilities," while simultaneously insisting the Rule creates no safety or privacy issues because recipients may offer single-occupancy facilities. 89 Fed. Reg. at 33,820. The reality is that the Rule does impose construction costs and interferes with recipients' reliance on the prior policy allowing single-sex facilities. That is because the Rule states students (including "nonbinary students") must be treated consistently with their gender identity as it relates to "access to sex-separate facilities, including bathrooms." *Id.* at 33,818. That means, at the very least, recipients must provide some gender-neutral bathrooms and may be

required to provide (a) bathrooms specifically designated for every claimed gender identity (so they are not treating those who identify as male or female better than those who assert other gender identities), or (b) expressly designate all bathrooms as being for all genders. This highlights additional problems with the Rule that the Department compounds even today: The Rule disregards reliance interests and misstates its effects and its costs, rendering its cost-benefit analysis wholly deficient. *See Louisiana*, 90 F.4th at 469.

In addition to refusing to acknowledge the Rule imposes significant construction costs, the Rule also underestimates the costs of reviewing the lengthy and contradictory Rule, revising policies, and training employees. *Compare* 89 Fed. Reg. at 33,866–68, *with, e.g.*, ROA.1756, 1766, 1788, 1821, 1843-44. And the Rule does not account for the costs associated with schools losing teachers and students because, if the Rule goes into effect, some teachers will resign, and some families will withdraw their children from public school. *See, e.g.*, ROA.1769, 1789, 1791, 1833-35. The Rule also improperly weighs "the non-monetary benefits" and costs. 89 Fed. Reg. at 33,877. That is because it refuses to acknowledge and account for the privacy and safety harms, the

detrimental impact on women, and the constitutional harms (infringement of Free Speech, Free Exercise, Due Process, and parental rights). *See, e.g.*, ROA.1874-75, ROA.1887-1923, 1930-56, 1960-72, 1975-86; *Tennessee*, 2024 WL 3019146, at *31, *see supra* pp. 34–38. For these reasons, the Court should rule that Plaintiffs are independently likely to succeed on the merits on arbitrary-and-capricious review.

## II.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT CONTINUED PRELIMINARY RELIEF.

Not only is the Rule unlawful across the Board, but it will also cause irreparable harm to Plaintiffs absent continued preliminary relief. The Rule (1) imposes unrecoverable compliances costs, (2) interferes with the enforcement of state law, and (3) causes coercive harm—all of which constitute irreparable harm.

*First*, the Rule will cause unrecoverable compliance costs. Under well-established precedent, "the nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. Law*, 66 F.4th at 597. The "key inquiry" is not the magnitude of the costs, but whether they "cannot be recovered 'in the ordinary course of litigation,'" *id.*, which is usually the case when a federal agency is the defendant, *Wages & White Lion*, 16 F.4th at 1142.

Absent continued preliminary relief, Plaintiffs will face "enormous administrative costs" that will be unrecoverable. *Louisiana*, 2024 WL 3452887, at *2. That is because Plaintiffs are recipients of federal funds subject to Title IX regulations, which means they have increased regulatory burdens and compliance costs under the Rule. *See* ROA.1727-49. Indeed, the Rule acknowledges that it will impose burdens and costs, *see, e.g.*, 89 Fed. Reg. at 33,867–74, which Plaintiffs substantiated with multiple declarations detailing the costs of understanding the Rule, revising policies, training staff, increased litigation risks, and increased compliance burdens, ROA.1751-1859, 1988-2002. On top of those costs, Plaintiff School Boards must also secure funding and begin the onerous process of designing, modifying, and constructing bathrooms and locker rooms to comply with the Rule and lessen its harmful effects on privacy and safety. *See supra* n. 15. These types of harms—"increased costs of compliance, necessary alterations in operating procedures," etc.—are exactly the sort of irreparable harm that warrant preliminary relief. *Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 235 (5th Cir. 2024); *see, e.g.*, *BST Holdings*, 17 F.4th at 618.

