No. 24-30399

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

State of Louisiana, by and through its Attorney General, Elizabeth B. Murrill; Louisiana Department of Education; State of Mississippi, by and through its Attorney General, Lynn Fitch; State of Montana, by and through its Attorney General, Austin Knudsen; State of Idaho, by and through its Attorney General, Raul Labrador; School Board of Webster Parish; School Board of Red River Parish; School Board of Bossier Parish; School Board Sabine Parish; School Board of Grant Parish; School Board of West Carroll Parish; School Board of Caddo Parish; School Board of Natchitoches Parish; School Board of Caldwell Parish; School Board of Allen Parish; School Board LaSalle Parish; School Board Jefferson Davis Parish; School Board of Ouachita Parish; School Board of Franklin Parish; School Board of Acadia Parish; School Board of Desoto Parish; School Board of St. Tammany Parish; All Plaintiffs,

*Plaintiffs-Appellees,*

v.

United States Department of Education; Miguel Cardona, in his official capacity as Secretary of Education; Office for Civil Rights, United States Department of Education; Catherine Lhamon, in her official capacity as the Assistant Secretary for Civil Rights; United States Department of Justice; Merrick B. Garland, in his official capacity as the Attorney General of the United States; Kristen Clarke, in her official capacity as Assistant Attorney General for the Civil Rights Division of United States Department of Justice,

*Defendants-Appellants.*

_____

School Board Rapides Parish,

*Plaintiff-Appellee,*

v.

United States Department of Education; Miguel Cardona, in his official capacity as Secretary of Education; Office for Civil Rights, United States Department of Education; Catherine Lhamon, in her official capacity as the Assistant Secretary for Civil Rights; United States Department of Justice; Merrick B. Garland, in his official capacity as the Attorney General of the United States; Kristen Clarke, in her official capacity as Assistant Attorney General for the Civil Rights Division of United States Department of Justice,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Western District of Louisiana
Case No. 3:24-cv-563; 1:24-cv-567 (Hon. Terry A. Doughty)

# BRIEF OF APPELLEE RAPIDES PARISH SCHOOL BOARD

(Attorneys Listed on Following Page)

Jonathan A. Scruggs
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org

Michael T. Johnson
JOHNSON, SIEBENEICHER & INGRAM
2757 Highway 28 East
Pineville, LA 71360
(318) 484-3911
mikejohnson@jslawfirm.com

John J. Bursch
Matthew S. Bowman
Natalie D. Thompson*
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
mbowman@ADFlegal.org
nthompson@ADFlegal.org

Julie Marie Blake
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jblake@ADFlegal.org

*Counsel for Appellee Rapides Parish School Board*

**CERTIFICATE OF INTERESTED PERSONS**

Counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

<u>Plaintiffs-Appellees</u>:

State of Louisiana

Louisiana Department of Education

State of Mississippi

State of Montana

State of Idaho

School Board of Webster Parish

School Board of Red River Parish

School Board of Bossier Parish

School Board Sabine Parish

School Board of Grant Parish

School Board of West Carroll Parish

School Board of Caddo Parish

School Board of Natchitoches Parish

School Board of Caldwell Parish

School Board of Allen Parish

School Board of LaSalle Parish

School Board of Jefferson Davis Parish

School Board of Ouachita Parish

School Board of Franklin Parish

School Board of Acadia Parish

School Board of Desoto Parish

School Board of St. Tammany Parish

School Board of Rapides Parish

Defendants-Appellants:

U.S. Department of Education

U.S. Department of Education, Office for Civil Rights

Miguel Cardona, in his official capacity as Secretary of Education

Catherine Lhamon, in her official capacity as Assistant Secretary of
Education for Civil Rights

U.S. Department of Justice

Merrick B. Garland, in his official capacity as Attorney General of the
United States

Kristen Clarke, in her official capacity as Assistant Attorney General
for the Civil Rights Division, U.S. Department of Justice.

Counsel for Plaintiffs-Appellees States:

Elizabeth B. Murrill, Attorney General of Louisiana

J. Benjamin Aguinaga, Solicitor General of Louisiana

Tracy Short, Assistant Chief Deputy Attorney General of Louisiana

Autumn Hamit Patterson, Special Assistant Solicitor General of
Louisiana

Donal A. Daugherty, Jr., Defense of Freedom Institute for Policy Studies

Paul Zimmerman, Defense of Freedom Institute for Policy Studies

Martha A. Astor, Defense of Freedom Institute for Policy Studies

Lynn Fitch, Attorney General of Mississippi

Scott G. Stewart, Solicitor General of Mississippi

Justin L. Matheny, Deputy Solicitor General of Mississippi

Austin Knudsen, Attorney General of Montana

Christian B. Corrigan, Solicitor General of Montana

Peter Torstensen, Deputy Solicitor General of Montana

Raúl Labrador, Attorney General of Idaho

Alan Hurst, Solicitor General of Idaho

Josh Turner, Chief of Constitutional Litigation and Policy for Idaho

Counsel for Plaintiff-Appellee Rapides Parish School Board:

John J. Bursch, Alliance Defending Freedom

Jonathan Scruggs, Alliance Defending Freedom

Julie Marie Blake, Alliance Defending Freedom

Matthew S. Bowman, Alliance Defending Freedom

Natalie D. Thompson, Alliance Defending Freedom

Michael T. Johnson, Johnson, Siebeneicher & Ingram

<u>Counsel for Defendants-Appellants</u>:

Brian M. Boynton, Principal Deputy Assistant Attorney General,

> U.S. Department of Justice

Emily B. Nestler, Assistant Branch Director,

> U.S. Department of Justice

Elizabeth Tulis, Trial Attorney, U.S. Department of Justice

Rebecca Kopplin, Trial Attorney, U.S. Department of Justice

Benjamin Takemoto, Trial Attorney, U.S. Department of Justice

Hannah Solomon-Strauss, Trial Attorney, U.S. Department of Justice

Pardis Gheibi, Trial Attorney, U.S. Department of Justice

Melissa N. Patterson, Attorney, U.S. Department of Justice

Stephanie R. Marcus, Attorney, U.S. Department of Justice

Jack Starcher, Attorney, U.S. Department of Justice

Steven A. Myers, Attorney, U.S. Department of Justice

David L. Peters, Attorney, U.S. Department of Justice

Lisa Brown, General Counsel, U.S. Department of Education

> */s/ Natalie D. Thompson*
> Natalie D. Thompson*
> *Counsel for Appellee Rapides Parish School Board*
>
> **Not a member of the D.C. bar; practicing under the*
> *supervision of D.C. bar members while application is*
> *pending.*

## STATEMENT REGARDING ORAL ARGUMENT

The district court preliminarily enjoined enforcement of a 423-page administrative rewrite of Title IX. The new regulations force schools to assign males to the health class covering the female reproductive system; allow males to play against girls in sports and P.E. class; use gender-identity-based pronouns; and permit males to use girls' locker rooms, showers, and overnight accommodations. The district court issued a preliminary injunction preventing enforcement of these regulations. Defendants-Appellants (together, "the Department") appealed.

In rejecting the Department's request to stay the injunction pending appeal, this Court concluded that (1) the Department forfeited its severability argument; (2) allowing the regulations to go into effect "would inflict enormous administrative costs and great legal uncertainty"; (3) the Department could not show irreparable harm; and (4) "the public interest would not be served by a temporary judicial rewriting of the Rule." *Louisiana v. U.S. Dep't of Educ.*, No. 24-30399, 2024 WL 3452887, at *2–3 (5th Cir. July 17, 2024) (unpublished) (per curiam). The Department is not likely to prevail on the merits, either.

Nonetheless, Plaintiff-Appellee agrees that oral argument would aid the Court in considering this extraordinary expansion of federal power and reimagining of an important civil-rights statute. The Court has set argument for November 4, 2024.

# TABLE OF CONTENTS

Certificate of Interested Persons ............................................................i

Statement Regarding Oral Argument ......................................................v

Table of Authorities.............................................................................viii

Introduction............................................................................................1

Statement of Issues ...............................................................................3

Statement of the Case ...........................................................................4

Summary of Argument..........................................................................11

Standard of Review ..............................................................................15

Argument...............................................................................................16

I.      The Supreme Court agreed plaintiffs are entitled to relief. .........16

II.     Plaintiffs will likely succeed on the merits....................................17

        A.      The Rule is contrary to Title IX. ...........................................17

                1.      Title IX respects the immutable differences
                        between male and female.............................................17

                2.      The Department's position ignores Title IX's
                        respect for sex-based distinctions. ...............................32

        B.      The Rule infringes on constitutional rights. ........................43

                1.      The Rule is vague and overbroad. ...............................43

                2.      The Rule compels and restricts speech based on
                        content and viewpoint as applied. ...............................49

        C.      The Rule is arbitrary and capricious. ...................................50

III.    The school board will suffer irreparable harm under the
        Rule...................................................................................................53

IV.   The public interest and balance of equities support
       preliminary relief. .......................................................... 54

V.    The preliminary injunction was well within the district
       court's discretion. ......................................................... 56

Conclusion ..................................................................... 58

Certificate of Compliance .................................................. 59

Certificate of Service ........................................................ 60

# TABLE OF AUTHORITIES

## <u>Cases</u>

*A.C. ex rel. M.C. v. Metropolitan School District of Martinsville,*
  75 F.4th 760 (7th Cir. 2023) ........................................................... 36

*Adams ex rel. Kasper v. School Board of St. Johns County,*
  57 F.4th 791 (11th Cir. 2022) ................................................. *passim*

*Alabama v. United States Secretary of Education,*
  2024 WL 3981994 (11th Cir. Aug. 22, 2024) ................ 2, 16, 45, 48

*Alexander v. Choate,*
  469 U.S. 287 (1985) ....................................................................... 27

*AMG Capital Management, LLC v. FTC,*
  593 U.S. 67 (2021) ......................................................................... 26

*Andrus v. Charlestone Stone Products Company,*
  436 U.S. 604 (1978) ....................................................................... 24

*Anibowei v. Morgan,*
  70 F.4th 898 (5th Cir. 2023) .......................................................... 15

*Bostock v. Clayton County,*
  590 U.S. 644 (2020) ............................................................. *passim*

*Boulahanis v. Board of Regents,*
  198 F.3d 633 (7th Cir. 1999) .......................................................... 34

*Cannon v. University of Chicago,*
  441 U.S. 677 (1979) ................................................................. 23, 24

*Cape v. Tennessee Secondary School Athletic Association,*
  563 F.2d 793 (6th Cir. 1977) .......................................................... 29

*Career Colleges & Schools of Texas v. United States Department of
  Education,*
  98 F.4th 220 (5th Cir. 2024) .......................................................... 53

*Chalenor v. University of North Dakota,*
  291 F.3d 1042 (8th Cir. 2002) ........................................................ 34

*Chance v. Rice University*,
    984 F.2d 151 (5th Cir. 1993) ....................................................... 41

*Clark ex rel. Clark v. Arizona Interscholastic Association*,
    695 F.2d 1126 (9th Cir. 1982) ............................................... 24, 29

*Clark v. Martinez*,
    543 U.S. 371 (2005) ...................................................................... 29

*Cohen v. Brown University*,
    101 F.3d 155 (1st Cir. 1996) ............................................. 4, 23, 34

*Cohen v. Brown University*,
    991 F.2d 888 (1st Cir. 1993) ............................................... 25, 26

*CSX Transportation, Inc. v. Alabama Department of Revenue*,
    562 U.S. 277 (2011) ...................................................................... 19

*Dambrot v. Central Michigan University*,
    55 F.3d 1177 (6th Cir. 1995) ....................................................... 49

*Davis ex rel. LaShonda D. v. Monroe County Board of Education*,
    526 U.S. 629 (1999) .............................................................. *passim*

*Davis v. Michigan Department of Treasury*,
    489 U.S. 803 (1989) ...................................................................... 21

*DeAngelis v. El Paso Municipal Police Officers Association*,
    51 F.3d 591 (5th Cir. 1995) ......................................................... 48

*Department of Education v. Louisiana*,
    144 S. Ct. 2507 (2024) .................................................. 2, 11, 16, 56

*Djie v. Garland*,
    39 F.4th 280 (5th Cir. 2022) ....................................................... 22