The Department does not dispute Plaintiffs will incur *some* unrecoverable compliance costs. Instead, it contends (at 39) that most costs, including training and recordkeeping costs, are unrelated to the challenged provisions. That argument disregards this Court's precedent instructing that the *amount* of unrecoverable costs is not the focus of the irreparable-harm inquiry, *Rest. Law*, 66 F.4th at 597, and it ignores Plaintiffs' significant construction costs. And it is premised on a false assumption, because Plaintiffs *did* challenge the recordkeeping requirements and training requirements, highlighting how those (and other compliance burdens) are amplified by the unlawful expansion of what constitutes sex discrimination and harassment. *See, e.g.*, ROA.566, 1646, 1655-56, 1819-25.

*Second*, the Rule interferes with Plaintiff States' ability to enforce state law. For example, the Rule conflicts with Plaintiff States' laws regarding access to sex-specific bathrooms and pronoun usage. *See, e.g.*, La. R.S. §§ 9:62 (bathrooms/changing rooms), 17:2122 (pronouns); Miss. Code § 29-18-1 *et seq*. ("Securing Areas for Females Effectively and Responsibly Act"); Mont. Code Ann. § 40-6-703(f) (pronouns); Idaho Code § 33-6703 (bathrooms/changing rooms). These invasions of Plaintiff

States' "'sovereignty … likely cannot be economically quantified, and thus cannot be monetarily redressed,' and as such constitute irreparable harm." *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024); *see Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) (concluding "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State"); *BST Holdings*, 17 F.4th at 618 (recognizing States are harmed by "federal overreach").

Nor does the cited Eleventh Circuit case (at 41) show otherwise. There the court concluded that the State lacked irreparable harm because the agency "had the authority to issue the interim rule," which is decidedly not the case here. *See Florida v. HHS*, 19 F.4th 1271, 1292 & n.4 (11th Cir. 2021); *id.* at 1312 (Lagoa, J., dissenting).

*Third* and relatedly, Plaintiff States will "face pressure to change their laws to avoid legal consequences," *Tennessee*, 104 F.4th at 613; *Florida*, 19 F.4th at 1312 (Lagoa, J., dissenting); *supra* p. 43, and Plaintiff School Boards are similarly being pressured into revising policies and practices that they believe are in the best interests of their students, schools, and communities, *e.g.*, ROA.1762-66, 1806-10, 1828-32, 1839-43, 1851-55. The Rule forces Plaintiffs into making a lose-lose choice: (1) lose

a significant amount of federal funding or (2) comply with the Rule by revising state laws, policies, and practices and by violating the constitutional rights of students, parents, and employees.[16]

Regardless of whether the loss of federal funding is "imminent," DOE Br. 40, the coercion is. And this coercion is yet another irreparable injury Plaintiffs will suffer if preliminary relief is vacated. *See Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *7, *9 (5th Cir. Feb. 17, 2022) (per curiam) (recognizing a "coercive choice" can "impose[] a distinct and irreparable harm"); *Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (6th Cir. 2022) ("invasions of state sovereignty and coerced compliance" are irreparable harm); *cf.*, *Texas*, 105 F.4th at 764 (concluding that coercing States "into making a choice between losing potentially billions of dollars or surrendering their ability to set state tax policy" is a "concrete" injury).

---

[16] Despite the Department's claims, Plaintiffs do not "assert the constitutional rights of their citizens," DOE Br. 40, but rather rely on their right to not be compelled to violate constitutional rights in exchange for federal funds. Plaintiffs also argue that the principle of constitutional avoidance further shows that the Department's interpretation of Title IX is untenable.

### III.   THE BALANCE OF EQUITIES FAVORS PLAINTIFFS.

The remaining preliminary-relief factors likewise favor Plaintiffs: Enjoining the Rule's enforcement will not harm the Department and is in the public interest. That is why the Department can muster only a half-hearted argument to the contrary.

The Department's only claimed irreparable harm (at 41–42) is that the injunction interferes with its ability to enforce Title IX to prevent discrimination. For support, the Department cites *Maryland v. King*, 567 U.S. 1301 (2012), which "is a most curious citation for the Department to lean on." *Tennessee v. Cardona*, No. 2:24-cv-00072, 2024 WL 3631032, at *10 (E.D. Ky. July 10, 2024). *King* is about irreparable injury to a *State* when a democratically enacted *state statute* is enjoined by a federal court. 567 U.S. at 1303. The Department does not "have the same claim to irreparable harm when its bureaucratically issued rule is enjoined as a democratically elected legislative body has when one of its statutes is enjoined." *Louisiana*, 2024 WL 3452887, at *3. There is no irreparable injury when APA litigation works as it is intended—to "check" bureaucrats that have exceeded statutory authority. *Cf. Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024).