*Doe v. Luzerne County*,
    660 F.3d 169 (3d Cir. 2011) ......................................................... 52

*Dubin v. United States*,
    599 U.S. 110 (2023) ...................................................................... 21

*Encino Motorcars, LLC v. Navarro,*
 579 U.S. 211 (2016) ...................................................... 41

*Evancho v. Pine-Richland School District,*
 237 F. Supp. 3d 267 (W.D. Pa. 2017) ............................ 27

*Fairchild v. Liberty Independent School District,*
 597 F.3d 747 (5th Cir. 2010) ........................................ 43

*FCC v. AT&T Inc.,*
 562 U.S. 397 (2011) ...................................................... 19

*Fischer v. United States,*
 144 S. Ct. 2176 (2024) ............................................. 23, 24

*Forsyth County v. Nationalist Movement,*
 505 U.S. 123 (1992) ...................................................... 49

*Gebser v. Lago Vista Independent School District,*
 524 U.S. 274 (1998) ...................................................... 40

*Grabowski v. Arizona Board of Regents,*
 69 F.4th 1110 (9th Cir. 2023) ....................................... 36

*Grimm v. Gloucester County School Board,*
 972 F.3d 586 (4th Cir. 2020) ........................................ 36

*Grove City College v. Bell,*
 465 U.S. 555 (1984) ...................................................... 25

*Hamilton v. Dallas County,*
 79 F.4th 494 (5th Cir. 2023) ......................................... 39

*Horton v. Goose Creek Independent School District,*
 690 F.2d 470 (5th Cir. 1982) .................................... 27, 52

*Jackson v. Birmingham Board of Education,*
 544 U.S. 167 (2005) .................................................. 19, 35

*Janus v. American Federation of State, County & Municipal
 Employees, Council 31,*
 585 U.S. 878 (2018) ...................................................... 45

*John Hancock Mutual Life Insurance Company v. Harris Trust & Savings Bank,*
510 U.S. 86 (1993) ......................................................... 41

*Kelley v. Board of Trustees,*
35 F.3d 265 (7th Cir. 1994) ........................................... 25

*Kent v. Johnson,*
821 F.2d 1220 (6th Cir. 1987) ....................................... 52

*Knox County v. M.Q.,*
62 F.4th 978 (6th Cir. 2023).......................................... 27

*L.M. v. Town of Middleborough,*
677 F. Supp. 3d 29 (D. Mass. 2023) .............................. 44

*L.W. ex rel. Williams v. Skrmetti,*
83 F.4th 460 (6th Cir. 2023)..................................... 35, 53

*Loper Bright Enterprises v. Raimondo,*
144 S. Ct. 2244 (2024) ........................................... 37, 45

*Louisiana v. United States Department of Education,*
2024 WL 3452887 (5th Cir. July 17, 2024) ..................... v, 2, 11, 57

*Maryland v. King,*
567 U.S. 1301 (2012) ..................................................... 55

*McBoyle v. United States,*
283 U.S. 25 (1931) ........................................................ 18

*McCormick ex rel. McCormick v. School District of Mamaroneck,*
370 F.3d 275 (2d Cir. 2004)...................................... 23, 26

*Meriwether v. Hartop,*
992 F.3d 492 (6th Cir. 2021) ......................................... 46

*Mexican Gulf Fishing Company v. United States Department of Commerce,*
60 F.4th 956 (5th Cir. 2023).......................................... 29

*Miami University Wrestling Club v. Miami University*,
     302 F.3d 608 (6th Cir. 2002) .................................................. 23, 34

*Mississippi Power & Light Company v. United Gas Pipe Line*
     *Company*,
     760 F.2d 618 (5th Cir. 1985) ......................................................... 54

*Moore v. Brown*,
     868 F.3d 398 (5th Cir. 2017) ......................................................... 15

*Muldrow v. City of St. Louis*,
     601 U.S. 346 (2024) ............................................................... 39, 40

*Murray v. UBS Securities, LLC*,
     601 U.S. 23 (2024) ........................................................................ 19

*National Federation of Independent Business v. Sebelius*,
     567 U.S. 519 (2012) ............................................................... 30, 31

*National Pork Producers Council v. Ross*,
     598 U.S. 356 (2023) ...................................................................... 35

*Neal v. Board of Trustees of California State Universities*,
     198 F.3d 763 (9th Cir. 1999) ......................................................... 35

*Neese v. Becerra*,
     640 F. Supp. 3d 668 (N.D. Tex. 2022) ........................................... 23

*Niz-Chavez v. Garland*,
     593 U.S. 155 (2021) ...................................................................... 18

*North Haven Board of Education v. Bell*,
     456 U.S. 512 (1982) ............................................................... 24, 25

*Odebrecht Construction, Inc. v. Secretary, Florida Department of*
     *Transportation*,
     715 F.3d 1268 (11th Cir. 2013) ..................................................... 54

*Ohio v. Becerra*,
     87 F.4th 759 (6th Cir. 2023) ......................................................... 55

*Ohio v. E.P.A.*,
144 S. Ct. 2040 (2024) ................................................................ 56

*Pennhurst State School & Hospital v. Halderman*,
451 U.S. 1 (1981) ........................................................................ 30

*Pilot Life Insurance Company v. Dedeaux*,
481 U.S. 41 (1987) ...................................................................... 21

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) .................................................................... 50

*Roark & Hardee LP v. City of Austin*,
522 F.3d 533 (5th Cir. 2008) ..................................................... 43

*Roe v. Department of Defense*,
947 F.3d 207 (4th Cir. 2020) ..................................................... 57

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) ...................................................................... 54

*Rosenberger v. Rector & Visitors of University of Virginia*,
515 U.S. 819 (1995) .................................................................... 49

*Speech First, Inc. v. Cartwright*,
32 F.4th 1110 (11th Cir. 2022) .................................................. 48

*Speech First, Inc. v. Fenves*,
979 F.3d 319 (5th Cir. 2020) ..................................................... 49

*Speech First, Inc. v. Schlissel*,
939 F.3d 756 (6th Cir. 2019) ..................................................... 49

*Stollings v. Texas Tech University*,
2021 WL 3748964 (N.D. Tex. Aug. 25, 2021) .......................... 38

*Tennessee v. Cardona*,
2024 WL 3019146 (E.D. Ky. June 17, 2024) ............................. 28

*Tennessee v. Cardona*,
2024 WL 3453880 (6th Cir. July 17, 2024) ......................... 2, 11

*Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*,
  576 U.S. 519 (2015) ........................................................ 26

*Texas Pipeline Association v. FERC*,
  661 F.3d 258 (5th Cir. 2011) ........................................ 19

*Texas v. E.P.A.*,
  829 F.3d 405 (5th Cir. 2016) ........................................ 56

*Texas v. EEOC*,
  633 F. Supp. 3d 824 (N.D. Tex. 2022) ......................... 38

*Texas v. Johnson*,
  491 U.S. 397 (1989) ...................................................... 49

*Threat v. City of Cleveland*,
  6 F.4th 672 (6th Cir. 2021) .......................... 18, 19, 39, 40

*Trump v. International Refugee Assistance Project*,
  137 S. Ct. 2080 (2017) .................................................. 57

*United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*,
  484 U.S. 365 (1988) .................................................. 20, 21

*United States Forest Service v. Cowpasture River Preservation Association*,
  590 U.S. 604 (2020) ...................................................... 31

*United States v. Fitzgerald*,
  906 F.3d 437 (6th Cir. 2018) .................................... 41, 42

*United States v. Lopez*,
  514 U.S. 549 (1995) ...................................................... 31

*United States v. Riverside Bayview Homes, Inc.*,
  474 U.S. 121 (1985) ...................................................... 25

*United States v. Varner*,
  948 F.3d 250 (5th Cir. 2020) ........................................ 46

*United States v. Virginia,*
    518 U.S. 515 (1996) ............................................................ 23, 27

*Vlaming v. West Point School Board,*
    895 S.E.2d 705 (Va. 2023) ..................................................... 46

*Wages & White Lion Investments, LLC v. FDA,*
    16 F.4th 1130 (5th Cir. 2021) ................................................ 54

*Webster v. Fall,*
    266 U.S. 507 (1925) ............................................................... 33

*Weinberger v. Hynson, Westcott & Dunning, Inc.,*
    412 U.S. 609 (1973) ............................................................... 21

*West v. Radtke,*
    48 F.4th 836 (7th Cir. 2022) .................................................. 52

*West Virginia v. E.P.A.,*
    597 U.S. 697 (2022) ............................................................... 32

*Whitman v. American Trucking Associations,*
    531 U.S. 457 (2001) ............................................................... 20

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) ................................................................... 16

*Wisconsin Central Ltd v. United States,*
    585 U.S. 274 (2018) ............................................................... 18

*Yellow Springs Exempted Village School District Board of*
    *Education v. Ohio High School Athletic Association,*
    647 F.2d 651 (6th Cir. 1981) .......................................... 28, 29

## **Statutes**

20 U.S.C. § 1681 ............................................................... *passim*

20 U.S.C. § 1686 ............................................................... *passim*

20 U.S.C. § 1687 ...................................................................... 25

42 U.S.C. § 2000e-2 ............................................................... 38

5 U.S.C. § 705 ....................................................................... 57

Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235 ....... 36

La. Stat. Ann. §§ 4:441–46 (2022) ........................................... 30

La. Stat. Ann. §§ 9:55–65 (2024) ............................................ 30

Pub. L. No. 93-380, § 844, 88 Stat. 484 (1974) ........................ 24

**Regulations**

34 C.F.R. § 106.10 ................................................................ 32

34 C.F.R. § 106.11 .................................................................. 6

34 C.F.R. § 106.14–41 ........................................................... 25

34 C.F.R. § 106.31 ........................................................... 36, 41

34 C.F.R. § 106.32 ............................................................. 6, 36

34 C.F.R. § 106.33 ......................................................... 6, 36, 38

34 C.F.R. § 106.34 ......................................................... 6, 36, 38

34 C.F.R. § 106.37 ................................................................ 36

34 C.F.R. § 106.41 ......................................................... 6, 36, 38

EEOC, *Proposed Enforcement Guidance on Harassment in the Workplace*, 88 Fed. Reg. 67,750 (Oct. 2, 2023) ........................... 47

Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance, 40 Fed. Reg. 24,128 (June 4, 1975) ...................... 22, 25

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) ......................................... 45

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ................................................... *passim*

## **Other Authorities**

117 Cong. Rec. 30,407 (1971) .................................................................23

118 Cong. Rec. 5807 (1972) .............................................................23, 27

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Text*s (2012)...................................... *passim*

Antonin Scalia, *A Matter of Interpretation* (1997)...................................18

John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387 (2003) ....................................................................................... 42

John F. Manning, *What Divides Textualists from Purposivists?*, 106 Colum. L. Rev. 70 (2006) ......................................................23

*The U.S. Department of Education Releases Proposed Changes to Title IX Regulations, Invites Public Comment*, U.S. Dep't of Educ. (June 23, 2022) ........................................................................4

U.S. Bureau of Labor Statistics, *A look at women's education and earnings since the 1970s*, TED: The Economics Daily (Dec. 27, 2017) ......................................................................................4

U.S. Dep't of Just., *Equal Access to Education: Forty Years of Title IX* (June 23, 2012) .............................................................................4

Webster's Third New International Dictionary (1966) ....................18, 19

Women's Sports Found., *50 Years of Title IX* (May 2022)........................4

## INTRODUCTION

Fifty years ago, Congress enacted Title IX to close the gap between women and men, promising equal educational opportunities for both. The law has been an undeniable success: American women have greater opportunities than ever. But the Department of Education has published a new rule that reimagines sex discrimination to cover distinctions Title IX never mentions and Congress never intended, adding concepts like gender identity and prioritizing them over sex. So now, Title IX's primary beneficiaries—women—are denied the very benefits Title IX has promised for 50 years.

This turns Title IX upside down, swapping a well-established, biological, and binary concept of sex for a recent, subjective, and fluid concept of identity. It snubs Congress, enlarges agency power, and renders Title IX incoherent. For example, under the Rule, women must share showers (but not dormitories) with males; high-school girls (but not Girl Scout troops) must share hotel rooms with males on school trips; and middle-school girls must share restrooms with males (but not with those who identify as men or as "nonbinary"). This is neither justified by the text nor consistent with the Constitution's structural demands. Whether gender identity supersedes sex across our nation's schools is a major question for our elected representatives, not a minor gap fillable by unelected bureaucrats five decades later.