Furthermore, a preliminary injunction "does not prevent the DOE from enforcing Title IX or longstanding regulations to prevent sex discrimination." *Louisiana*, 2024 WL 3452887, at *3. To the contrary, "[t]he protections under the *existing* regulatory framework remain in place, continuing to provide a mechanism for addressing discrimination." *Tennessee*, 2024 WL 3631032, at *11; *see Carroll ISD*, 2024 WL 3381901, at *7. The preliminary injunction simply prevents the Department from enforcing the new Rule that (a) has never been in effect in the four Plaintiff States and thus has generated no reliance interests and (b) subverts rather than implements Title IX. And the Department still has no explanation for how it will suffer irreparable harm from delaying the Rule's effective date when the Department *itself* delayed the Rule's issuance multiple times. ROA.1866. The Department "can hardly be said to be injured by putting off the enforcement of a Rule it took three years to promulgate after multiple delays." *Louisiana*, 2024 WL 3452887, at *3.

In reality, "any interest" the Department "may claim in enforcing an unlawful" and unconstitutional Rule "is illegitimate." *BST Holdings*, 17 F.4th at 618. That is because "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Louisiana*, 55 F.4th at 1035.

And the inverse is true: the public interest is served by forcing the Department to comply with statutory and constitutional limits on its authority. *See BST Holdings*, 17 F.4th at 618; *Texas v. Biden*, 10 F.4th 538, 559 (5th Cir. 2021).

The public interest is likewise served by "upholding regulatory clarity, protecting constitutional rights, and avoiding unnecessary upheaval in schools" pending the final resolution of this case. *See Tennessee*, 2024 WL 3631032, at *12. If the Rule goes into effect, speech will be compelled as it relates to pronouns and an enormous amount of speech on various topics will be chilled. *See supra* pp. 34–38. That means preliminary relief furthers the public's interest in academic freedom and in preventing the violation of constitutional rights of students, parents, and teachers. *See, e.g.*, *Keyishian v. Bd. of Regents of Univ. of State of N. Y.*, 385 U.S. 589, 603 (1967); *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

A preliminary injunction also advances the public interest in protecting children. It protects children who do not wish to share bathrooms and locker rooms with adults and children of the opposite sex and face increased sexual assault risks and invasions of privacy. *See* ROA.1876-78, 1884-1923. It also protects children struggling with their

gender identity, because social transitioning can be harmful to children's mental health and is a pathway to dangerous medical procedures that "will not be the best way to manage their gender-related distress." ROA.1705; *see* ROA.1708-10, 2009-58.[17]

## IV. THE INJUNCTION'S SCOPE IS NECESSARY TO PREVENT IRREPARABLE HARM.

The Department ends by recycling its already rejected arguments that the district court issued an overbroad injunction. That is nonsense. The Court can quickly dispense of the Department's argument on forfeiture grounds, or it can do so on the merits.

*First*, forfeiture. The Department forfeited any request that the preliminary injunction be tailored in the manner that it now requests. To be specific, the Department dedicated "two conclusory sentences" to this issue in its preliminary-injunction briefing, *Louisiana*, 2024 WL 3452887, at *1, and it never even identified what "portions of the Rule" it believed were being challenged, what "remainder" it believed "should be permitted to go into effect." ROA.2203, or which provisions could

---

[17] *See also, e.g.*, Pamela Paul, *As Kids, They Thought They Were Trans. They No Longer Do.*, N.Y. Times (Feb. 2, 2024), https://www.nytimes.com/2024/02/02/opinion/transgender-children-gender-dysphoria.html.

plausibly function while the Rule's core provisions are enjoined. *See Tennessee*, 2024 WL 3453880, at *4. The Department insists (at 43) it would be "unreasonable" to require the Department to do more than it did before the injunction issued, but it tellingly (a) does not cite legal authority for that point (or any authority regarding forfeiture at all) or (b) explain why it could not have filed a motion to modify the injunction after it had issued.