The Rule also violates constitutional rights. It forces schools to discriminate based on viewpoint and to compel speech by staff and students—such as requiring pronouns based on gender identity. Simultaneously, the Rule claims to override state laws and policies that protect free speech and privacy. None of this is lawful.

Under the Rule, Appellee Rapides Parish School Board must change many longstanding policies that respect biological differences between boys and girls. For example, the school board must let males who identify as girls use the girls' locker rooms and showers and assign them to girls' physical education classes. That would violate Louisiana law as well as endanger student safety, particularly for girls.

Eight different courts have enjoined the entire Title IX rewrite, stopping enforcement in 26 states and thousands of additional schools. *Alabama v. U.S. Sec'y of Educ.*, No. 24-12444, 2024 WL 3981994, at *1 n.2 (11th Cir. Aug. 22, 2024) (per curiam) (collecting cases). Two courts of appeals—including this one—have blessed the scope of these injunctions. *Tennessee v. Cardona*, No. 24-5588, 2024 WL 3453880 (6th Cir. July 17, 2024); *Louisiana*, 2024 WL 3452887. The Supreme Court did the same, and it rejected the Department's attempt to revive the Rule's redefinition of sex-based discrimination. *Dep't of Educ. v. Louisiana*, 144 S. Ct. 2507 (2024) (per curiam). The Court should affirm and preserve the status quo.

## STATEMENT OF ISSUES

Title IX says, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity[.]" 20 U.S.C. § 1681(a). As text and history show, Title IX allows and sometimes requires sex distinctions to ensure equal educational opportunities. But the Department of Education's new rule reinterprets Title IX to (i) regulate new bases and forms of discrimination, (ii) prohibit sex distinctions in private spaces like restrooms and showers when applied to individuals who identify as transgender, and (iii) expand the definition of sex-based harassment to censor and compel speech. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024) ("the Rule"). The district court concluded this is likely unlawful as well as arbitrary and capricious.

The question presented is whether the district court correctly enjoined the Rule's enforcement while this case proceeds.

## STATEMENT OF THE CASE

*Title IX.* Congress passed Title IX to ensure equal educational opportunities for "women." *Cohen v. Brown Univ.*, 101 F.3d 155, 165 (1st Cir. 1996) (*Cohen II*). The statute has greatly succeeded. It "paved the way for millions of girls and women to access equal opportunity in … schools,"[1] and "help[ed] to ensure that no educational opportunity is denied to women on the basis of sex."[2] In 1970, for example, only 66% of working women had high-school diplomas; in 2016, it was 94%.[3] In 1972, only 7% of high-school varsity athletes were women; in 2018, it was 43%.[4] Title IX achieved this success by defining its protection based on *sex*.

*The Rule.* Now, the Department has tried to remake Title IX in the image of *Bostock v. Clayton County*, 590 U.S. 644 (2020). The Rule redefines "sex-based discrimination" to include distinctions based on "gender identity," "sex stereotypes," and other characteristics. 89 Fed. Reg. at 33,886 (codified at 34 C.F.R. 106.10). Such distinctions violate

---

[1] *The U.S. Department of Education Releases Proposed Changes to Title IX Regulations, Invites Public Comment*, U.S. Dep't of Educ. (June 23, 2022), https://tinyurl.com/27h37a3c.

[2] U.S. Dep't of Just., *Equal Access to Education: Forty Years of Title IX*, 1 (June 23, 2012), https://perma.cc/3GFD-74YX (cleaned up).

[3] U.S. Bureau of Labor Statistics, *A look at women's education and earnings since the 1970s*, TED: The Economics Daily (Dec. 27, 2017), https://tinyurl.com/mrrjr75a.

[4] Women's Sports Found., *50 Years of Title IX* 12 (May 2022), https://perma.cc/TN74-PJ4S.

Title IX, the Rule says, because they "necessarily" require noticing "a person's sex," even assuming "sex" means the "physiological or 'biological distinctions between male and female,' as the Supreme Court assumed in *Bostock*." *Id.* at 33,802 (quoting *Bostock*, 590 U.S. at 655).

Next, the Rule creates a new form of discrimination: "treating a person inconsistent with their gender identity." *E.g.* 89 Fed. Reg. at 33,803. A new provision says sex-based distinctions are still allowed, but not if they cause more-than-de-minimis harm, *id.* at 33,887 (codified at 34 C.F.R. § 106.31(a)(2)), and any policy or "practice that prevents a person from participating … consistent with [their] gender identity" causes more than de minimis harm, *id.* at 33,820. That's a new way of saying a student's gender identity is treated as the student's sex. This new form of discrimination stretches beyond *Bostock* to favor gender identity *over* sex, and it turns the statute into a disparate-impact regime—but only for gender identity.

The new form of discrimination doesn't apply across the board. After all, Title IX has a list of exceptions, 20 U.S.C. § 1681(a)(1)–(9), and cannot "be construed to prohibit … separate living facilities for the different sexes," *id.* § 1686. So the de-minimis-harm form of discrimination carves these out along with their "corresponding regulations." 34 C.F.R. § 106.31(a)(2). And the Department couldn't bring itself to destroy women's sports, so it also carved out the regulatory provision for "separate teams for members of each sex,' 34

C.F.R. § 106.41(b), even though the statutory text does not exempt or even mention athletics. So "treating a person inconsistent with their gender identity" claims cannot be asserted in these contexts.

As a result, the Rule's new form of discrimination makes no sense. The de-minimis-harm proviso applies to "separate toilet, locker room, and shower facilities," 34 C.F.R. § 106.33, "[c]ontact sports in physical education classes," lessons on "[h]uman sexuality," *id.* § 106.34(a)(1), (3), and "interscholastic, intercollegiate, club or intramural athletics," *id.* § 106.41(a). Schools must assign males to the health class covering the female reproductive system and allow males to play against girls in P.E. Yet the Rule permits "living facilities" based on sex—but only in dormitories, *id.* § 106.32(a), not in other bathrooms and showers or on overnight trips, *id.* § 106.33.

While the Department says the Rule "does not implicate" athletics, Gov't.Br.27 n.5, that's wrong, regardless of the exemption from its new form of discrimination. First, § 106.10 redefines sex discrimination generally. Second, § 106.11 says this definition "applies … to all sex discrimination occurring under a recipient's education program or activity." That includes athletics. 89 Fed. Reg. at 33,528. Third, § 106.31(a)(1) repeats that § 106.10 covers "other education program[s] or activit[ies]," which includes athletics. Fourth, § 106.31(a)(2) does not exempt § 106.41(a), which bans sex discrimination "in any interscholastic, intercollegiate, club or

intramural athletics," and it doesn't limit § 106.10 or § 106.11's broad scope. So § 106.10's redefinition of sex discrimination applies generally via § 106.11, and specifically to sports through § 106.41(a).

The Rule also expands what counts as hostile-environment harassment. *Id.* at 33,498. Harassment now can be "severe *or* pervasive"—it need not be both. *Id.* at 33,884 (emphasis added). Complainants need not allege "any particular harm" or show they were denied access to an educational program. *Id.* at 33,511. Harassment can be anything a student considers "unwelcome" or that "limits" someone's ability to benefit. *Id.* at 33,884 (codified at 34 C.F.R. 106.2). This extends to speech online or even overseas. *Id.* at 33,535, 33,886.

The Department recognizes the new standard is "broader" than the Supreme Court's interpretation in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999). 89 Fed. Reg. at 33,498. That is unlawful in itself. Combine it with § 106.10, and the definition forces students and school staff to avoid saying sex is binary and to endorse gender-identity ideology by using opposite-sex pronouns, among other things. This violates the First Amendment.

The Rule's new definitions affect how many other provisions apply. For example, a school must keep records of reported "conduct that reasonably may constitute sex discrimination." 89 Fed. Reg. at 33,886 (codified at 34 C.F.R. § 106.8(f)(2)). The Rule adds provisions governing a school's duty to respond to sex-discrimination claims, 89

Fed. Reg. at 33,888–91 (codified at 34 C.F.R. § 106.44), and new

"grievance procedures" for "sex-based harassment," 89 Fed. Reg. at

33,888–95 (codified at 34 C.F.R. §§ 106.45–106.46).

*Rapides Parish School Board.* The school board administers a

school district serving 20,000+ students. ROA.2572–73. Last year, the

district received $30 million in federal funding—that's around 10% of

its annual budget. ROA.2693. Losing eligibility for this funding would

cause significant financial harm. ROA.2692–94.

The school board relies rely on federal funding to support its most

underserved students. Federal funds provide after-school tutoring on

campus and at local homeless shelters as well as bus passes, school

uniforms, and winter clothes for students experiencing homelessness.

ROA.2694. Federal funding covers specialized services for English

language learners as well as children with disabilities. ROA.2694. It

also pays salaries and benefits for all the district's pre-kindergarten

teachers. ROA.2695; *see* ROA.2572–73, ROA.2692–95.

The Rule would force the school board to change policies and

practices crafted to protect students' privacy, promote safety, and

recognize that male and female students are not similarly situated in

many respects. *E.g.* ROA.2573–74, ROA.2580, ROA.2582, ROA.2605,

ROA.2692. The school board limits restrooms, locker rooms, and

changing rooms based on sex, not gender identity, ROA.2574; respects

sex differences for overnight housing during school activities,

ROA.2603; and requires that any search of a student's person be conducted by staff of the same sex, ROA.2593. The school board also protects free speech; it will not force anyone to participate in a "social transition" by using a gender-identity-based name or pronouns or to otherwise speak about gender ideology. ROA.2574. It recognizes that boys and girls are not similarly situated when it comes to athletics, so it assigns sports teams and P.E. classes based on sex. ROA.2573–74.

*District Court.* The school board challenged the Rule under the APA. ROA.2519–2610. So did four states—Louisiana, Mississippi, Montana, and Idaho—the Louisiana Department of Education, and additional school boards. ROA.537–1114. Plaintiffs all sought a delay of the Rule's effective date and preliminary injunction. ROA.1140–45, ROA.1621–62, ROA.2647–3314. After consolidating the related cases, ROA.2059, the district court granted plaintiffs' motions, ROA.2348–89.

The district court concluded the Rule likely conflicts with Title IX, infringes on constitutional rights, and is arbitrary and capricious. "[T]he Court must interpret the words in a manner consistent with the ordinary meaning at the time Congress enacted the statute," ROA.2366, and "statutory language, plain or not, depends on context," ROA.2368. So Title IX cannot be interpreted to favor gender identity and other characteristics over sex. ROA.2366–68. The Rule's new standard for hostile-environment harassment goes against Title IX and will chill and

compel speech, including by forcing gender-identity-based speech on pain of punishment for "harassment." ROA.2369–70.

The district court also concluded the Rule implicates issues "of vast economic and political significance," preventing the agency from issuing it without clear statutory authority. ROA.2370–74. And because the Rule's new conditions are not clear in the statutory text, the Rule exceeds limits on Spending Clause legislation. ROA.2374–77.

Finally, the district court concluded the Rule is likely arbitrary and capricious. ROA.2377–82. The Rule "focuses on the 'effect on the student who changes their gender identity' and fails to address the effect on the other students," particularly "females [who] must use the bathroom, undress, and shower in the presence of persons who may identify as females but still have male biological parts." ROA.2381–82; *see* 89 Fed. Reg. at 33,820.

The court agreed plaintiffs would suffer irreparable harm if the Rule took effect and that the equities and public interest favored relief. ROA.2383–85. So it issued a preliminary injunction covering Louisiana, Mississippi, Montana, and Idaho. ROA.2386–87, 2388–89.

*Stay Proceedings*. The Department appealed and sought a stay of the injunction as to all but two applications: 34 C.F.R. § 106.31(a)(2)'s new form of discrimination and 34 C.F.R. § 106.2's definition of "hostile environment harassment" as applied to discrimination on the basis of gender identity. ROA.2405–15. It argued preliminary relief should not

10

affect other provisions of the Rule, including § 106.10, the provision defining "sex-based discrimination" to include gender identity and other characteristics. ROA.2405–15; Emergency Mot. for Partial Stay, ECF 28. The district court denied the stay motion. ROA.2508–12.