The Department instead cites (at 43) a case reflecting the unremarkable proposition that an injunction cannot be based "only on a possibility of irreparable harm." *Winter v. NRDC*, 555 U.S. 7, 22 (2008). Plaintiffs, however, showed far more than the possibility of irreparable harm—they showed the certainty of it—and that the Rule's unlawful provisions operate together to cause that irreparable harm. *See* ROA.1632, 1639-41, 1646-47, 2240. Nevertheless, the Department never responded to these arguments below or explained how the "remainder of the regulation could function sensibly." *MD/DC/DE Broadcasters Ass'n v. FCC,* 236 F.3d 13, 22 (D.C. Cir. 2001); *see* ROA.2203. To sum up: the Department offers no new arguments and no reason to depart from this Court's earlier determination that it forfeited its severability argument.

*Second*, the merits. The Department continues to pretend (at 44–48) that Plaintiffs did not actually challenge the entire Rule and are not harmed by the entire Rule. This is inaccurate. As the motions panel correctly recognized, Plaintiffs "sought to overturn the *entire* Rule." *Louisiana*, 2024 WL 3452887, at *1 (emphasis added). An accurate account of the suit demonstrates that Plaintiffs challenged the entire Rule (including arguing that it was arbitrary and capricious across the board), and will be harmed by the entire Rule, making an injunction that extends to the whole Rule proper. *See* ECF No. 61-1 at 13–16; Opp. to Stay Application, *U.S. Dep't of Educ. v. Louisiana*, No. 24A78, 2024 WL 3569116, at *33–35, *45–47; ROA.2379-81 (concluding "multiple failures" to consider relevant factors, including compliance costs related to training, "indicate that the Final Rule is arbitrary and capricious"); *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1217 (D.C. Cir. 2004) (concluding it was required to "vacate the entire rule as arbitrary and capricious" where an agency's failure to consider a relevant issue "permeated the entire rulemaking process").

Plaintiffs are necessarily harmed by increased obligations and liability risks, especially when the increased burdens are contrary to law

and interfere with Plaintiff States' sovereignty over education. *Cf.*
*Kentucky*, 23 F.4th at 611 n.19. Nor does the fact that Plaintiffs have no
desire to bar students from participating in band based on their self-
professed gender identity (or any of § 106.10's other grounds) mean that
§ 106.10 does not cause Plaintiffs harm. *Cf.* DOE Br. 47–48. That is
because, among other reasons, "[r]ecognizing new forms of discrimination
'substantially changes the experience' for all regulated entities, in terms
of how to carry out their obligations." *Tennessee*, 104 F.4th at 613.[18] Just
consider increased obligations and compliance costs (even aside from
increased litigation costs and construction costs): Plaintiffs will need to
spend time and incur costs to (1) revise policies and training materials;
(2) train employees on the changes; (3) compel employees to report
anything that *may* constitute discrimination based on new grounds;
(4) take prompt and necessary responsive action; and (5) maintain
records for seven years that document their response to discrimination
complaints based on new grounds. *See* 89 Fed. Reg. at 33,886, 33,888–89.
Expanding the definition of sex discrimination also deprives Plaintiffs of

---

[18] Contrary to the Department's claims (at 48), § 106.10 also harms Plaintiffs
by *itself* requiring recipients to treat persons consistently with their claimed gender
identity; § 106.31(a)(2) simply provides "more detail" about what that means. 89 Fed.
Reg. at 33,809; *see Opp. to Stay Application*, 2024 WL 3569116, at *45–47.

the ability to come up with policies or accommodations that they believe will work best. *See, e.g.*, La. R.S. § 17:221.8.

The Department continues to misunderstand the severability analysis and ignore the Rule's interrelated nature. Even if Plaintiffs' claims were limited to the three central provisions, the injunction would be proper for at least two reasons.

*First*, it is a *preliminary* injunction with the purpose—and effect here—of "maintain[ing] the status quo pending litigation." *Louisiana*, 2024 WL 3452887, at *2. That means the district court has "wide latitude to craft a temporary remedy" and "will not abuse its discretion if its temporary order is broader than final relief." *Id.*

*Second*, the Rule satisfies neither of the severability factors that apply when a court considers the scope of final relief "in the agency rulemaking context:" (1) agency intent, and (2) "whether the remaining parts can 'function sensibly without the stricken provision.'" *Nat'l Ass'n of Mfrs. v. SEC*, 105 F.4th 802, 816 (5th Cir. 2024) ("*NAM*") (quotation omitted).[19]