This Court also denied the Department's request, concluding the Department provided "little basis to assess the likelihood of success" on the merits and forfeited the issue of severability. *Louisiana*, 2024 WL 3452887, at *1–2. Concurrently, the Sixth Circuit refused the Department's parallel stay motion in another case challenging the Rule. *Tennessee*, 2024 WL 3453880.

The Supreme Court also denied relief. *Louisiana*, 144 S. Ct. at 2509. All nine justices agreed plaintiffs "were entitled to preliminary injunctive relief as to three provisions of the rule, including [§ 106.10,] the central provision that newly defines sex discrimination to include discrimination on the basis of sexual orientation and gender identity." *Id.* at 2509–10; *accord id.* at 2510 (Sotomayor, J., dissenting in part).

## SUMMARY OF ARGUMENT

The Supreme Court agreed plaintiffs were entitled to preliminary relief as to 34 C.F.R. § 106.2's hostile-environment harassment definition, § 106.10, and § 106.31(a)(2). That supports the district court's injunction.

Title IX targets discrimination based on sex—not gender identity or other characteristics. It prohibits treating one sex worse than the other, but does not prohibit all sex distinctions. Indeed, the statute recognizes sex-based distinctions can be *necessary* to equalize educational opportunity because of immutable differences between males and females. The statute's plain text and its context foreclose the Rule's rewritten definition of sex-based discrimination to encompass numerous additional characteristics.

The Rule's reimagining of Title IX is also barred by constitutional canons of construction. Conditions on federal funding must be unam-biguously stated by Congress, not invented in agency interpretations. The Spending Clause does not allow an agency to coerce changes to state policies, and interference with traditional state authority must be clearly stated. Congress also does not resolve monumental questions of political and economic significance without expressing its decision clearly to agencies. These constitutional principles bar the Rule.

*Bostock* does not justify it either. For one, *Bostock* disavowed that implication. 590 U.S. at 681. And for good reason—numerous textual and contextual differences between Title VII and Title IX foreclose treating the statutes as identical. Title IX, after all, includes a rule of construction requiring respect for sex-based privacy; and everyone agrees that Title IX (unlike Title VII) allows sex-based distinctions in athletics. The Rule fails to account for textual differences.

Further, the Rule's provisions reach beyond *Bostock*. *Bostock* created no new protected classes. But the Rule's definition of "sex-based discrimination" elevates "gender identity," "sex stereotypes," and other characteristics to the same level as sex. As a result, Title IX's nondiscrimination principle collapses on itself. And the Rule's "de minimis harm" provision further distorts the statute. It creates a new form of discrimination, turns Title IX into a disparate-impact regime—but only for gender identity—and nullifies the distinctions Title IX has long respected. All this is unlawful.

The Rule also imposes a broad definition of hostile-environment harassment inconsistent with the Supreme Court's interpretation of Title IX. The Rule's definition is vague and overbroad, so it infringes on First Amendment freedoms. Combined with the Rule's other new provisions—and its refusal to define key terms like "sex" and "sex stereotypes"—the new standard will both restrict and compel speech based on viewpoint. A federal agency cannot lawfully force schools to adopt such policies.

The Rule is also arbitrary and capricious. As noted, it ignores textual and contextual differences between Title IX and Title VII. It creates bizarre results, like males in women's locker rooms and showers but not women's dormitories. And it fails to recognize or address its impact on sports and P.E. classes, where girls face increased injury risk if they compete against males—however those males identify.

The Rule also leaves questions unanswered, particularly regarding how schools can comply with its gender-identity mandate when it comes to "nonbinary" individuals. In this regard, the Rule is internally inconsistent; even under the Department's logic, there is no justification for treating nonbinary students worse than students who identify as the opposite sex—not to mention giving transgender students accommodations closed to others. It is also arbitrary and capricious to fail to meaningfully respond to concerns about students' constitutionally recognized privacy interests. And the Rule's definition of sex-based discrimination arbitrarily extends to "sex stereotypes" as if biological differences are invidious stereotypes. Finally, the Rule fails to meaningfully respond to significant comments raising these issues.

The district court recognized the Rule's irreparable harm. Compliance will take significant resources and mandate harmful and unwanted policies on pain of losing 10% of the school board's total funds. That outweighs any harm to the Department's interest in preventing sex discrimination. Title IX, after all, will still apply as it has for 50 years.

The district court correctly extended relief to the whole Rule. Its core provisions redefine sex-based discrimination (§ 106.10), create a new form of discrimination for disparate impact based on gender identity (§ 106.31(a)(2)), and broaden liability for hostile-environment harassment (§ 106.2). They are intertwined with the rest of the Rule, as

the motions panel and the Supreme Court concluded. And a piecemeal rollout would risk double the compliance costs, compounding the Rule's harms.

The Court should affirm the district court's award of preliminary relief preventing enforcement of the Rule.

## STANDARD OF REVIEW

A district court's "decision to grant or deny a preliminary injunction … may be reversed on appeal only by a showing of abuse of discretion." *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023). "Factual findings are reviewed for clear error, while legal conclusions are reviewed de novo." *Moore v. Brown*, 868 F.3d 398, 403 (5th Cir. 2017) (per curiam).

# ARGUMENT

## I. The Supreme Court agreed plaintiffs are entitled to relief.

When it denied the Department's stay, the Supreme Court explained that "all Members of the Court today accept that the plaintiffs were entitled to preliminary injunctive relief as to three provisions of the rule, including the central provision that newly defines sex discrimination to include discrimination on the basis of sexual orientation and gender identity." *Louisiana*, 144 S. Ct. at 2509–10. To reach that "agree[ment]," *id.* at 2510 (Sotomayor, J., dissenting in part), "the Court had to have found that all the requirements for a preliminary injunction were met." *Alabama*, 2024 WL 3981994, at *1 n.1. Those requirements are (1) likely success on the merits, (2) irreparable harm, and (3) the balance of equities and public interest favoring movants. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

The Department says (at 20 n.4) "the Supreme Court did not address … the applicability of *Bostock* to Title IX's text." The Eleventh Circuit correctly rejected that, and this Court should too. The Department told the Supreme Court that the Rule's definition of discrimination "is compelled by a straightforward application of [the Supreme] Court's decision in *Bostock*." Appl. for Partial Stay of Injunction 5, *Dep't of Educ. v. Louisiana et al.*, No. 24A78 (U.S. July 22, 2024). That is the Department's lead argument here. *E.g.* Gov't.Br.2.

16

The Supreme Court necessarily agreed this theory is unlikely to succeed. This Court, too, should reject it.

## II.    Plaintiffs will likely succeed on the merits.

The Rule contradicts Title IX, defies the Constitution, and is arbitrary and capricious. The district court correctly found it is unlawful.

### A.    The Rule is contrary to Title IX.

Title IX's plain text, structure, and context—not to mention constitutional canons of construction—require rejecting the Rule.

#### 1.    Title IX respects the immutable differences between male and female.

Title IX forbids schools from treating one sex worse than the other but does not forbid all sex distinctions. Sometimes, Title IX requires schools to provide equal opportunity by recognizing the biological differences between boys and girls.

##### a. Title IX forbids treating one sex worse than the other.

The Department believes *Bostock*'s analysis in the employment context automatically transfers to Title IX. Gov't.Br.18–24. It doesn't. Title IX uses different text to regulate a different context where noticing sex is "relevant"—and crucial—to ensuring equal opportunities for both sexes, particularly women. *Bostock*, 590 U.S. at 660. Those differences

convey a different meaning. *See Wis. Cent. Ltd v. United States*, 585 U.S. 274, 279 (2018).

Statutory interpretation begins with the text. Courts give "terms their ordinary meaning at the time Congress adopted them." *Niz-Chavez v. Garland*, 593 U.S. 155, 160 (2021). When terms have more than one possible meaning, courts choose the "everyday" one. *McBoyle v. United States*, 283 U.S. 25, 26 (1931); Antonin Scalia, *A Matter of Interpretation* 24 (1997) ("[T]he good textualist is not a literalist."). And they do not "add to, remodel, update, or detract from old statutory terms" to fit their "own imaginations." *Bostock*, 590 U.S. at 654–55.

Title IX states: "No person … shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving" federal assistance. 20 U.S.C. § 1681(a). This text forbids treating one sex worse than the other.

No one disputes that "sex" means the "physiological or 'biological distinctions between male and female.'" 89 Fed. Reg. at 33,802 (quoting *Bostock*, 590 U.S. at 655); *e.g.* Gov't.Br.13 (accepting this definition).

The word "discrimination," could mean "to make a distinction," Webster's Third New International Dictionary 648 (1966) ("Webster's Third"), or to treat someone "differently," *Threat v. City of Cleveland*, 6 F.4th 672, 677 (6th Cir. 2021) (citing Webster's Third 648). But to "be subjected to discrimination," 20 U.S.C. § 1681(a), means making a

distinction for the wrong reason: "a difference in treatment or favor on a class or categorical basis in disregard of individual merit." Webster's Third 648. Here, "precedent and dictionaries row in the same direction." *Threat*, 6 F.4th at 677. To "discriminate" means "to treat similarly situated individuals differently." *Id.*

Title IX also prohibits "exclud[ing] from participation in" or "den[ying] the benefits of" an educational program. 20 U.S.C. § 1681(a). These nearby terms help clarify discrimination because "[t]he meaning … of certain words or phrases may only become evident when placed in context." *Tex. Pipeline Ass'n v. FERC*, 661 F.3d 258, 261 (5th Cir. 2011) (cleaned up); *accord FCC v. AT&T Inc.*, 562 U.S. 397, 406 (2011) (multiple "words together may assume a more particular meaning than those words in isolation"); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Text*s 195–98 (2012) (explaining associated-words canon). To "exclude" means to "bar from participation, enjoyment, consideration, or inclusion." Webster's Third 793. And to "deny" means "to turn down or give a negative answer." *Id.* at 603. These words reinforce that discrimination is not merely "differential" treatment, but "less favorable" treatment based on sex, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005), where nothing justifies "the difference," *CSX Transp., Inc. v. Ala. Dep't of Revenue*, 562 U.S. 277, 287 (2011); *see Murray v. UBS Sec., LLC*, 601 U.S. 23, 33 (2024) ("Discrimination" in a "catchall" provision takes a

meaning consistent with prior text rather than "a new or different meaning.").

Finally, the context is an "education program," like classrooms, locker rooms, and sports. *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("A provision … is often clarified by" its "context."); Scalia & Garner, *supra*, 167–69 (explaining whole-text canon). Though sex isn't "relevant to the selection, evaluation, or compensation of employees," *Bostock*, 590 U.S. at 660 (citation omitted), it is critical to ensuring equal opportunities for men and women in education.

In sum, Title IX forbids differential treatment that disfavors, denies, or treats one sex worse than the other when it comes to full and equal educational opportunities. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 811 (11th Cir. 2022) (en banc).

### b. Title IX allows sex distinctions.

"[S]tatutory and historical context" confirm this understanding. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001). While Title IX prohibits sex *discrimination*, it does not forbid all sex *distinctions*. Indeed, the statute *expressly permits* sex distinctions that make good on its promise of equal opportunity. The Department is therefore wrong to claim that "[a] school, no less than an employer" engages in sex discrimination whenever it treats an individual differently "for traits or

actions that it tolerates" in the opposite sex. Gov't.Br.21 (quoting *Bostock*, 590 U.S. at 660).

**i.** Section 1681(a) cannot be read "in a vacuum." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). Its words "must be read in … context" and construed to fit "the overall statutory scheme." *Id.* Here, a nearby provision states: "[N]othing … [in Title IX] shall be construed to prohibit any educational institution … from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. This rule of construction shows that § 1681(a) itself allows sex distinctions. *See United Sav.*, 484 U.S. at 371 (courts will accept meaning that is "compatible with the rest of the law"); Scalia & Garner, *supra*, 167–69; *e.g. Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987); *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 631–32 (1973).