---

[19] The Department (at 45–46) quotes the standard from "the statutory context" to suggest *NAM* mandates severability here. *Id.* at 815. It ignores that (a) the severability analysis involves two factors in the regulatory context, (b) appellants in

Regarding intent, the Rule loses its "primary purpose" without the three central provisions, which means there is "substantial doubt" that the Department would have issued the Rule without those provisions notwithstanding "the severability clause." *Mayor of Baltimore v. Azar*, 973 F.3d 258, 292–93 (4th Cir. 2020) (en banc). And this substantial doubt is further magnified because there is no "suggestion that the cost-benefit analyses underlying the Rule contemplated the idea of allowing these provisions to go into effect with a *different* definition of sex discrimination." *Tennessee*, 2024 WL 3453880, at *4.

Regarding feasibility, the main challenged provisions are "so central to the Final Rule … that it cannot operate without them." ROA.2511. The "provisions, particularly the new definition of sex discrimination, appear to touch every substantive provision of the Rule." *Tennessee*, 2024 WL 3453880, at *3; *see* Tenn. Suppl. Br., *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3521678 (6th Cir.). And, while the Supreme Court considered severability in an emergency posture, it faulted the Department for failing to "adequately identif[y] which

---

*NAM* seemingly did not advance an argument about agency intent, and (c) *NAM* involved final relief.

particular provisions, if any, are sufficiently independent of the enjoined definitional provision and thus might be able to remain in effect." *Louisiana*, 144 S. Ct. at 2510. Because the Department here does little more than identify the same purportedly independent provisions and reiterate the same unpersuasive arguments, there is no reason for this Court to reach a different conclusion than the Supreme Court.

## CONCLUSION

The Supreme Court and district court were right: preliminary relief is warranted. This Court should affirm.

Dated:    September 19, 2024    Respectfully submitted,

ELIZABETH B. MURRILL
Attorney General of Louisiana

*/s/ Autumn Hamit Patterson*
J. BENJAMIN AGUIÑAGA
Solicitor General
AUTUMN HAMIT PATTERSON
Special Assistant Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746

*Counsel for Plaintiffs-Appellees State of Louisiana, Louisiana Department of Education, and 17 Plaintiff School Boards*

LYNN FITCH
Attorney General of Mississippi

*/s/Scott G. Stewart*
SCOTT G. STEWART
Solicitor General
JUSTIN L. MATHENY
Deputy Solicitor General
MISSISSIPPI ATTORNEY GENERAL'S
OFFICE
P.O. Box 220
Jackson, Mississippi 39205
(601) 359-3680

*Counsel for Plaintiff-Appellee
State of Mississippi*

RAÚL LABRADOR
Attorney General of Idaho

*/s/ Alan Hurst*
ALAN HURST
Solicitor General
OFFICE OF THE ATTORNEY
GENERAL OF IDAHO
700 W. Jefferson Street, Suite
201
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400

*Counsel for Plaintiff-Appellee
State of Idaho*

AUSTIN KNUDSEN
Attorney General of Montana

*/s/Christian B. Corrigan*
CHRISTIAN B. CORRIGAN
Solicitor General
PETER TORSTENSEN
Deputy Solicitor General
MONTANA DEPARTMENT OF JUSTICE
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707

*Counsel for Plaintiff-Appellee State
of Montana*

*/s/Donald A. Daugherty, Jr.*
DONALD A. DAUGHERTY, JR.
Senior Counsel, Litigation
PAUL ZIMMERMAN
Senior Counsel, Policy and
Regulation
MARTHA A. ASTOR
Counsel, Litigation
DEFENSE OF FREEDOM INSTITUTE
FOR POLICY STUDIES
1455 Pennsylvania Avenue, NW,
Suite 400 Washington, DC 20004
(414) 559-6902

*Counsel for Plaintiffs-Appellees
States*

## CERTIFICATE OF SERVICE

I certify that on September 19, 2024, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/ Autumn Hamit Patterson*
AUTUMN HAMIT PATTERSON

# CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this brief complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 32 (a)(7) because it contains 12,997 words, excluding the parts of the document exempted by Rule 32(f); and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook font, except for footnotes in 12-point font) using Microsoft Word (the same program used to calculate the word count).

*/s/ Autumn Hamit Patterson*
AUTUMN HAMIT PATTERSON

Dated:    September 19, 2024