The Department calls the § 1686 rule of construction one of Title IX's "exceptions." *E.g.* Gov't.Br.4, 24. But it isn't listed among the statutory exceptions. 20 U.S.C. § 1681(a)(1)–(9). Instead, its text forbids § 1681(a) from being "construed" to prohibit a sex distinction, 20 U.S.C. § 1686. And Congress called the provision an "[i]nterpretation" principle in its section title. *Id.* That title "reinforces what the text's nouns and verbs independently suggest"— § 1681(a)'s nondiscrimination mandate allows sex distinctions. *Dubin v. United States*, 599 U.S. 110, 121 (2023) (citation omitted); *accord* Scalia & Garner, *supra*, 221–24 (explaining

title-and-headings canon). That forecloses the Rule's transplant of *Bostock* into § 1681(a).

The Department accepts this logic to defend another point, saying its regulations allow sex-specific bathrooms directly under § 1681(a). Gov't.Br. 29–30. Since 1975, regulations have provided for sex-specific "toilet, locker room, and shower facilities." Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance, 40 Fed. Reg. 24,128, 24,139–43 (June 4, 1975) ("1975 rulemaking"). If § 1686 were a mere exception from the non-discrimination rule, then this regulation would be unlawful unless the listed facilities count as "living facilities"—and the Department insists they do not. *Contra Adams*, 57 F.4th at 803 & n.6. But the Rule retains the longstanding sex-specific regulation without change, recognizing that it remains lawful.

Section 1686 is not an exception, but an interpretive command. The Department is wrong to claim (at 24) it contributes nothing toward the meaning of Title IX's "scope of prohibited sex discrimination in the first instance." To the contrary, this rule of construction "compel[s] a different understanding," Gov't.Br.24: Title IX does not require blindness to an individual's sex. And "[w]hen a regulation attempts to override statutory text, the regulation loses every time—regulations can't punch holes in the rules Congress has laid down." *Djie v. Garland*, 39 F.4th 280, 285 (5th Cir. 2022).

**ii.** Historical context confirms Title IX's plain meaning. "Title IX was enacted in response to evidence of pervasive discrimination against women with respect to educational opportunities." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 286 (2d Cir. 2004); *accord Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 & n.36 (1979); *Cohen II*, 101 F.3d at 164–65. That means "Title IX's remedial focus is, quite properly, not on the overrepresented gender, but on the underrepresented gender"—women. *Cohen II*, 101 F.3d at 175; *see Miami Univ. Wrestling Club v. Miami Univ.*, 302 F.3d 608, 615 (6th Cir. 2002); *Neese v. Becerra*, 640 F. Supp. 3d 668, 681–82 (N.D. Tex. 2022). And sex distinctions are often necessary to ensure equal opportunities. After all, "[p]hysical differences" between men and women are "enduring." *United States v. Virginia (VMI)*, 518 U.S. 515, 533 (1996).[5]

As Title IX's principal sponsor understood, the Act must respect relevant differences between men and women. 117 Cong. Rec. 30,407 (1971) (statement of Sen. Bayh) (Title IX would not require co-ed sports teams or locker rooms); 118 Cong. Rec. 5807 (1972) (statement of Sen. Bayh) (Title IX would respect personal privacy in athletic facilities).

---

[5] The Government's critique (at 24–25) of the district court's reasoning is misplaced—courts should recognize a statute's historical context to discern its meaning. *See Fischer v. United States*, 144 S. Ct. 2176, 2186 (2024) (looking to "history of the provision" to discern meaning); John F. Manning, *What Divides Textualists from Purposivists?*, 106 Colum. L. Rev. 70, 84 (2006) ("textualists" consider "relevant context," including "the mischiefs the authors were addressing").

When it comes to privacy, for example, "biological sex is the sole characteristic" that determines whether individuals are similarly situated for purposes of restrooms. *Adams*, 57 F.4th at 803 n.6. The same for athletic ability. *Clark ex rel. Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982).

Thus, Title IX's text, "context," and "history" all agree. *Andrus v. Charlestone Stone Prods. Co.*, 436 U.S. 604, 616 (1978). Sex distinctions are allowed; otherwise, Title IX cannot achieve its goal to stop denial of "benefits" in educational programs "on the basis of sex." 20 U.S.C. § 1681(a); *cf. Fischer*, 144 S. Ct. at 2185 (looking to the "distinct purpose of each provision" to discern meaning based on their "evident purpose") (cleaned up); Scalia & Garner, *supra*, 63–65 (explaining presumption against ineffectiveness).

**iii.** What's more, the Supreme Court has interpreted Title IX's "postenactment developments" as "authoritative expressions concerning [its] scope and purpose." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) (citation omitted). When Congress agrees to a statute's settled interpretation, courts assume this interpretation is correct. *Cannon*, 441 U.S. at 686 n.7, 702–03.

And Title IX has a well-documented history in Congress. Start with Title IX's implementing regulations born out of the Javits Amendment. Pub. L. No. 93-380, § 844, 88 Stat. 484, 612 (1974). Those regulations are codified throughout 34 C.F.R. § 106. *Compare* 40 Fed.

Reg. 24,128, 24,139–43 *with* 34 C.F.R. § 106.14–41. They permit sex-specific spaces like P.E. classes, restrooms, showers, locker rooms, and sports teams. And Congress allowed the regulations to take effect after six days of hearings on whether the rulemaking was "consistent with the law" and congressional intent. *N. Haven*, 456 U.S. at 531–32 (citation omitted); *see* 1975 rulemaking, 40 Fed. Reg. 24,128.

Courts and presidential administrations (including this one) have long believed these regulations "accurately reflect congressional intent." *Grove City Coll. v. Bell*, 465 U.S. 555, 568 (1984); 89 Fed. Reg. at 33,817. Unlike situations where Congress merely fails to act, refusing "to overrule an agency's construction" that Congress specifically asked to review provides "evidence of the reasonableness of that construction." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 137 (1985). That is why courts have given Title IX's contemporaneous implementing regulations a "high" degree of deference. *E.g.*, *Kelley v. Bd. of Trs.*, 35 F.3d 265, 270 (7th Cir. 1994); *Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993) (*Cohen I*).

Congress further ratified this understanding when it amended Title IX through the 1987 Civil Rights Restoration Act, 20 U.S.C. § 1687(2)(A). That Act reversed *Grove City College* to ensure that Title IX applied to all education programs at federally funded schools, including programs like sports. *Id.* Congress did this to ensure "equal

opportunities for female athletes." *McCormick*, 370 F.3d at 287; *Cohen I*, 991 F.2d at 894.

This was no "isolated amendment[ ]" with no relation to sex distinctions. *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 81 (2021) (citation omitted). Rather, Congress considered the precise issue here. That is "convincing" evidence Congress adopted the well-established statutory understanding. *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 537–38 (2015); Scalia & Garner, *supra*, 322–23 (explaining prior-construction canon). Congress adopted the legal consensus since 1972 that Title IX allows schools to consider sex to ensure equal opportunities.

### c. Sometimes Title IX *requires* sex distinctions.

Title IX sometimes even requires sex-based distinctions. Students are denied opportunities and benefits when they cannot access the spaces necessary to obtain an education.

Again, start with the text. "Students are not only protected from discrimination, but also specifically shielded from being 'excluded from participation in' or 'denied the benefits of' any 'education program or activity.'" *Davis*, 526 U.S. at 650 (quoting 20 U.S.C. § 1681(a)). That may be harassment that keeps "female students from using … an athletic field." *Id.* at 650–51. It may be action "that unintentionally results in exclusion," *Knox Cnty. v. M.Q.*, 62 F.4th 978, 1002 (6th Cir.

2023), or precludes "meaningful access" to a desired benefit, *Alexander v. Choate*, 469 U.S. 287, 301 (1985).

Take showers and locker rooms. "[T]he use by students of school restrooms is part and parcel of the provision of educational services covered by Title IX ..." *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 295 (W.D. Pa. 2017). And students cannot meaningfully access those spaces when their privacy is violated. Society recognizes students' bodily privacy. *Horton v. Goose Creek I.S.D.*, 690 F.2d 470, 478 (5th Cir. 1982) (per curiam). They have "the right to shield [their] bod[ies] from exposure to viewing by the opposite sex." *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494–95 (6th Cir. 2008) (citation omitted).

Title IX was enacted with that same understanding. 118 Cong. Rec. 5807 (1972) (Title IX would "permit differential treatment by sex ... in sports facilities or other instances where personal privacy must be preserved."). As Justice Ginsburg explained, integrating Virginia Military Institute "would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements." *VMI*, 518 U.S. at 550 n.19. There was no question when VMI was decided, much less in 1972, that Title IX allowed those alterations. Yet the Rule requires schools to permit males into girls' showers and locker rooms. That cannot be squared with Title IX.

27

Students do not have equal educational access if forced to shower with the opposite sex.

For example, another plaintiff challenging the Rule is a fifteen-year-old girl, A.C., who described how she was harmed when gender identity was used instead of sex in the girls' locker room at her middle school. "[A] student who was born male but identifies as female … was allowed to compete on [the girls'] cross-country and track teams" and "was permitted to use the girls' locker room to change clothes." *Tennessee v. Cardona*, No. 2:24-CV-072-DCR, 2024 WL 3019146, at *6 (E.D. Ky. June 17, 2024). This "prompted A.C. to change clothes elsewhere," as she felt uncomfortable "undressing in the presence of biological males and does not want to see biological males undressing." *Id.* If girls must flee their own locker rooms, they are deprived of equal opportunity.

Similarly, for "equal opportunity" in sports, "relevant differences cannot be ignored." *Yellow Springs Exempted Vill. Sch. Dist. Bd. of Educ. v. Ohio High Sch. Athletic Ass'n*, 647 F.2d 651, 657 (6th Cir. 1981). While the Department objects that its rule carved out sports teams, Gov't.Br.27 n.5, that is wrong (*supra* at 6–7), but also irrelevant.

*First*, the parties agree that the Rule would force the school board to allow males into girls' P.E. classes. *E.g.*, ROA.2916–20. Girls will face a heightened risk of injury and lost opportunity in P.E. classes no less than in competitive interscholastic sports. *Second*, this context shows

the Department's sex-blind interpretation of § 1681(a) is wrong. That interpretation cannot be squared with the undisputed fact that § 1681(a) *allows* sex distinctions in sports, as Title IX regulations have long recognized. The Department cannot ignore that women lose opportunities without sex-specific sports. *E.g.* ROA.2905–16. Because of "average physiological differences" between men and women, "males would displace females to a substantial extent if they were allowed to compete" for the same teams. *Clark*, 695 F.2d at 1131; *accord Cape v. Tenn. Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977) (per curiam).

When "the law is blind" to sex differences, "there may be as much a denial of equality as when a difference is created which does not exist." *Yellow Springs*, 647 F.2d at 657. Title IX's promise of equal opportunity means little if the law blinks reality. The Act cannot be read to defeat itself. *Clark v. Martinez*, 543 U.S. 371, 380 (2005) (accepting "limiting construction called for by one of the statute's applications" although broader construction possible).

### d. The Rule flouts constitutionally mandated canons of construction.

The Rule puts Title IX on a collision course with multiple constitutional requirements and canons of construction. Constitutional avoidance therefore requires rejecting the Rule. *See Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 971 (5th Cir. 2023).

*First*, in a Spending Clause context, Congress must "speak with a clear voice" and impose conditions "unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17–18 (1981). For over 50 years, everyone, including the Department, accepted that Title IX allowed sex distinctions in locker rooms, showers, and athletics. It is unreasonable to say that Title IX "unambiguously" elevated gender identity over sex when no federal court or official so construed the Act.

*Second*, the Rule's new conditions exceed Spending Clause limits. Louisiana law prohibits the school board from adopting many of the Rule's required policies. *E.g.*, La. Stat. Ann. §§ 9:55–65 (2024) (requiring public schools to limit access to multiple-occupant restrooms and changing rooms based on biological sex); La. Stat. Ann. §§ 4:441–46 (2022) (similar for girls' sports). Under the Rule, "pressure" to change these laws "turns into compulsion." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577–78 (2012) (*NFIB*) (opinion of Roberts, C.J.) (cleaned up). The Rule leaves "no real option but to acquiesce" to the federal policy. *Id.* at 582. States must adopt the Rule's new gender-identity mandate or sacrifice 100% of federal education funds. For Rapides Parish, that means giving up 10% of its budget—the very percentage *NFIB* described as "economic dragooning." *Id.* The Rule is all the more coercive because states and school boards must upend "intricate statutory and administrative regimes [implemented] over the course of many decades." *Id.* at 581. Instead of the requisite exercise of

a state's free will, this amounts to a "gun to the head." *Id*. Rejecting the Rule is necessary to avoid rendering Title IX constitutionally suspect.

*Third*, Supreme Court "precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 621–22 (2020). Education is a context "where States historically have been sovereign." *United States v. Lopez*, 514 U.S. 549, 564 (1995). Yet here, the Department wants to override school policies covering an array of topics like locker rooms, restrooms, physical education, and speech on a controversial issue like gender identity. Such a deep incursion into states' traditional power needs clear Congressional approval. It's absent here.

It does not help the Department to belatedly recognize that "[t]he Rule does not actually prevent the states from enforcing their laws." Gov't.Br.41. It is the Department, not the plaintiffs, that contended the Rule preempts state law. *Compare* 89 Fed. Reg. at 33,541–42 (calling 34 C.F.R. § 106.6(b) "the preemption provision" and defending its preemptive effect); *with* ROA.2681–82. Recognizing that the Rule cannot preempt state law does not negate the Department's attempt to coerce states and override their laws. This, too, makes the Rule unlawful.

*Fourth*, "clear congressional authorization" is needed when agencies purport to resolve questions of vast "economic and political

significance." *West Virginia v. E.P.A.*, 597 U.S. 697, 721–23 (2022). The Rule tries to settle important political issues like whether states can protect student privacy. Indeed, over half of the states have passed or proposed laws ensuring privacy in men's and women's restrooms. And the Rule does so by tying the mandate to hundreds of billions of dollars in federal funding—$30 million a year for Rapides Parish alone. That's a major question.

The new Rule threatens to change Title IX "from one sort of scheme of regulation into an entirely different kind." *Id.* at 728 (cleaned up). It would displace many state laws, affect millions of students, and jeopardize billions in school funding. No clear statement gives the Department that power.

### 2. The Department's position ignores Title IX's respect for sex-based distinctions.

The Department's position disregards Title IX's text, structure, and context to reach its policy goal—treating an individual's "gender identity" as the individual's "sex." That cannot be justified based on *Bostock* or by gesturing to the concept of *de minimis* harm.

#### a. *Bostock* cannot be transplanted to Title IX.

Misusing *Bostock*, the Rule redefines "sex discrimination" in Title IX to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," 34 C.F.R. § 106.10; *see* 89 Fed. Reg. at 33,802;

Gov't.Br.20 (exporting *Bostock*'s logic). *Bostock* disavowed its application to "other laws" such as Title IX, 590 U.S. at 681, and applying its rationale here is unjustified for five reasons.

**i.** *Bostock* did not confront the clear-statement rule or the major questions doctrine, as it did not involve Spending Clause legislation or agency action. The Department's defense is to insist (at 25–26) that *Bostock* is required by the statutory text. That's wrong for all the reasons discussed. More than that, the *Bostock* Court admitted "many, maybe most, applications of Title VII's sex provision were 'unanticipated' at the time of the law's adoption." *Bostock*, 590 U.S. at 679; *see id.* at 649 ("unexpected consequences"), *id.* at 660 (calling its holding "momentous"). That forecloses transplanting *Bostock*'s holding to Title IX.

The Department also says (at 26) that before *Bostock*, "the [EEOC] had already concluded" that Title VII prohibits gender-identity discrimination. That is immaterial. The Court did not adopt an EEOC interpretation. If the Department means to suggest *Bostock* silently rejects the major questions doctrine, questions "neither brought to the attention of the court nor ruled upon, are not [precedent]." *Webster v. Fall*, 266 U.S. 507, 511 (1925).

**ii.** *Bostock* held that "sex is not relevant to the selection, evalua-tion, or compensation of employees" under Title VII, which treats sex like race and other protected classifications. 590 U.S. at 660 (cleaned

up). But Title IX covers only sex, which often *is* relevant to promoting equal educational opportunities.

Take P.E. classes. Under *Bostock*, employers cannot consider sex when hiring or firing employees. For P.E., that logic would mean schools cannot create sex-specific gym classes, as Rapides Parish has done for its students. ROA.2573. But "athletics programs *necessarily* allocate opportunities separately for male and female students." *Cohen II*, 101 F.3d at 177; *see* Gov't.Br.27 n.5 (Title IX permits sex-specific "athletic teams"). And if sex-specific interscholastic sports teams are permitted under § 1681(a), so are sex-specific P.E. classes. The Javits Amendment, after all, mentioned only "intercollegiate athletics," so § 1681(a) must permit separate teams in elementary and secondary schools even on the Department's (incorrect) theory that the Javits Amendment is what allows the Rule to exempt sports teams from its new form of discrimination.

Indeed, when some schools began cutting men's teams to comply with Title IX, male students sued for sex discrimination. *E.g.*, *Miami Univ. Wrestling Club*, 302 F.3d at 615; *Chalenor v. Univ. of N.D.*, 291 F.3d 1042, 1049 (8th Cir. 2002) (collecting cases). They argued any action "taken 'but for' the sex of the participants" facially violated Title IX. *Boulahanis v. Bd. of Regents*, 198 F.3d 633, 636 (7th Cir. 1999); 89 Fed. Reg. at 33,807 (incorporating "but-for … test"). But courts rejected that theory—Title IX does not forbid schools "from making gender-

conscious decisions" in this context. *Neal v. Bd. of Trs. of Cal. State Univs.*, 198 F.3d 763, 765 (9th Cir. 1999).

This shows Title IX "vastly" differs from Title VII as described in *Bostock*. *Jackson*, 544 U.S. at 175. Even the Department accepts that Title IX allows sex distinctions. It concedes the longstanding regulation allowing sex-specific "toilet, locker room, and shower facilities" arose from § 1681(a)'s "general nondiscrimination mandate." Gov't.Br.30. Yet the Department insists *Bostock*'s interchangeable use of "on the basis of" with "because of" shows *Bostock* applies to Title IX. Gov't.Br.23–24. But courts do not parse "[t]he language of an opinion" as though "dealing with language of a statute." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373 (2023) (citation omitted).

*Bostock* doesn't work in the educational context. *Bostock* dealt with hiring and firing employees; Title IX concerns educational opportunities. No one thinks Title VII allows business owners to hire only male accountants or assign men and women to different office floors. But sex distinctions are common in schools—take boys' and girls' gym class. *See Adams*, 57 F.4th at 808. That is why many courts have concluded *Bostock* does not carry beyond Title VII. *E.g.*, *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023).

Like the Rule, the Department cites out-of-circuit decisions that applied *Bostock* to Title IX. Gov't.Br.21–22. They are unpersuasive. The Ninth and Fourth Circuits did not mention section 1686's rule of

35

construction or recognize that Title IX allows consideration of sex in many contexts. *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616–17 (4th Cir. 2020). And though the Seventh Circuit cited section 1686 and 34 C.F.R. § 106.33, it adopted an interpretation that the Rule has disclaimed: ambiguity when it comes to sex and gender identity. *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023); *see* 89 Fed. Reg. at 33,807.

**iii.** *Bostock* relied on Title VII's nondiscrimination mandate as applying to "individuals, not groups." 590 U.S. at 658. The court contrasted that approach to "sex discrimination" laws that "focus on differential treatment between the two sexes as groups." *Id.* at 659. Title IX is that kind of law. Not only is "sex discrimination" in its title and headings, Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235, 373, but a group-based understanding explains the many provisions requiring comparable treatment of men and women as groups. Housing for each sex must be "[c]omparable in quality and cost to the student." 34 C.F.R. § 106.32(b)(2)(ii); *see id.* § 106.32(c)(2) (similar). "[T]oilet, locker room, and shower facilities" must be comparable. 34 C.F.R. § 106.33. And schools must "provide equal athletic opportunity for members of both sexes." *Id.* § 106.41(c). The list goes on. *E.g.*, *id.* §§ 106.31(c) 106.34(b)(2), 106.37(c).

Applying *Bostock*'s individualistic logic would negate all these group-focused regulations as violating Title IX. After all, a school necessarily considers sex when assigning girls and boys to separate dormitories, P.E. classes, locker rooms, and sports teams. Courts should not discount regulations that were "issued roughly contemporaneously with [Title IX's] enactment" and have "remained consistent over time." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2258 (2024). The Department erred in superimposing *Bostock's* individualistic interpretation of Title VII, which was the Department's vehicle for smuggling gender identity into the statute. Title IX should be read as allowing schools to "treat[ ] males and females comparably as groups" in these contexts. *Bostock*, 590 U.S. at 665.

**iv.** Title IX's nondiscrimination mandate—not just its "exceptions"—allows sex distinctions. Section 1686 shows that § 1681(a) allows sex distinctions, including to ensure comparable living facilities. § I.A.2. Misapplying *Bostock* to Title IX ignores this rule of construction and would invalidate regulations allowing sex distinctions that the Department itself justifies based on § 1681(a)'s nondiscrimination mandate. *Cf.* Gov't.Br.30.

The Department says (at 24–25), "Title VII, too, contains statutory exceptions" and can protect privacy. Title VII's "bona fide occupational qualification" provision is unlike § 1686. The BFOQ provision says certain distinctions "shall not be an unlawful employment practice." 42

37

U.S.C. § 2000e-2(e). Unlike § 1686, that *is* an exception to the general rule. Title IX's provisions are more than "exceptions" to the non-discrimination rule; they govern its interpretation (§ 1686) and reflect the shared understanding (since 1972) that recognizing sex differences for privacy and athletics is not discrimination (*e.g.*, 34 C.F.R. §§ 106.33, 106.34, 106.41(a)–(b)). *Supra* at 21–22, 24–25.

    **v.** *Bostock*'s logic causes Title IX and its regulations to implode. The Rule allows sex-specific locker rooms unless applied to individuals who identify as transgender. 89 Fed. Reg. at 33,818. But facilities assigned by gender identity still notice a person's sex, according to the Rule, which would make them unlawful under *Bostock*. *Id.* at 33,816. So the Rule draws distinctions forbidden by its own reading of Title IX's nondiscrimination provision. That can't be right.

    Moreover, the Rule's new form of discrimination goes beyond *Bostock*. *Bostock* did not change the meaning of "sex" or say all sex-based distinctions are gender-identity discrimination. Gov't.Br.22; 89 Fed. Reg. at 33,807. Even *Bostock* did not create any new protected classes, as lower courts have recognized. *Texas v. EEOC*, 633 F. Supp. 3d 824, 831 (N.D. Tex. 2022); *Stollings v. Tex. Tech Univ.*, No. 5:20-CV-250-H, 2021 WL 3748964, at *10 (N.D. Tex. Aug. 25, 2021). But the Rule elevates gender identity and other characteristics to the same level as sex. So schools cannot separate locker rooms or P.E. classes based on gender identity *or* sex. Either way, there would be discrimination.

### b. The de-minimis harm standard subverts Title IX's sex-based protections.

The Department manufactures a new de-minimis-harm standard to achieve its policy goals. 89 Fed. Reg. at 33,887 (codified at 34 C.F.R. § 106.31(a)); Gov't.Br.26–29. The Department says this standard is just another way to say legally cognizable injury. *Id.* at 27. It's not. The provision creates a never-before-seen form of sex-based discrimination based on disparate impact, only for gender identity. This subverts Title IX's sex-based protections.

Title IX never mentions de minimis harm. It prohibits schools from excluding, denying benefits, or discriminating—meaning to "treat worse." *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024); *see* § I.A.1. To be sure, "the law does not take account of trifles," *Threat*, 6 F.4th at 678, and that background exception of de minimis injuries guards against antidiscrimination laws becoming "a general civility code," *Hamilton v. Dallas Cnty.*, 79 F.4th 494, 505 (5th Cir. 2023) (en banc). But far from furthering that ancient principle, the Rule distorts it. If sex-specific "toilet, locker room, and shower facilities" are within a de minimis carveout from § 1681(a)'s *sex*-based nondiscrimination rule—as the Department says (at 30)—that does not change based on a person's *gender identity*. The Department makes no effort to link its new de-minimis-harm concept to Title IX's text or background concepts of harm understood in 1972. Instead, the Department tries to update

what counts as cognizable harm to reflect 2024 societal norms (as the Department sees them) unmoored from both text and history. *Bostock* itself condemned this very sort of updating. 590 U.S. at 685.

The provision is a biased way to achieve policy goals contrary to Title IX's text. *See Threat*, 6 F.4th at 679 (condemning efforts to impose de minimis standards that "stray" from text and like "children's game of telephone, … risk converting the ultimate message into something quite different from the original….") (cleaned up). For example, the Rule says sex distinctions always cause more than de minimis harm—but only when applied to persons with gender identities different than sex. *E.g.*, 89 Fed. Reg. at 33,887; *accord id.* at 33,815 (saying "stigmatic injuries" are per se harmful); Gov't.Br.28. So sex-specific locker room policies are a trifle when applied to men who identify as men but actionable injury when applied to men who identify as women, 89 Fed. Reg. at 33,820, even though women—whose harms the Department dismisses—have their unclothed bodies exposed to a male in both cases. On this logic, gender identity supersedes sex—the one thing that Title IX protects. *Adams*, 57 F.4th at 814. And far from an "objective standard," the Rule says harm is cognizable only if implicating a person's "subjective, deep-core sense of self." *Compare* 89 Fed. Reg. at 33,815, *with id.* at 33,809; *see Muldrow*, 601 U.S. at 354–55.

Moreover, Title IX requires intentional discrimination, not just disparate impact. *Gebser v. Lago Vista I.S.D.*, 524 U.S. 274, 287 (1998);

*Chance v. Rice Univ.*, 984 F.2d 151, 153 (5th Cir. 1993). The "de minimis harm" provision says long-recognized distinctions—like restrooms and showers—are generally permissible. But applied to someone who identifies as transgender, these same distinctions are unlawful discrimination. The Department of Education lacks authority to turn Title IX into a disparate-impact regime. And the agency has not acknowledged this is a change in position—that independently makes the Rule arbitrary and capricious. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

Elevating gender identity above sex undermines Title IX's statutory context and historical purpose. The new standard makes it harder for students, particularly women and girls, to "participat[e] in" or receive "the benefits of" educational programs. 20 U.S.C. § 1681(a). Statutory constructions should "serve, rather than frustrate, the statute's manifest purpose." *United States v. Fitzgerald*, 906 F.3d 437, 443 (6th Cir. 2018); *see John Hancock Mut. Life Ins. Co. v. Harris Tr. & Sav. Bank*, 510 U.S. 86, 94–95 (1993) (interpreting text consistent with statute's "object"); Scalia & Garner, *supra*, 63–65. The de-minimis-harm standard fails this test.

By elevating gender identity over Title IX's sex-based protections, the Rule leads to bizarre results. On the Department's logic, Congress meant to license widespread harm. Gov't.Br.15. It was content to allow "more than de minimis harm," 34 C.F.R. § 106.31(a)(2), in educational

"living facilities" across the country, 20 U.S.C. § 1686. And Congress supposedly cared more about distinguishing "Boy Scouts" from "Girl Scouts" than preserving student privacy in showers and locker rooms.

The Department has no explanation for § 106.31(a)(2)'s bizarre patchwork, opting instead to blame Congress (at 30). Rather than concluding Congress enacted an incoherent statute, courts should reject a reading that makes the statute incoherent. Scalia & Garner, *supra*, 180 (courts should prefer a reading that harmonizes the statutory scheme); John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2458–59 (2003). Courts should not "construe a statute to 'produce an absurd result that … Congress did not intend.'" *Fitzgerald*, 906 F.3d at 442 (cleaned up). For five decades, Title IX has recognized sex-specific spaces, but in the Department's view, they have been discrimination waiting to happen.

The Department accepts that "courts may not 'disregard [a statute's] plain terms based on some extratextual consideration.'" Gov't.Br.30 (quoting *Bostock*, 590 U.S. at 673–74). But its new de-minimis-harm standard violates that principle. The Rule uses this new ideological-driven standard to enforce its gender-identity mandate contrary to Title IX's text, history, and tradition. And the Rule's concept of de minimis harm picks and chooses which injuries matter, usurping Congress's regime, and inflicting new harms on women and girls in the process. The Court should reject the Department's rewritten Title IX.

**B.     The Rule infringes on constitutional rights.**

The Rule also forces schools to infringe individual constitutional rights. The Rule compels and restricts speech through vague and overbroad standards. And it does so based on content and viewpoint.

### 1.     The Rule is vague and overbroad.

A law is overbroad if it "reaches a substantial amount of constitutionally protected conduct" or threatens to chill First Amendment rights. *Fairchild v. Liberty Indep. Sch. Dist.*, 597 F.3d 747, 754–55 (5th Cir. 2010) (cleaned up). A law is too vague if it fails to "give[ ] the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008) (cleaned up).

The Rule is overbroad and vague for two reasons. First, § 106.10 expands the definition of "sex" to include subjective concepts like "gender identity" and "sex stereotypes." 89 Fed. Reg. at 33,886. It does not define "gender identity," except to say it "describe[s] an individual's sense of their gender." *Id.* at 33,809. Second, the Rule creates an amorphous, "broader standard" for hostile-environment claims. *Id.* at 33,498.

The Rule fails because it forces students and staff to speak inaccurate pronouns and to avoid saying sex is binary or immutable. It says "treating a person inconsistent with their gender identity" is discrimination. *E.g.* 89 Fed. Reg. at 33,803. This means failing to use

someone's chosen pronouns is discriminatory. So it's no wonder the Department says "misgendering" can be harassment. *Id.* at 33,516. Severe or not, pervasiveness is enough to trigger liability under the Rule. And pronoun use is pervasive given its ubiquity in conversation. *Id.* at 33,498. The Rule also praised punishing a student for wearing a t-shirt saying, "THERE ARE ONLY TWO GENDERS," because that speech "invades the rights of others." *Id.* at 33,504 (citing *L.M. v. Town of Middleborough*, 677 F. Supp. 3d 29 (D. Mass. 2023)). The school board would have to adopt these sorts of policies to comply with the Rule's new conditions or forego 10% of its budget.

The Department downplays these problems, saying the Rule made only a "handful of changes." Gov't.Br.34. It also says the new standard "mirrors" the one applicable to "Title VII," *id.* at 35, and doesn't force anyone to "affirm any particular view on any issue," *id.* at 36 (citation omitted). This ignores the Rule's major overhaul, which (1) changes Title IX's harassment standard contrary to law, (2) requires a broader standard that will inevitably censor and compel more speech, and (3) reasonably prompts fears reinforced by what the Department has said elsewhere, which will chill protected speech. *Davis*, 526 U.S. at 648–52.

*First*, the Rule changes Title IX's harassment standard contrary to law. It starts by disregarding *Davis*, which holds that under Title IX, actionable harassment must be "severe, pervasive, and objectively

offensive." 526 U.S. at 650. In 2020, the Department adopted *Davis* because the First Amendment demands a "narrowly tailored" harassment definition to avoid censoring protected speech. Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026, 30,142 (May 19, 2020); *accord id.* at 30,033 ("[T]he *Davis* definition of sexual harassment … helps ensure that Title IX is enforced consistent with the First Amendment."). Indeed, the Supreme Court in *Davis* warned against "impos[ing] more sweeping liability than" it "read Title IX to require." 526 U.S. at 652. The Rule's new standard is far lower.

The Department says *Davis* arose in the context of a "private" lawsuit, not an administrative suit. Gov't.Br.35 n.9. But the Court was interpreting "the same word in the same statute to address the same legal question: the meaning of 'discrimination' under Title IX." *Alabama*, 2024 WL 3981994, at *5. The statute's words don't change meaning based on the type of claim. *Loper Bright*, 144 S. Ct. at 2266 (statutes "have a single, best meaning").

The standard also restricts certain speech about gender identity— a matter "of profound value and concern to the public" that "merits special protection." *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 585 U.S. 878, 913–14 (2018) (cleaned up). Even "[p]ro-nouns … convey a powerful message implicating a sensitive topic of public concern." *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir.

2021); *Vlaming v. W. Point Sch. Bd.*, 895 S.E.2d 705, 740 (Va. 2023); *cf.*
*United States v. Varner*, 948 F.3d 250, 256 (5th Cir. 2020). As do
statements about what defines men and women and whether sex can be
chosen or changed.

Some may consider these statements offensive. But *Davis* gave
"very real limitations" to Title IX's definition of harassment. 526 U.S. at
652. It does not cover "teasing[,]" "name-calling," or isolated incidents.
*Id.* "[S]chools" are not the "workplace"; they require *more* expressive
freedom. *Id.* at 651–52. So the Sixth Circuit has held that a school
violates the First Amendment if it compels staff to use preferred
gender-identity-based pronouns. *Meriwether*, 992 F.3d at 511–12. The
Department's interest in such compulsion is "weak" compared to
teachers' and students' substantial interest in "remain[ing] free to
inquire, … to evaluate, [and] to gain new maturity and understanding."
*Id.* at 510 (citation omitted). The district court correctly reached the
same conclusion. ROA.2369–70.

*Second*, the Department says the Rule doesn't tell "students and
staff 'what they must say,'" it merely requires schools to "address sex-
based harassment." Gov't.Br.37 (citation omitted). That is nonsense. If
what a student wants to say is deemed "harassment" under the Rule,
the school must prohibit her from saying it to avoid violating the Rule's
conditions, so the Rule prohibits her from saying it. Given that the Rule
says "misgendering" can be harassment, 89 Fed. Reg. at 33,516, and

celebrates punishing students for saying there are two only genders, *id.* at 33,504, teachers and students have much to fear. Their speech must conform, or they risk investigation and discipline for sex-based harassment. The Department cannot avoid responsibility for violating First Amendment rights because schools are forced to do the dirty work.

*Third*, prior government statements validate such fears. In 2023, the government said employers violate Title VII when they allow employees to "misgender" co-workers. EEOC, *Proposed Enforcement Guidance on Harassment in the Workplace*, 88 Fed. Reg. 67,750 (Oct. 2, 2023), https://perma.cc/VY3Y-RCE8. The Rule incorporates this guidance into Title IX. 89 Fed. Reg. at 33,516. And the government says a school policy requiring teachers to use gender-neutral titles like "teacher" or "coach," but not gender-identity-based honorifics and pronouns, creates a hostile environment under Title VII. Statement of Interest of the U.S. of Am., *Wood v. Fla. Dep't of Educ.*, No. 4:23-cv-00526, 2024 WL 3380723 (N.D. Fla. June 27, 2024); *see also* Br. for U.S. as Amicus Curiae, *Kluge v. Brownsburg Cmty. Sch. Corp.*, No. 21-2475, 2021 WL 5405970 (7th Cir. Nov. 8, 2021) (similar). It's immaterial that these were Title VII cases; after all, the Department argues that the Rule "mirrors" Title VII's harassment standard. Gov't.Br.35; 89 Fed. Reg. at 33,500. And Title VII harassment liability can also "impose[ ] content-based, viewpoint-discriminatory restrictions on speech."

*DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 596–97 (5th Cir. 1995).

Because the Rule chills too much speech, it is unconstitutionally overbroad. *Alabama*, 2024 WL 3981994, at \*6. It is nearly identical to a policy the Eleventh Circuit struck down on that basis. *Id.* (citing *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1114–15 (11th Cir. 2022)). Such policies "restrict[ ] political advocacy and cover[ ] substantially more speech than the First Amendment permit[s]." *Id.* Pronoun use is ubiquitous; the Rule compels individuals to speak only one viewpoint; and it extends liability to conversations online and around the world. That restricts "substantially more speech" than allowed. *Id.*

The Rule is vague, too. It fails to explain what teachers and students can or can't say. For example, can athletes say it's unfair for males to compete in women's sports without having "some impact" on students who identify as transgender? Can girls object to having males in their locker rooms or P.E. classes? The Department won't say. The Rule's "imprecision exacerbates its chilling effect." *Speech First*, 32 F.4th at 1121, 1125. Worse, the Rule says failing to accommodate a person's gender identity automatically causes harm. That will deter reasonable people from expressing the view that sex is objectively determined and fixed. As would the Rule's express support of cases punishing students for speaking their minds. 89 Fed. Reg. at 33,504. This creates an "impermissible risk" that the Rule will suppress "ideas."

*Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 129–30 (1992); *accord Speech First, Inc. v. Schlissel*, 939 F.3d 756, 761 (6th Cir. 2019).

The Department's insistence that it will comply with the First Amendment can't save the Rule. 89 Fed. Reg. at 33,503; Gov't.Br.36. That is meaningless in practice. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 334 (5th Cir. 2020) (vacating and remanding denial of preliminary injunction in challenge to speech policy with savings clause); *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177, 1183 (6th Cir. 1995) (disregarding savings clause in harassment policy). Both the overbreadth and vagueness of the Rule violate the Constitution.

### 2. The Rule compels and restricts speech based on content and viewpoint as applied.

The Rule also compels and restricts speech based on viewpoint. Viewpoint discrimination is "an egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Schools may not forbid "the expression of an idea simply because" the Department believes the expression is "offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). But the Rule forces the school board to do just that by investigating for harassment when, for example, someone uses standard English pronouns, says that sex is immutable, or voices support for Louisiana's law reserving women's sports for females. The Rule allows teachers and students to

champion "one side of a debate," but not the other. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 392 (1992). The First Amendment forbids this. *Id.*

### C.   The Rule is arbitrary and capricious.

The Rule is also arbitrary and capricious for eight reasons.

*First*, the Rule's new definition of sex discrimination irrationally hinges on *Bostock* even though *Bostock* interpreted a different statute with different text covering a different context. § I.A.

*Second*, the Rule's new definition of sex discrimination applies irrationally. It allows biology-based standards for beauty pageants, girls and boys clubs, living facilities, and admissions, but not restrooms, showers, locker rooms, or physical-education classes where biological differences play at least an equal role. The Rule's distinction between living facilities versus locker rooms and overnight school trips is particularly irrational, especially considering the Department's recognition that its longstanding regulation regarding "toilet, locker room, and shower facilities" was promulgated under Title IX's "general nondiscrimination mandate." Gov't.Br.30.

*Third*, the Rule fails to accept its impact on sports—a key part of Title IX's purpose. While the Department insists that the Rule doesn't cover sports because 34 C.F.R. § 106.41(b) is exempt from the new form of discrimination created by § 106.31(a)(2), Gov't.Br.27 n.5, it inevitably does, *supra* at 6–7. Assuming the Department's position shows why the

Rule's logic cannot hold. Unless the Department accepts that § 1681(a) allows sex distinctions—regardless of gender identity and contrary to its position on *Bostock*—it may not allow a biology-based distinction for sports because *"there is [no] statutory basis for allowing" this.* Gov't.Br.30 (quoting 89 Fed. Reg. at 33,814). Under the Rule, such a distinction always causes more than de minimis harm. *E.g.*, 89 Fed. Reg. at 33,887. It is arbitrary and capricious to ignore what sports show about Title IX meaning by hiding "the existing regulation regarding sex-separate athletic teams" in "a separate rulemaking." Gov't.Br.7.

*Fourth*, the Rule is vague and fails to adequately explain the who, what, when, where, or why of how it applies in different contexts. For example, the Rule says the new definition of sex discrimination "applies with equal force to … nonbinary students," but fails to show "how a recipient must provide access to sex-separate facilities for students who do not identify as male or female." 89 Fed. Reg. at 33,818. The Rule does not even explain how *Bostock*'s "but-for test" can apply to students who identify as neither male nor female. *Bostock*, 590 U.S. at 656. And it ignores the difficulty of identifying an individual's "gender identity," which the Rule says is subjectively determined and can change.

*Fifth*, the Rule is internally inconsistent and incoherent. Consider restrooms. Though the Rule claims its protections apply equally to "transgender and nonbinary students," 89 Fed. Reg. at 33,807, it opens restrooms based on gender identity, but *not* for "nonbinary" students,

*id.* at 33,818. The Rule treats nonbinary students worse than others, discriminates against them based on gender identity, and inflicts legally cognizable harm on them.

*Sixth*, the Rule disregards the biological differences that justify certain sex distinctions, including the protection of bodily privacy interests. On the Department's read, the statute allows sex-specific "toilet, locker room, and shower facilities" to preserve bodily privacy but forbids such a distinction as applied to anyone who identifies as transgender, inflicting the very harm justifying the distinction. So Title IX protects women from being exposed to males—except when the male identifies as transgender. That's arbitrary.

There is a well-recognized right "to be free from forced exposure of one's person to strangers of the opposite sex." *Kent v. Johnson*, 821 F.2d 1220, 1226 (6th Cir. 1987); *see Horton*, 690 F.2d at 478. This right applies in intimate spaces like school restrooms, showers, and locker rooms where students appear in their "underwear." *Brannum*, 516 F.3d at 495; *see Doe v. Luzerne Cnty.*, 660 F.3d 169, 175–76 n.5 (3d Cir. 2011) (noting right to bodily privacy from persons of the opposite sex); *Adams*, 57 F.4th at 805 (collecting cases). And sex—not a subjective concept of gender identity—is the relevant trait for protecting that privacy interest. *Adams*, 57 F.4th at 806; *West v. Radtke*, 48 F.4th 836, 850 (7th Cir. 2022). Yet the Rule declares no one has a "legitimate" privacy-based objection to such exposure. 89 Fed. Reg. at 33,820.

The Rule would deprive girls of private places to change clothes, use the restroom, and shower after P.E. class. Indeed, the Rule extends its gender-identity mandate for locker rooms and restrooms to adults, including visitors on campus. 89 Fed. Reg. at 33,484, 33,882. And it's no help that the Rule allows a girl to request a single-user facility if she wants "additional privacy for any reason." Gov't.Br.31 (citation omitted). The Rule tells girls they are likely engaging in harassment if they object to undressing in front of a male who identifies as female. 89 Fed. Reg. at 33,820. Failure to meaningfully respond to commenters' objection concerning this constitutionally protected right is arbitrary and capricious. *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 246 (5th Cir. 2024) ("agencies must offer a reasoned explanation, rather than a mere summary discussion") (cleaned up).

*Seventh*, the Rule says sex discrimination includes discrimination based on sex stereotypes, even though "[r]ecognizing and respecting biological sex differences does not amount to stereotyping." *Skrmetti*, 83 F.4th at 486.

*Eighth*, the Rule fails to meaningfully respond to comments, particularly about sex-specific privacy concerns.

## III.   The school board will suffer irreparable harm under the Rule.

The Rule forces the school board to amend its policies and procedures at significant cost. Compliance would require many

amendments to existing policies and practices and time spent analyzing the Rule. ROA.2692–93. Compliance would consume resources on legal advice and would take many hours of Title IX coordinator and school-board member time as they consider and adopt new policies. ROA.2692–93. Training the school board's 3,200 employees would cost millions of dollars in educator time. ROA.2693. And the policies the Rule requires will force the school board to infringe on staff and students' constitutional rights—that too, is irreparable harm. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam).

There is no cause of action or waiver of sovereign immunity to recover compliance costs from the government. *See Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021); *Odebrecht Constr., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013). That makes these harms irreparable.

## IV. The public interest and balance of equities support preliminary relief.

The district court properly "balance[d] the harm that would be suffered by the public if the preliminary injunction were denied against the possible harm that would result to [the Department] if the injunction were granted." *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 626 (5th Cir. 1985).

Without preliminary relief, the school board would be forced to adopt the harmful and burdensome policies required by the Rule or give

up 10% of its budget that provides programs for the Parish's most underserved students. *Supra* at 8. That outweighs any harm to the federal government.

The Department says, "[e]very time the federal government 'is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" Gov't.Br.41–42 (quoting *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)). But *King* was discussing "a State." *King*, 567 U.S. at 1303 (citation omitted). An administrative agency isn't a State. Nor is the Department effectuating a duly enacted statute. It is an agency rewriting a statute contrary to law. There is no sovereign harm.

The Department also says an injunction injures its interest in "stamping out sex discrimination." Gov't.Br.42. Rule or not, Title IX continues to apply as it has for 50 years. The Rule redefines "sex discrimination" and harms women. Nothing justifies enforcing this change. The "public interest lies in correctly applying the law." *Ohio v. Becerra*, 87 F.4th 759, 783 (6th Cir. 2023). And on the Department's logic, the statute has always prohibited gender-identity discrimination anyway, Gov't.Br.21–22, so the Rule's new definition in § 106.10 does no work. Regardless, the balance of equities favors plaintiffs, not the Department. No one will be harmed if the Department is correct about what § 106.10 requires (though it's not), but the school board will imminently suffer harm if the Department is wrong (and it is).

**V.    The preliminary injunction was well within the district court's discretion.**

This Court should affirm the district court's injunction. While the Department says the injunction is overbroad because the Rule can be severed, Gov't.Br.42–47, this argument has been waived and should be rejected.

The Department forfeited the severability issue below, offering exactly two sentences on severance in its brief opposing preliminary relief. ROA.2153–54. And even when seeking a partial stay, the Department's brief did not explain how the Rule could function without *any* of its core provisions. ROA.2408–14. In a challenge to a 423-page regulation, the agency must do *something* to show the district court how an injunction could be narrowed. Indeed, under this Court's precedent, it does not suffice to request that preliminary relief pausing agency action be "narrowly tailored." *Texas v. E.P.A.*, 829 F.3d 405, 435 (5th Cir. 2016). The district court did not abuse its discretion by following this Court's lead. Because the severability point was inadequately briefed below, the Court should "decline[ ] to entertain" it now. *Ohio v. E.P.A.*, 144 S. Ct. 2040, 2057 (2024) (cleaned up).

Forfeiture aside, the Department still does not provide a "sufficient basis" to disturb the conclusion that the Rule's unlawful provisions "are intertwined with and affect other provisions." *Louisiana*, 144 S. Ct. at 2510. Even now, it has not "adequately identified which

particular provisions, if any, are sufficiently independent" to function without §§ 106.2, 106.10, and 106.31(a)(2). *Id.*

A district "court will not abuse its discretion if its temporary order is broader than final relief." *Louisiana*, 2024 WL 3452887, at \*2; *accord Roe v. Dep't of Def.*, 947 F.3d 207, 232–34 (4th Cir. 2020). The district court did not exceed its "wide latitude" in crafting preliminary relief. *Louisiana*, 2024 WL 3452887, at \*2 (citing *Trump v. Int'l Refugee Assistance Project*, 979 F.3d 319 (2017) (per curiam)). It prevents a partial rollout that would confuse and impose expensive compliance costs. *See* ROA.2512. It also respects the APA, which directs courts to delay "the effective date" of agency action to stop irreparable harm and "preserve" the status quo. 5 U.S.C. § 705. The Rule has one effective date and is one agency action; its provisions stick together.

# CONCLUSION

The Court should affirm the preliminary injunction.

Dated: September 19th, 2024

Respectfully submitted,

*s/Natalie D. Thompson*

Michael T. Johnson
JOHNSON, SIEBENEICHER &
   INGRAM
2757 Highway 28 East
Pineville, LA 71360
(318) 484-3911
mikejohnson@jslawfirm.com

John J. Bursch
Matthew S. Bowman
Natalie D. Thompson*
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(202) 393-8690
jbursch@ADFlegal.org
mbowman@ADFlegal.org
nthompson@ADFlegal.org

Jonathan A. Scruggs
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, AZ 85260
(480) 444-0020
jscruggs@ADFlegal.org

Julie Marie Blake
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jblake@ADFlegal.org

*Counsel for Appellee Rapides Parish
School Board*

***Practicing under the supervision of
D.C. bar members while bar
application is pending.***

## CERTIFICATE OF COMPLIANCE

This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32 because this brief contains 12,936 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in Word 365 using a proportionally spaced typeface, 14-point Century Schoolbook.


*s/ Natalie D. Thompson*
Natalie D. Thompson*
*Counsel for Appellee*
*Rapides Parish School Board*

## CERTIFICATE OF SERVICE

I hereby certify that on September 19th, 2024, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

*s/ Natalie D. Thompson*
Natalie D. Thompson*
*Counsel for Appellee*
*Rapides Parish School Board*